IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                       :

In re:                                  :        Chapter 11
                                                       :

TOISA LIMITED, *et al.*,             :        Case No. 17-XXXXX (XXX)
                                                       :

              Debtors.[1]         :        (Motion for Joint Administration
                                                       :        Pending)
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### DECLARATION OF ROBERT HENNEBRY PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2 AND IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Robert Hennebry, being duly sworn, hereby depose and state as follows:

1.      I am Chief Financial Officer of Debtor Toisa Limited ("Toisa" and, together with its affiliated debtors and debtors in possession, the "Debtors").

2.      I submit this declaration (the "Declaration") pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Bankruptcy Rules") and in support of the Debtors' (a) voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and (b) various motions and applications, filed concurrently herewith, including various "first day" motions (collectively, the "First Day Pleadings").  I am over the age of 18, competent to testify, and authorized to submit this Declaration in support of the Debtors' chapter 11 petitions and the First Day Pleadings described herein.

---

[1]    The Debtors are: The Debtors are:  Trade Prosperity, Inc.;  Toisa Limited;  United Courage, Inc.; Trade Vision, Inc.;  United Journey, Inc.;  United Kalavryta, Inc.;  Trade Sky, Inc.;  Trade Industrial Development Corporation;  United Honor, Inc.;  Trade Will, Inc.;  United Leadership Inc.;  United Seas, Inc.;  United Dynamic, Inc.;  United Emblem, Inc.;  United Ideal Inc.;  Trade Unity, Inc.;  Trade Quest, Inc.;  Trade Spirit, Inc.;  Trade Resource, Inc.;  United Ambassador, Inc.;  Edgewater Offshore Shipping, Ltd.;  United Banner, Inc.;  Toisa Horizon, Inc.;  and Trade and Transport Inc.

3.     I have served as Chief Financial Officer of Toisa since August 1997. Prior to joining Toisa, I served as Vice President of the CIT Group, The Chase Manhattan Bank, N.A. and the Manufacturers Hanover Trust Co.

4.     I am familiar with the Debtors' day-to-day operations, financial condition, business affairs, and books and records.  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of my team, the Debtors' management, including their management teams at their non-debtor management companies Sealion Shipping, Ltd. ("Sealion"), Marine Management Services M.C. ("MMS"), and Marine Management Bulker Services Inc. ("MMBS") or the Debtors' advisors, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtors' operations and financial condition.  If I were called to testify, I would testify competently to the facts set forth in this Declaration.

5.     This Declaration is divided into four parts.  Part I of this Declaration provides an overview of the Debtors' business and operations, including their corporate and capital structure.  Part II describes the circumstances leading to the commencement of these chapter 11 cases and the Debtors' restructuring plans.  Part III sets forth the relevant facts in support of each of the Debtors' First Day Pleadings.  Part IV provides the specific information required by Local Bankruptcy Rule 1007-2.

## PART I: THE DEBTORS' BUSINESSES AND OPERATIONS

### A.     The Chapter 11 Filings

6.     On the date hereof (the "Petition Date"), each of the Debtors filed voluntary petitions in this Court for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to manage and operate their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  The Debtors have

2

requested joint administration of these chapter 11 cases by motion filed concurrently herewith.  No trustee or examiner has been appointed in these cases.

**B.      Overview of the Debtors' Businesses and Operations**

7.      The Debtors are a viable diversified shipping business hauling both wet goods with their fleet of tankers and dry goods with their fleet of bulkers.  The Debtors also own a fleet of offshore oil support vessels that provide marine transportation, construction and support services to companies in the oil and gas industry that conduct offshore exploration, production, and subsea construction activities.  The Debtors have also serviced the subsea fiber optic cable installation market.  The Debtors current fleet consists of twenty-six (26) offshore oil service vessels, thirteen (13) tankers, and seven (7) bulkers.  A complete list of the Debtors fleet with specifications is attached as <u>Exhibit K</u>.  The Debtors have a technologically advanced offshore fleet and a modern dry cargo fleet and double hull tanker fleet.  The Debtors' vessels operate in locations throughout the world, including the North Sea, and offshore Brazil, offshore Mexico and the Far East.

8.      Toisa directly owns 23 of the Debtors' offshore support vessels. Additionally, three of the Debtors' offshore vessels (Toisa Independent, Toisa Pisces, and Sealion Amazonia) are wholly owned by separate, direct subsidiaries of Toisa, and three of the Debtors' tankers (United Dynamic, United Emblem and United Ideal) are wholly owned by separate, direct subsidiaries of Toisa.  Ten of the Debtors' tankers are wholly owned by separate, direct subsidiaries of Debtor Trade and Transport Inc. ("<u>T&T</u>").  The Debtors' seven bulkers are all wholly owned by separate, direct subsidiaries of T&T.  Gregory Callimanopulos, who has over fifty (50) years of experience in the maritime industry, is the ultimate beneficial owner of each of the Debtors.  Two of the Debtors' board members reside in New York City.

3

9.      As is common practice in the shipping industry, the Debtors have very few employees.  Rather they rely on three non-debtor ship managers to provide management services to the Debtors.  Sealion provides ship management services to the offshore fleet and MMS and MMBS provide ship management services to the tanker and bulker fleets.  As more fully described below, these management services companies oversee, manage, and exercise a degree of control over the operations of the Debtors' vessels.

10.      Sealion historically has arranged the employment of more than 1000 seastaff and employees and more than 80 people onshore.  Sealion is an accredited ISM (International Safety Management) ship management company and provides a full range of ship management functions including operating, technical, chartering, crewing, project management, safety, purchasing and logistics, and accounting services to the offshore fleet.  Additionally, Brokerage and Management Corporation ("BMC"), a New York corporation with offices at 40 Wall Street in New York City, is an agency of Toisa and provides advice and support to Sealion managed vessels.  Typically, Sealion will pay all invoices for these services to third-parties and then invoice Toisa or, where applicable, the specific vessel operating company for reimbursement.

11.      MMS and MMBS provide operating, technical, chartering, accounting, financial and legal support on behalf of the Debtors to facilitate their tanker and bulker operations.  Additionally Trade and Transport (UK) Ltd. ("T&T UK") is an agency of T&T and provides chartering, and sale and purchase support for the ships in the T&T fleet.  Further, BMC provides chartering, and sale and purchase support for MMS and MMBS managed vessels.  Typically expenses of the tanker and bulker vessels are paid by either MMS or MMBS, which in turn seek reimbursement from the vessel operating companies.  MMS and BMC provide such services making payments from an

4

MMS Citibank account located in New York City.  Charter receipts for the tankers and bulkers are also received by MMS and deposited on such vessels behalf in the MMS Citibank account in New York City.

*Offshore Fleet*

12.    The Debtors' offshore fleet consist of four (4) construction support vessels, one (1) well test service vessel, nine (9) remotely operated vehicle ("ROV") support vessels, and twelve (12) platform supply and anchor handling tug supply vessels ("PSV vessels" and "AHTS vessels," respectively).  The entire offshore fleet is equipped with dynamic positioning ("DP") technology that enables a vessel to maintain its position over the ocean floor without use of anchors, which is critical to the ability of the vessels to perform their functions in the deep sea locations they operate in, where use of anchors would be impractical.

13.    The Debtors' construction support vessels are equipped with large unobstructed deck areas, substantial accommodation capacity and subsea heavy lift crane capability, able to support surface and subsea construction and installation projects, and inspection, repair and maintenance ("IRM") programs.  Construction support vessels are designed to provide tailored solutions and facilitate larger projects that often require such vessels to remain on location for long periods of time.  The Debtors' construction support vessels range in length from 373 to 436 feet long.



Figure 1-Toisa Paladin Offshore Construction Vessel

14.    The Debtors' well test service vessel, Toisa Pisces, is a highly specialized type of DP vessel – designed and built to receive, process, store and offload hydrocarbons and other products, from drilling rigs or clean-up operations.



Figure 2-Toisa Pisces - Well Testing Vessel

15.    The Debtors' ROV Support Vessels are DP vessels from which ROV (Remote Operating Vehicle) operations are conducted.  ROV Support Vessels are equipped with computer-controlled, precision, position-keeping capabilities with added redundancy features, such as multiple computers, thrusters and reference systems.  Such vessels have additional cabins, mess room facilities and customer offices, to comfortably accommodate the ROV support crews of the Debtors' customers.



Figure 3-Toisa Warrior ROV Vessel

16.    The Debtors' PSV vessels are specially designed to carry a diverse range of equipment, cargoes and personnel to offshore drilling rigs and platform.  Modern PSVs now incorporate dynamic positioning systems as standard, have substantial available deck areas, and the capability underdeck to transport and discharge offshore, oil and water-based muds, brine, fuel, dry bulk cargoes, drill water and potable water.  The Debtors' AHTS vessels are designed for towing and/or anchor handling.  AHTS vessels are predominantly employed in the movement of rigs and

platforms, and for the handling and laying of their anchors.  These vessels also have supply duty capabilities.



<span style="color:blue">**Figure 4-Toisa Dauntless AHTS Vessel**</span>

17.    Due to the downturn in the oil market, a number of the Debtors' offshore vessels are currently being held in cold lay-up to reduce costs and maintain the assets and preserve value pending the oil market's return.



*Tankers*

18.    The Debtors' thirteen tankers consist of five (5) Suezmax tankers, five (5) Aframax tankers, and three (3) Panamax tankers.  The Debtors' Suezmax tankers can carry approximately 160,000

<span style="color:blue">**Figure 5 - Tanker United Journey (formerly Gan Dignity)**</span>

8

deadweight tons ("DWT"), their Panamax tankers carry 73,584 DWT, and their Aframax Tankers approximately 112,000 DWT. The tanker business has historically been a strong segment for the Debtors, and after a brief downturn in late summer 2016 has recently returned to moderate profitability. The Debtors operate one of the youngest tanker fleets for an operator of their size with the entire fleet less than twelve years old.

*Bulkers*



19.      The Debtors' seven (7) bulkers are all Kamsarmax bulkers capable of carrying approximately 81,000 tons of dry cargo in seven holds/hatches. The Debtors' bulker fleet is very young with all of the bulkers built since 2011.

**Figure 6 - Bulker Trade Vision (formerly Nord Aquarius)**

*New Builds*

20.      The Debtors have entered into a number of contracts for new builds that will augment the collective enterprise's fleet. Specifically, T&T has six tankers on order and under construction; and Toisa has (i) one DSV vessel, and (ii) two ROV Support Vessels on order and under construction. On April 28, 2016, Toisa cancelled a shipbuilding contract with Hyundai Heavy Industries Co., Ltd. ("HHI") for the construction of an Offshore Construction Vessel (Hull No. 2649(P139)) due to late delivery by HHI. The Debtors may be entitled to refunds of approximately $90 million from HHI on account of this late delivery. The matter is currently in arbitration. Further information about the related arbitration can be found on the attached Exhibit J, which lists all of the Debtors' currently pending litigation matters.

*Recent Operations*

21.     The Debtors' tankers generated the majority of the revenue and the profits for the company in the first three quarters of 2016.  The Debtors' tanker segment experienced a firm market for the first half of 2016.  However, weakness began to develop in the third quarter of 2016 and the tanker market fell sharply in August 2016.

22.     The offshore vessels operated in a depressed market in 2016 as demand continued to fall and more of Toisa's offshore vessels were put into layup.  With the price of oil below $50 for much of 2016, demand for offshore vessels was very limited.  Rather than operate offshore vessels at a loss, Toisa placed many of its offshore vessels into layup.

23.     The Debtors' seven bulk carriers operated in a weak dry goods market that produced negative returns for the first three quarters of 2016.

## C.     Corporate Organization and Capital Structure

24.     A corporate organization chart is attached as Exhibit A hereto.  As noted above, Toisa is an operating company that directly owns 23 offshore vessels and is the ultimate parent of each of the Debtors in these chapter 11 cases.  Toisa's registered office is at Clarendon House, 2 Church Street, Hamilton, Bermuda.

25.     In addition to owning 23 vessels, Toisa directly owns six Debtors, each of which owns a single vessel (three offshore vessels and three tankers).  Toisa also owns the Debtor holding company, T&T, which directly owns 17 Debtors, each of which owns a single vessel (ten tankers and seven bulkers).  The Debtors' capital structure is organized into 17 separate groups or "silos" that reflect obligations to separate lenders under separate loan facilities secured by various built vessels, as well as two separate silos related to the financing of the new builds and a Gulfstream Aerospace GV-SP G550 airplane.  Each of these silos and the related secured debt

10

facilities are described below.  The Debtors' lenders are located throughout the world; the majority of which are either headquartered or have substantial offices in New York City.

I.    Off-Shore Silos

    (a)    Silo 1 – "BNDES Silo"

26.    BNDES Credit Facility.  Non-debtor Sealion Do Brazil Navegacao LTDA ("Sealion Do Brazil") is a borrower under that certain senior secured credit facility, dated as of May 28, 2003, utilized to finance the vessel *Sealion Amazonia* (the "BNDES Credit Facility").  The BNDES Credit Facility has a term of twenty (20) years with a rate of five percent (5%).  The unpaid principal balance of the BNDES Credit Facility is approximately $8,407,000.  Sealion Do Brazil's obligations under the BNDES Credit Facility are secured by a lien on the vessel, including the assignment of charters and insurances.  The lender under the BNDES Credit Facility is Banco Nacional de Desenvolvimento Economico e Social ("BNDES").  Toisa is a party to a guarantee dated as of May 28, 2003 pursuant to which it undertook to guarantee the non-Debtor's obligations in connection with the BNDES Credit Facility.

    (b)    Silo 2 – "BNP Silo"

27.    BNP Credit Facility.  Toisa is a borrower under that certain senior secured credit facility, dated as of March 11, 2008, utilized to finance the vessels named *Toisa Pegasus* and *Toisa Paladin* (the "BNP Credit Facility").  The BNP Credit Facility has a term of twelve (12) years from the drawdown date and has a rate of Libor + 150 bps. The unpaid principal balance of the BNP Credit Facility is approximately $78,869,045. Toisa's obligations under the BNP Credit Facility are secured by first priority liens on the vessels, including the assignment of earnings and insurances.  The lenders under the BNP Credit Facility are BNP Paribas ("BNP"), Unicredit Bank AG ("Unicredit") and

Commerzbank AG ("Commerzbank"), who are the successors to the original lenders. BNP is the swap bank, agent and security trustee.

>        (c)     Silo 3 – "Commonwealth Bank of Australia Silo"

> 28.     Commonwealth Bank of Australia Credit Facility. Toisa is a

borrower under that certain senior secured credit facility, dated as of February 21, 2014, utilized to finance the vessel named *Toisa Solitare* (the "Commonwealth Bank of Australia Credit Facility").  The Commonwealth Bank of Australia Credit Facility has term of seven (7) years and rate of Libor + 2.35%.  The unpaid principal balance of the Commonwealth Bank of Australia Credit Facility is approximately $22,750,000.  Toisa's obligations under the Commonwealth Bank of Australia Credit Facility are secured by a lien on the vessel *Toisa Solitare*, including the assignment of charters and insurances.  In addition, the vessel named *Toisa Warrior* was added as additional collateral at a later date via an intercreditor agreement with ING and the Commonwealth Bank of Australia.  The Commonwealth Bank of Australia is the agent, security trustee, and lender under the Commonwealth Bank of Australia Credit Facility

>        (d)     Silo 4 – "Citi Offshore Silo"

> 29.     Citi Offshore Credit Facility. Toisa is a borrower under that certain

senior secured credit facility, dated as of December 30, 2009, utilized to finance the vessels named *Toisa Envoy, Toisa Explorer, Toisa Elan*, and *Toisa Wave* (the "The Citi Offshore Credit Facility").  The Citi Offshore Credit Facility has a term of ten (10) years with a rate of Libor + 3%.  The unpaid principal balance on the Citi Offshore Credit Facility is approximately $99,493,000.  Toisa's obligations under the Citi Offshore Credit Facility are secured by liens on the vessels, including assignment of insurance and charters.  The lenders under the Citi Offshore Credit Facility are Citibank N.A.  ("Citi"), the Export-Import Bank of China ("Cexim") and ING Bank N.V. ("ING"), who joined the

Citi Offshore Credit Facility after it signed a transfer certificate taking half of Citi's previous 30% share of the facility.  Citibank Europe PLC is agent and Citi is security trustee.

(e)    Silo 5 – "Citizens Silo"

30.    Citizens I Credit Facility. Edgewater Offshore Shipping, LTD. ("Edgewater") is a borrower under that certain senior secured credit facility, dated as of July 28, 2010, utilized to finance the vessel named *Toisa Independent* (the "Citizens I Credit Facility").  The Citizens I Credit Facility has a term of seven (7) years and rate of Libor + 2.5%.  The unpaid principal balance on the Citizens I Credit Facility is approximately $12,260,000.  Edgewater's obligations under the Citizens I Credit Facility are secured by a lien on the vessel, including assignment of insurance and charters.  The lender under the Citizens I Credit Facility is Citizens Bank NA ("Citizens").  Toisa is a party to a guarantee dated as of July 28, 2010 pursuant to which it undertook to guarantee the Edgewater's obligations in connection with the Citizens I Credit Facility. Related to the Citizens I Credit Facility, on January 13, 2017, Edgewater extended a loan in the principal amount of $14,664,613.73 to Toisa (the "Edgewater Loan").  The Edgewater Loan had a term of one (1) month (renewable on a month-to-month basis), and Toisa agreed to place the principal in an interest bearing account with the sum becoming due upon maturity.

31.    Citizens II Credit Facility.  Toisa is a borrower under that certain senior secured credit facility, dated as of July 28, 2010, utilized to finance the vessel named *Toisa Coral* (the "Citizens II Credit Facility").  The Citizens Credit II Facility has a term of seven (7) years and rate of Libor + 2.5%.  The unpaid principal balance on the Citizens II Credit Facility is approximately $7,315,148.  Toisa's obligations under the

Citizens II Credit Facility are secured by a lien on the vessel, including assignment of insurance and charters.  The lender under the Citizens II Credit Facility is Citizens.

       (f)     <u>Silo 6 – "Credit Agricole Offshore Silo"</u>

       32.    <u>Credit Agricole Offshore Credit Facility</u>. Toisa is a borrower under that certain senior secured credit facility, dated as of September 21, 2007, utilized to finance the vessels named *Toisa Valiant*, *Toisa Vigilant*, and *Toisa Voyager* (the "<u>Credit Agricole Offshore Credit Facility</u>").  The Credit Agricole Offshore Credit Facility has a term of twelve (12) years from the drawdown date and a rate of Libor + 0.65 %.  The unpaid principal balance on the Credit Agricole Offshore Credit Facility is approximately $47,400,000.  Toisa's obligations under the Credit Agricole Offshore Credit Facility are secured by liens on the vessels, including assignment of insurance and charters. The lender under the Credit Agricole Offshore Credit Facility is Credit Agricole Corporate and Investment Bank ("<u>Credit Agricole</u>"), formerly known as Calyon.

       (g)     <u>Silo 7 – "DNB Offshore Silo"</u>

       33.    <u>DNB Offshore Credit Facility</u>. Toisa is a borrower under that certain senior secured credit facility, dated as of December 16, 2014, utilized to finance the purchase of vessels named *Toisa Proteus*, *Toisa Intrepid*, and *Toisa Conqueror* (the "<u>DNB Offshore Credit Facility</u>").  The DNB Offshore Credit Facility has a term of five (5) years and a rate of Libor + 2.25 %.  The unpaid principal balance on the DNB Offshore Credit Facility is approximately $58,411,354.  Toisa's obligations under the DNB Offshore Credit Facility are secured by liens on the vessels, including assignment of insurance and charters. The lenders under the DNB Offshore Credit Facility are DNB Bank ASA ("<u>DNB</u>") and UniCredit Bank AG ("<u>UniCredit</u>").  DNB is the agent and security trustee.

      (h)      Silo 8 – "DVB Silo"

      34.      DVB Credit Facility. Toisa is a borrower under that certain senior secured credit facility, dated as of December 19, 2014, utilized to partially finance the the vessels named *Toisa Pisces* and *Toisa Perseus* (the "DVB Credit Facility"). The DVB Credit Facility has a term of five (5) years and a rate of Libor + 2.15 %. The unpaid principal balance on the DVB Credit Facility is approximately $73,978,000. Toisa's obligations under the DVB Credit Facility are secured by liens on the vessels, including assignment of insurance and charters. The lender under the DVB Credit Facility is DVB Bank of America N.V. ("DVB"). DVB is the agent and security trustee. Toisa Horizon Inc. is party to a guarantee dated December 19, 2014 pursuant to which it undertook to guarantee Toisa's obligations in connection with the DVB Credit Facility.

      (i)      Silo 9 – "ING Offshore Silo"

      35.      ING Offshore Credit Facility. Toisa is a borrower under that certain senior secured credit facility, dated as of February 21, 2014, utilized to finance the purchase of the vessels named *Toisa Serenade* and *Toisa Sonata* (the "ING Offshore Credit Facility"). The ING Offshore Credit Facility has a seven (7) year term and a rate of Libor + 2.3%. The unpaid principal balance on the ING Offshore Credit Facility is approximately $42,316,000. Toisa's obligations under the ING Offshore Credit Facility are secured by liens on the vessels, including assignment of insurance and charters. In addition, via a letter dated June 22, 2016 and an intercreditor agreement also dated June 22, 2016, the vessel named *Toisa Warrior* was added as additional collateral. The lender under the ING Offshore Credit Facility is ING Bank N.V. ("ING"). ING is the agent and security trustee.

(j)      Silo 10 – "Wells Fargo Silo"

36.     Wells Fargo Credit Facility. Toisa is a borrower under that certain senior secured credit facility, dated as of July 28, 2010, utilized to finance the purchase of the vessel named *Toisa Crest* (the "Wells Fargo Credit Facility"). The Wells Fargo Credit Facility has a term of seven (7) years from the drawdown date and a rate of Libor + 2.5%. The unpaid principal balance on the Wells Fargo Credit Facility is approximately $6,756,000. Toisa's obligations under the Wells Fargo Credit Facility are secured by a lien on the vessel, including assignment of insurance and charters. The lender under the Wells Fargo Credit Facility is Wells Fargo Equipment Finance Inc. ("Wells Fargo"), who is the successor to the original lender.

II.     Tanker and Bulker Silos

(k)      Silo 11 – "Citi Tanker Silo"

37.     Citi Tanker Credit Facility. Debtors United Journey Inc. and United Seas Inc. (collectively, the "UJ-US Debtors") are borrowers under that certain senior secured credit facility, dated as of January 26, 2015, utilized to finance the vessels *United Journey* and *United Seas* (the "Citi Tanker Credit Facility "). The Citi Tanker Credit Facility has a term of five (5) years and a rate of Libor + 2%. The unpaid principal balance of the Citi Tanker Credit Facility is approximately $46,094,548. The UJ-US Debtors' obligations under the Citi Tanker Credit Facility are secured by liens on the vessels, including assignments of insurance and charters. Citi is the lender under the Citi Tanker Credit Facility. Toisa is a party to a guarantee dated as of January 26, 2015 pursuant to which it undertook to guarantee the UJ-US Debtors' obligations in connection with the Citi Tanker Credit Facility. As discussed is greater detail below, Citi caused the tanker United Journey to be arrested of the coast off St. Eustatius on or about Christmas Eve 2016.

16

(l)      Silo 12 – "Commerzbank Silo"

38.     Commerzbank I Credit Facility. Debtors United Banner, Inc.,

United Carrier, Inc., and United Ambassador, Inc. (the "UB-UC-UA Debtors") are

borrowers under that certain senior secured credit facility, dated as of June 13, 2007,

utilized to finance the vessels named *United Banner, United Courage*, and *United*

*Ambassador* (the "Commerzbank I Credit Facility"). The Commerzbank I Credit Facility

has a term of ten (10) years and a rate of Libor + 1%.  The unpaid principal balance on

the Commerzbank I Credit Facility is approximately $53,237,261.48.  The UB-UC-UA

Debtors' obligations under the Commerzbank I Credit Facility are secured by liens on

the vessels, including assignment of insurance and charters.  The lenders under the

Commerzbank I Credit Facility are Commerzbank AG and Unicredit AG.  T&T and

Toisa are parties to two separate guarantees dated as of June 13, 2007 and February 13,

2013 respectively, pursuant to which they undertook to guarantee the UB-UC-UA

Debtors' obligations in connection with the Commerzbank I Credit Facility.

39.     Commerzbank II Credit Facility. Debtor United Honor, Inc. (the

"UH Debtor") is a borrower under that certain senior secured credit facility, dated as of

March 3, 2010, utilized to finance the vessel named *United Honor* (the "Commerzbank II

Credit Facility").  The Commerzbank II Credit Facility has a term of ten (10) years and a

rate of Libor + 2.5%.  The unpaid principal balance on the Commerzbank II Credit

Facility is approximately $25,609,035.46.  The UH Debtor's obligations under the

Commerzbank II Credit Facility are secured by a lien on the vessel, including

assignment of insurance and charters.  The lender under the Commerzbank II Credit

Facility is Commerzbank [FKA Deutsche Schiffsbank AG].  T&T is a party to a

guarantee dated as of March 3, 2010, pursuant to which it undertook to guarantee the

UH Debtor's obligations in connection with the Commerzbank II Credit Facility.  Toisa

is also a party to a guarantee dated October 24, 2014 pursuant to which it undertook to guarantee the UH Debtor's obligations in connection with the Commerzbank II Credit Facility.

(m)    Silo 13 – "Credit Agricole Tanker Silo"

40.    <u>Credit Agricole Tanker Credit Facility</u>. Debtor Trade Industrial Development Corporation (the "<u>UG Debtor</u>") is a borrower under that certain senior secured credit facility, dated as of November 7, 2008, utilized to finance the purchase of the vessel named *United Grace* (the "<u>Credit Agricole Tanker Credit Facility</u>").  The Credit Agricole Offshore Credit Facility has a term of twelve (12) years and a rate of Libor + 1.0%.  The unpaid principal balance on the Credit Agricole Offshore Credit Facility is approximately $25,976,000.  The UG Debtor's obligations under the Credit Agricole Tanker Credit Facility are secured by a lien on the vessel, including assignment of insurance and charters. The lender under the Credit Agricole Tanker Credit Facility is Credit Agricole Corporate and Investment Bank ("<u>Credit Agricole</u>"), who is the successor to the original lender.  T&T is a party to a guarantee dated as of November 7, 2008, pursuant to which it undertook to guarantee the UG Debtor's obligations in connection with the Credit Agricole Tanker Credit Facility.

(n)    Silo 14 – "DNB Tanker Silo"

41.    <u>DNB Tanker Credit Facility</u>.  Debtors United Dynamic, Inc., United Emblem, Inc., and United Ideal, Inc. (the "<u>Toisa Tanker Debtors</u>") are borrowers under that certain senior secured credit facility, dated as of September 20, 2010, utilized to finance the vessels named *United Emblem*, *United Dynamic*, and *United Ideal* (the "<u>DNB Tanker Credit Facility</u>").  On August 30, 2012 *Toisa Invincible* was added as collateral and gave a first preferred mortgage via a supplemental agreement.  The DNB Tanker Credit Facility has a term of ten (10) years and a rate of Libor + 0.90% - 0.65%

18

depending on the interest coverage ratio. The unpaid principal balance on the DNB Tanker Credit Facility is approximately $110,703,990. The Debtor's obligations under the DNB Tanker Credit Facility are secured by liens on the vessels, including assignment of insurance and charters. The lenders under the DNB Offshore Credit Facility are DNB Bank ASA ("DNB"), Royal Bank of Scotland PLC ("RBS"), and HSH Nordbank AG ("HSH"). DNB is the agent and security trustee. Toisa is a party to a guarantee dated as of September 20, 2010, pursuant to which it undertook to guarantee the Toisa Tanker Debtors' obligations in connection with the DNB Tanker Credit Facility

(o)    Silo 15 – "ING Bulker Silo"

42.    ING Bulker Credit Facility. Trade Unity Inc., Trade Resource Inc., Trade Prosperity Inc., Trade Quest Inc., and Trade Spirit Inc. (the "Five SPC Debtors") are borrowers under that certain senior secured credit facility, dated as of May 7, 2015, utilized to finance the vessels named *Trade Quest*, *Trade Spirit*, *Trade Unity*, *Trade Prosperity*, and *Trade Resource* (the "ING Bulker Credit Facility"). The ING Bulker Credit Facility has a term of seven (7) years and a rate of Libor + 1.9%. The unpaid principal balance on the ING Bulker Credit Facility is approximately $72,276,921. Toisa's obligations under the ING Bulker Credit Facility are secured by liens on the vessels, including assignment of insurance and charters. The lender under the ING Bulker Credit Facility is ING Bank N.V. ("ING"). ING is the agent and security trustee. Toisa is a party to a guarantee dated as of May 7, 2015, pursuant to which it undertook to guarantee the Five SPC Debtors' obligations in connection with the ING Bulker Credit Facility.

(p)      Silo 16 – "NBG Silo"

43.     <u>NBG Credit Facility.</u>  Debtor Trade Sky Inc. is a borrower under

that certain senior secured credit facility, dated as of November 13, 2008, utilized to

finance the purchase of vessel named *United Fortitude* (the "<u>NBG Credit Facility</u>").  The

NBG Credit Facility has a term of ten (10) years and a rate of Libor + 1%.  The unpaid

principal balance on the NBG Credit Facility is approximately $29,925,000.  Toisa's

obligations under the NBG Credit Facility are secured by a lien on the vessel, including

assignment of insurance and charters. The lender under the NBG Credit Facility is

National Bank of Greece S.A. ("<u>NBG</u>").  T&T is a party to a guarantee dated as of

November 12, 2008 pursuant to which it undertook to guarantee Toisa's obligations in

connection with the NBG Credit Facility.

(q)      Silo 17 – "Danish Ship Finance Silo"

44.     <u>Danish Ship Offshore Credit Facility.</u> Toisa is a borrower under that

certain senior secured credit facility, dated as of November 11, 2014, utilized to finance

the vessels named *Toisa Defiant*, *Toisa Daring*, and *Toisa Dauntless* (the "<u>Danish Ship</u>

<u>Offshore Credit Facility</u>").  The Danish Ship Finance Offshore Credit Facility has a term

of seven (7) years and a rate of Libor + 1.90 %.  The unpaid principal balance on the

Danish Ship Offshore Credit Facility is approximately $64,643,000.  Toisa's obligations

under the Danish Ship Offshore Credit Facility are secured by liens on the vessels,

including assignment of insurance and charters.  In addition, the vessel named *United*

*Leadership* was added as additional collateral on April 28, 2016.  The lender under the

Danish Ship Offshore Credit Facility is Danish Ship Finance A/S. Danish Ship Finance

A/S is the agent and security trustee.  United Leadership, Inc. is a party to a guarantee

dated as of April 28, 2016, pursuant to which it undertook to guarantee the Debtors'

obligations in connection with the Danish Ship Offshore Credit Facility.

20

45.  <u>Danish Ship Tanker Credit Facility</u>. Debtors United Leadership, Inc. and United Kalavryta Inc. (the "<u>UL-UK Debtors</u>") are borrowers under that certain senior secured credit facility, dated as of February 28, 2014, utilized to finance the purchase of the vessels named *United Leadership* and *United Kalavryta* (the "<u>Danish Ship Tanker Credit Facility</u>").  The Danish Ship Tanker Credit Facility has a term of seven 7 years with a rate of Libor + 1.8%.  The unpaid principal balance on the Danish Ship Tanker Credit Facility is approximately $35,286,000.  The UL-UK Debtors' obligations under the Danish Ship Tanker Credit Facility are secured by liens on the vessels, including assignment of insurance and charters. The lender under the Danish Ship Tanker Credit Facility is Danish Ship Finance A/S.  Danish Ship Finance A/S is the agent and security trustee.  Toisa is a party to a guarantee dated as of March 4, 2014, pursuant to which it undertook to guarantee the UL-UK Debtors' obligations in connection with the Danish Ship Tanker Credit Facility.

46.  <u>Danish Ship Bulker Credit Facility</u>. Debtors Trade Vision, Inc. and Trade Will Inc. (the "<u>TV-TW Debtors</u>") are borrowers under that certain senior secured credit facility, dated as of March 22, 2013, utilized to finance the purchase of the vessels named *Trade Vision* and *Trade Will* (the "<u>Danish Ship Bulker Credit Facility</u>").  The Danish Ship Finance Bulker Credit Facility has a term four (4) years and nine (9) months and a rate of Libor + 2.95%.  The unpaid principal balance on the Danish Ship Bulker Credit Facility is approximately $22,000,000.  The TV-TW Debtors' obligations under the Danish Ship Bulker Credit Facility are secured by liens on the vessels, including assignment of insurance and charters. The lender under the Danish Ship Tanker Credit Facility is Danish Ship Finance A/S. Danish Ship Finance A/S is the agent and security trustee.  Toisa is a party to a guarantee dated as of March 27, 2013, pursuant to which it

undertook to guarantee the TV-TW Debtors' obligations in connection with the Danish
Ship Bulker Credit Facility.

III.   New Builds Silo

   (r)   "New Builds Related Silo"

   47.   Citi Newbuilding Tanker Credit Facility.  Toisa is a borrower under
that certain senior secured credit facility, dated as of June 14, 2016, utilized to finance
the construction of a total of six (6) vessels: three (3) Aframax tankers and (3) Suezmax
tankers (the "Citi Newbuilding Tanker Credit Facility").  The Citi Newbuilding Tanker
Credit Facility has a term of seven (7) years post-delivery or up to 9.5 years from
signing, and a rate of Libor + 1.95% for the Citi tranche and Libor +4.35% of the Cexim
tranche.  The unpaid principal balance on the Citi Newbuilding Tanker Facility is
approximately $24,034,500.  Toisa's obligations under the Citi Newbuilding Tanker
Credit Facility are secured by an assignment of the shipbuilding contract and refund
guarantees and will be secured by liens on the vessels when delivered, including
assignment of insurance and charters. The lenders under the Citi Newbuilding Credit
Tanker Facility are Citi and Cexim.  Citi Europe PLC is agent and security trustee.  T&T
and certain of its subsidiaries are parties to a guarantee dated as of June 14, 2016,
pursuant to which they undertook to guarantee the Toisa obligations in connection with
the Citi Newbuilding Credit Tanker Facility.

IV.   Additional Non-Vessel Related Silos

   (s)   "Airplane Silo"

   48.   G550 Airplane Credit Facility.  A Gulfstream Aerospace GV-SP
G550 (the "G550 Airplane") is held in trust on behalf of Toisa.  Non-Debtor Bank of
Utah, as owner trustee and registered owner, ("BoU") is a borrower under that certain
senior secured credit facility, dated as of June 16, 2015, utilized to finance the

acquisition the G550 Airplane (the "G550 Airplane Credit Facility").  The G550 Airplane

Credit Facility has a term of eight (8) years and a rate of Libor + 1.95%.  The unpaid

principal balance on the G550 Airplane Credit Facility is approximately $18,210,309.

BoU's obligations under the G550 Airplane Credit Facility are secured by a lien on the

G550 Airplane, including assignment of insurance. The lender under the G550 Airplane

Credit Facility is Citizens Asset Finance, Inc.  Toisa is a party to a guarantee pursuant to

which it undertook to guarantee the BoU's obligations in connection with the G550

Airplane Credit Facility.

## PART II: EVENTS LEADING TO THE CHAPTER 11 CASES

49.    Starting in the summer of 2014, oil prices began to decline

precipitously.  In only six months, the price of oil was cut in half.  This wholly

unexpected and unprecedented decline in oil prices, and the resulting decrease in

capital expenditure by oil exploration and production ("E&P") companies, led to a

significant reduction in demand for the Debtors' offshore supply vessels.  Over the past

18 months, the Debtors' utilization rate for its offshore supply vessels has dropped from

85% in 2014 to well below 50% as of the Petition Date, and the Debtors have, at times,

been forced to accept rates below certain vessel's operating expenses to maintain

customer relationships and goodwill.

50.    Owing to their strong liquidity position at the onset of the decline

in oil prices, continued strong earnings from their tanker fleet, and relatively moderate

leverage position, the Debtors were able to weather these adverse market conditions

longer than many of their competitors and other companies involved in the offshore oil

and gas sector.  The Debtors are a diversified enterprise with vessels operating in three

distinct sectors:  offshore, wet (tankers) and dry (bulkers).  As the shipping and offshore

markets have cyclical risk, a diversified fleet softened some of the impact of the depressed oil market.

51.     As early as 2015, the Debtors' also undertook an aggressive costs savings program including, reducing yearly OPEX expenditures by $40 million and cancelling a new shipbuilding contract due to late delivery.  This plan, which continued in 2016, included laying up 21 vessels, on and offshore staff reductions of 52 and 730 employees respectively, closing their offices in Singapore and Aberdeen, negotiating reductions in crew wages and reducing supplier costs.

52.     Despite these measures, the Debtors and their advisors anticipate that utilization and day rates for offshore support vessels will remain under pressure through the end of 2017 and then begin to improve as oil prices increase in 2018 and continue to climb through 2020.  Due to the prolonged duration of the slump in oil prices as well as the sudden material decline in tanker rates during late summer of 2016, the Debtors' began to experience significant cash flow pressure and projected that continued repayment of principle as scheduled would result in cash being exhausted by the middle of 2017.

53.     In the fall of 2016, the Debtors began to engage with their lender group to negotiate a standstill agreement, which would allow time for a consensual workout to be agreed.  A standstill would allow the Debtors to preserve sufficient liquidity to weather the persistent weak market conditions (in the offshore and drybulk markets), which at the time the Debtors were facing for the foreseeable future due to low oil prices and oversupply of oceangoing vessels.  The Debtors also hired financial advisors in the late fall of 2016.  Although many of the Debtors' lenders appeared to be receptive to entering a standstill agreement, others were not.  During the above period, the Company did not make principal payments to certain of its lenders due in

24

September 2016 and has not made them since (aggregating approximately $49 million through December 31, 2016).

54.    On or about December 12, 2016, Citi issued an Acceleration and Demand Notice.   Shortly thereafter, on or about December 24, 2016 Citi caused the Debtors' tanker United Journey to be arrested in St. Eustatius in the Caribbean Netherlands.[2]  It is my understanding that the ship mortgage cannot be enforced in St. Eustatius without a court first ruling on the monetary claims.  It is my further understanding that as of the Petition Date, no case on the merits has been commenced in St. Eustatius or the United Kingdom.

55.    Since Citi caused United Journey to be arrested, several of the Debtors' other lenders (including, among others, DNB Bank ASA, BNP Paribas SA, Danish Ship Finance A/S and Commonwealth Bank of Australia) have issued similar acceleration and demand notices but have not arrested any vessels, but have taken certain other enforcement actions.

56.    The Debtors met with a group of their lenders in London on January 12, 2017 and committed to work toward a consensual resolution.  For those discussions to succeed, it was important to obtain a stay of further enforcement actions. With the protections afforded by chapter 11 of the Bankruptcy Code, it is hoped that those discussions will result in agreements, and, then, the Debtors will file a chapter 11 plan to implement the agreements.  These cases will streamline that process, and provide a single forum for those conversations to succeed.

---

[2]    As a result of the arrest of United Journey, the Debtors have incurred losses and expenses in the approximate amount of $735,000.  This figure is merely an estimate, as many components of the Debtors' losses and expenses are continuously incurred while the United Journey remains under arrest.

## PART III: FIRST DAY PLEADINGS AND ORDERS

57.     Concurrently with the commencement of these chapter 11 cases, the Debtors have filed the following pleadings and, at the "first day" hearing, will seek orders approving the First Day Pleadings and associated proposed orders (collectively, the "First Day Orders"), each as listed on the attached Exhibit B, and respectfully request that the Court consider entering the proposed orders granting such First Day Pleadings. I have reviewed each of the First Day Pleadings and First Day Orders (including the exhibits thereto) and the facts set forth therein are true and correct to the best of my knowledge, information and belief.  Moreover, I believe that the relief sought in each of the First Day Pleadings and First Day Orders is vital to the Debtors' ability to transition to, and operate in, chapter 11 with minimum interruption or disruption to their businesses or loss of productivity or value.

### A.     Administrative Pleadings.

58.     The Debtors have filed several "administrative" motions pursuant to which they seek (a) joint administration of the Debtors' bankruptcy cases, (b) authorization to retain Kurtzman Carson Consultants LLC as the Debtors' claims and noticing agent, (c) authorization to file a single, consolidated list of the Debtors' 30 largest creditors and approve the notice of commencement and the form of notice thereof, (d) extension of the Debtors' deadline to file schedules and statements and related relief, and (e) confirmation of the protections of sections 362, 365, and 525 of the Bankruptcy Code.

59.     **Joint Administration**. The Debtors are requesting that their chapter 11 cases be jointly administered. The Debtors consist of 23 entities, all of which are direct or indirect subsidiaries of Toisa.  I believe that the joint administration of these cases will avoid the unnecessary time and expense of duplicative motions, applications,

26

orders and other pleadings that otherwise would need to be filed in each separate case

absent joint administration, thereby saving considerable time and expense for the

Debtors and resulting in substantial savings for their estates.  I also believe that

duplication of substantially identical documents would be wasteful and would

overburden the Clerk of the Court with duplicative filings. Further, I believe joint

administration will protect parties-in-interest by ensuring that parties in each of the

Debtors' respective chapter 11 cases will be apprised of the various matters before the

Court in these cases.  In addition, I believe it would be far more practical and expedient

for the administration of these chapter 11 cases if the Court were to authorize their joint

administration.  The Debtors envision that many of the motions, hearings, and other

matters involved in these chapter 11 cases will affect all of the Debtors.  Consequently, I

believe joint administration will reduce costs and facilitate a more efficient

administrative process, unencumbered by the procedural problems otherwise attendant

to the administration of separate, albeit related, chapter 11 cases.  Additionally, I believe

joint administration will also allow the Court and the Debtors to employ a single docket

for all of the chapter 11 cases and to confine, and thereby simplify, notice to creditors

and other parties in interest in these bankruptcy cases.  Finally, I believe joint

administration will ease the burden on the United States Trustee in supervising these

bankruptcy cases.

60.    Additionally, I believe waiver of the requirements imposed by

section 342(c)(1) of the Bankruptcy Code and Bankruptcy Rule 2002(n) that the Debtors'

caption and other notices mailed in these chapter 11 Cases include the Debtors' tax

identification numbers and other information relating to the Debtors is appropriate in

these chapter 11 cases.  I believe including the Debtors' tax identification numbers and

addresses on each caption would be unduly cumbersome, and may be confusing to

parties in interest.  More importantly, I am advised that waiver of the tax identification

number and address requirement is purely procedural in nature and will not affect the

rights of parties in interest, especially given that the Debtors propose to include in each

pleading they file and notice they mail a footnote listing all of the Debtors, their

addresses, and the last four digits of their tax identification numbers (if applicable).

61.     **Application to Retain Kurtzman Carson Consultants LLC as
Claims and Noticing Agent**. The Debtors seek authority to retain Kurtzman Carson

Consultants LLC ("KCC") as their claims and noticing agent.  I understand that such

appointment is required by the rules of this Court.  Moreover, I believe such relief is

prudent in light of the numerous creditors, potential creditors, and parties-in-interest to

whom certain notices will be sent and from whom proofs of claims may be received.

Accordingly, I believe that the most effective and efficient manner by which to give

notice in these cases is to engage KCC, an independent third party with significant

experience in this role, to act as an agent of the Court.

62.     **Authorization to File a Consolidated List of Creditors and to
Establish Notice Procedures**. The Debtors are requesting authorization to file a single

consolidated list of their top 30 creditors (the "Consolidated Top 30 List") in lieu of a

Top 20 List (defined below) for each Debtor.  I am advised that Rule 1007(d) of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") requires a debtor to

file a list containing information on its twenty largest unsecured creditors, excluding

insiders (a "Top 20 List").  I am further advised that the Top 20 List is intended to

facilitate the appointment of a creditors' committee by the United States Trustee (the

"U.S. Trustee").  If a creditors' committee is appointed, I believe the Consolidated Top 30

List will be sufficient to aid in the U.S. Trustee's appointment of a creditors' committee.

63.     I am advised the Debtors have filed, or will soon file, a motion to retain a claims and noticing agent (the "Noticing Agent") as agent for the Clerk of Court ("Clerk") to assist the Clerk with, among other things, the notices to be provided in these chapter 11 cases.  I am further advised that the Noticing Agent has prepared a consolidated list of creditors and potential parties in interest (the "Creditor List") based on the names and addresses that the Debtors maintained in their databases or were otherwise readily ascertainable by the Debtors prior to the Petition Date.  I am advised that the Creditor List is in a format ordinarily used by the Noticing Agent and might not comply with all or some of the various List Filing Requirements.

64.     Under the circumstances, I believe re-formatting the Creditor List, preparing and filing separate formatted creditor matrices, and otherwise complying with the List Filing Requirements will impose unnecessary administrative burdens on, and will distract the Debtors without any corresponding benefit to the estates.  In this context, I believe requiring each Debtor to file a Top 20 List would impose an unnecessary administrative burden on the Debtors, without conferring any benefit upon the Debtors' estate or the U.S. Trustee.

65.     The Debtors also request authority for their Noticing Agent to serve by regular mail the notice to parties of the commencement of these chapter 11 cases and of the meeting of creditors pursuant to section 341 of the Bankruptcy Code (the "Notice of Commencement") to creditors and shareholders.  In addition to mailing the Notice of Commencement, the Debtors propose to publish, as soon as reasonably practicable, (i) the Notice of Commencement on the website maintained by the Noticing Agent, and (ii) a modified, condensed version of the Notice of Commencement in a relevant periodical. I believe these proposed procedures will ensure that the Debtors' creditors and

shareholders receive prompt notice of the commencement of these chapter 11 cases and of the meeting of creditors.

66.    **Schedules and Statements Motion**. The Debtors are requesting that the Court extend the time by which the Debtors must file their schedules of assets and liabilities and statements of financial affairs ("Schedules and Statements") to 30 days after the current deadline.  The requested extension would give the Debtors until 44 days after the Petition Date to file their Schedules and Statements.  I believe no creditor or other party in interest will be prejudiced by the requested extension of time for the filing of the Schedules and Statements.  Due to the circumstances leading to the filing of these chapter 11 cases in emergency fashion, coupled with the number of the Debtors' creditors, the scope of the Debtors' operations, the size and complexity of the Debtors' business, and the limited staffing available to gather, process, and complete the Schedules and Statements, I believe the Debtors will be unable to complete their Schedules and Statements by the current deadline imposed by the Bankruptcy Code, as relayed to me by counsel.  Given the substantial burdens already imposed on the Debtors' management by the sudden commencement of these chapter 11 cases, the limited number of employees available to collect the information, the competing demands upon such employees, and the time and attention the Debtors must devote to the restructuring process, I believe that "cause" exists to extend the current deadline by thirty (30) days.  I believe the requested extension will enhance the accuracy of the Schedules and Statements when filed and help avoid the potential necessity of substantial subsequent amendments.

67.    Additionally, the Debtors seek authority to file the monthly operating reports (the "MORs") required by the U.S. Trustee Guidelines on a consolidated basis.  I believe that consolidated the MORs will further administrative

economy and efficiency in these chapter 11 cases without prejudice to any party in interest, and consolidated MORs will accurately reflect the Debtors' business operations and financial affairs because the Debtors regular business practice is to keep consolidated financials. Although the Debtors seek to file one consolidating MOR, their consolidated MOR will still track and break out specific information concerning receipts, disbursements, etc., on a Debtor-by-Debtor basis.

68.     **Motion to Confirm the Protections of Sections 362 and 365 of the Bankruptcy Code**. The Debtors' business operations are conducted worldwide, with significant assets moving through international waters at any given time. As a result, the Debtors have many foreign creditors and counterparties to contracts who may not be well versed in the restrictions of the Bankruptcy Code. It is my understanding that many of these creditors do not transact business on a regular basis with companies that have filed for chapter 11, or are unfamiliar with the scope of a debtor in possession's authority to conduct its business. I believe these creditors may be unfamiliar with the operation of the automatic stay and other provisions of the Bankruptcy Code. I believe an affirmative court order will make the impact of the automatic stay and its applicability to creditors wherever located clearer to such creditors.

69.     Moreover, because the Debtors' business operations implicate maritime law, I am advised that various foreign creditors could seek to assert maritime liens against the Debtors' assets. I am further advised that the determination of what claim may constitute a maritime lien is determined by local law on a case by case basis. Thus, I believe various interested parties may attempt to seize assets located outside of the United States to the detriment of the Debtors and their creditors, or take other actions in contravention of the automatic stay of section 362 of the Bankruptcy Code that could harm the Debtors' estates. In addition, I am advised that, upon learning of

31

the Debtors' bankruptcy, counterparties to leases and executory contracts may attempt to terminate those leases or contracts pursuant to *ipso facto* provisions in contravention of section 365 of the Bankruptcy Code.

70.     Finally, because of the international nature of the Debtors' business, the Debtors are required to obtain licenses, permits, and charters from various governmental units located outside the United States.  I believe these governmental units may be unfamiliar with the non-discrimination provisions of section 525 of the Bankruptcy Code, which I am advised prohibits governmental units from revoking, suspending, or failing to renew a license, permit, charter, franchise, or other similar grant or discriminate with respect to such grant against a debtor solely based on the debtor's bankrupt status or financial condition.  Without the relief requested in this Motion, I am advised certain foreign governmental units may attempt to take adverse action against the Debtors with respect to their various licenses, permits, and charters upon learning of the Debtors' bankruptcy filings.

**B.     Operational Motion – Cash Management**

71.     In addition to the administrative motions described above, the Debtors have filed a more "operational" focused motion, seeking authorization to continue using their existing cash management system and dispense with requirements under section 345 of the Bankruptcy Code

72.     **Cash Management Motion**. As discussed more fully above, the Debtors' fleet consists of twenty-six (26) offshore vessels, thirteen (13) tankers, and seven (7) bulkers.  These vessels are owned by various Debtor entities, including Toisa Limited, which owns twenty-three (23) of the Company's twenty-six (26) offshore vessels.

32

73.     The Debtors' operations are divided into three segments: (i) dry bulk, (ii) tanker, and (ii) offshore shipping.  Given the size of the Debtors' fleet and the complexity of their operations, the Debtors' business segments are managed day-to-day by distinct non-Debtor affiliate management agents (collectively, the "Management Agents").  MMS and MMBS manage the tankers and bulkers, respectively, and Sealion manages the offshore vessels.

74.     In order to streamline the Company's management process, the Company designed a sophisticated cash management system (the "Cash Management System") to facilitate the efficient flow of funds between the various Debtor entities that directly own the Debtors' vessels (collectively, the "Vessel Owners") and the Management Agents (as well as other entities within the Company) to ensure the Management Agents can timely satisfy the Vessel Owners' operational needs and further the company's corporate purpose.

75.     As described more fully above, since the downturn of the Debtors' operations in Q3 2016, revenues on account of the Vessel Owners' charter receipts and receivables flow directly to the accounts of the Management Agents, who, in turn, (i) pay the Vessel Owners' operating expenses as they come due (including interest on the company's funded debt obligations to the extent such interest is being paid), and (ii) otherwise transfer funds between and among the company's various bank accounts as needed.  Importantly, each and every deposit, payment, and other transfer within the Cash Management System is documented and accounted for on both a per Vessel and a per entity basis.  I believe these accounting procedures ensure that (a) cash flow attributable to the Debtors' distinct business segments is not commingled, as each segment has its own Management Agent, and (b) the proceeds of each Vessel Owners' charter receivables can be easily traced through the Debtors' Cash Management System

33

to ensure that any cash (or corresponding liability) is allocated to the appropriate Vessel and, in turn, Vessel Owner.

76.     I believe the Cash Management System is integral to the stability and efficiency of the Debtors' operations, as it ensures charter receivables are easily collected and the Company's operating expenses are timely satisfied in a way that minimizes the Company's administrative costs.  Thus, the preservation of the Cash Management System post-petition, particularly with respect to the Management Agents, is critical. Indeed, given the Debtors' complex internal structure and the unique industry in which they operate, I believe any loss or interruption of the Management Agents' services or the Cash Management System — even temporarily — would immediately halt operation of the Company, thereby causing irreparable harm not only to the Debtors' ongoing operations (and, therefore, to their ability to generate revenue during these cases), but also to the continued maintenance and care of the Vessels.  I believe such damage would be detrimental at this critical early stage of the Debtors' chapter 11 cases.

77.     The Debtors therefore request that the Court authorize them to continue using the existing Cash Management System, which entails the continued use of the Management Agents' services under the Management Agreements, and to continue to transfer funds into, out of, and through the Company's Cash Management System, as described more fully in the Cash Management Motion.

78.     Additionally, I am advised that the U.S. Trustee Guidelines, among other restrictions and requirements, prohibit disbursements other than by numbered checks, which checks must bear the applicable debtor's case name and case number, a "debtor in possession" designation, and an indication of the account type.  I am further advised that rigid adherence to the U.S. Trustee Guidelines would require, among other

things, closure of prepetition bank accounts, the opening of new accounts, and the

immediate printing of new checks with a "Debtors in Possession" designation on them.

Thus, I believe enforcement of the U.S. Trustee Guidelines in these chapter 11 cases

would disrupt the Debtors' business operations, impose burdensome expenses on the

estates, and unnecessarily distract the Debtors from their reorganization efforts.

79.    Moreover, in the ordinary course of business, the Debtors may also

use other various business forms, including, but not limited to, business letterhead,

purchase orders, invoices, envelopes, promotional materials, and other business forms

and correspondence.  To minimize expenses, the Debtors seek authority to continue

using the Business Forms, substantially in the forms existing immediately before the

Petition Date and without any reference in such forms to the Debtors' status as debtors

in possession.  As with the bank accounts, I believe requiring the Debtors to change

their existing business forms would unnecessarily distract the Debtors from their

restructuring efforts and impose needless expense.  Furthermore, I believe authorizing

continued use of both the Bank Accounts and the Business Forms will make the

Debtors' transition into chapter 11 smoother, less costly, and more orderly.

80.    In connection with the cash management system, the Debtors incur

fees and other charges in connection with bank services, dishonored or returned checks,

and other obligations under their bank account agreements (the "Bank Account

Claims").

81.    I am advised that absent payment of the Bank Account Claims, the

Banks might assert setoff rights against the funds in the Bank Accounts on account of

the Bank Account Claims, freeze the Bank Accounts, and/or refuse to provide services

to the Debtors.  Therefore, I believe the payment of Bank Account Claims will not

35

prejudice unsecured creditors given that, as noted above, the banks may have setoff rights with respect to the Bank Account Claims.

82.    In addition, the Debtors routinely engage in the intercompany transactions in the ordinary course of business. As such, I believe the continuation of these intercompany transactions post-petition would be within the ordinary course of business. However, in an abundance of caution, the Debtors seek authority to enter into such postpetition intercompany transactions. If the Debtors are permitted to continue entering into the Postpetition Intercompany Transactions in the ordinary course, the Debtors will continue to maintain records of Postpetition Intercompany Transactions, including records of intercompany accounts receivable and accounts payable on a per entity basis.

83.    I believe the intercompany transactions facilitate the Debtors' day-to-day operations, as well as the day-to-day operations of the non-Debtor affiliates, which are responsible for managing the Debtors' affairs. I believe payments associated with the intercompany transactions received by the Debtors from their non-Debtor affiliates are important sources of liquidity for the Debtors. Moreover, I believe that without the ability to continue supporting the non-Debtor affiliates through the intercompany transactions, the Debtors' future cash flows and ongoing operations may be jeopardized, to the detriment of the Debtors and their estates.

84.    Accordingly, I believe entry of an Order granting the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates.

## PART IV: INFORMATION REQUIRED BY LOCAL BANKRUPTCY
## RULE 1007-2

85.     Local Bankruptcy Rule 1007-2 requires that the Debtors provide

certain information, which is set forth below.

86.     As required under Local Bankruptcy Rule 1007-2(a)(3), to the best

of the Debtors' knowledge and belief, there have been no committees organized prior to

the Petition Date.

87.     As required under Local Bankruptcy Rule 1007-2(a)(4), Exhibit C

lists the following information with respect to each of the holders of the Debtors' thirty

(30) largest unsecured claims on a consolidated basis, excluding claims of insiders: the

creditor's name, address (including the number, street, apartment or suite number, and

zip code, if not included in the post office address), telephone number, the name(s) of

person(s) familiar with the Debtors' accounts, the amount of the claim, and an

indication of whether the claim is contingent, unliquidated, disputed or partially

secured.  In each case, the claim amounts listed on Exhibit C are estimated and subject

to verification.  In addition, the Debtors reserve their rights to assert remedies, defenses,

counterclaims, and offsets with respect to each claim.

88.     As required under Local Bankruptcy Rule 1007-2(a)(5), Exhibit D

provides the following information with respect to each of the holders of the five (5)

largest secured claims against the Debtors on a consolidated basis: the creditor's name

and address (including the number, street, apartment or suite number, and zip code, if

not included in the post office address), the amount of the claim, a brief description of

the claim, and whether the claim or lien is disputed.  In each case, the claim amounts

listed on Exhibit D are estimated and subject to verification.  In addition, the Debtors

reserve their rights to assert remedies, defenses, counterclaims, and offsets with respect to each claim.

89.     As required under Local Bankruptcy Rule 1007-2(a)(6), the Debtors submit that as of September 30, 2016 the Debtors' unaudited consolidated financial statements, aggregated $1,767,037,578 in total assets and $1,052,024,537 in total liabilities.

90.     As required under Local Bankruptcy Rule 1007-2(a)(7), to the best of the Debtors' knowledge and belief, as of the Petition Date, 12,000 shares of Toisa were outstanding.  It is my understanding that none of the shares of Toisa are publicly held.

91.     As required under Local Bankruptcy Rule 1007-2(a)(8), to the best of the Debtors' knowledge and belief, other than the tanker United Journey, the Debtors do not have any property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, or secured creditor, or agent for any such entity. United Journey is currently being held twelve miles off the coast of St. Eustatias by Mr. Roberto Ricardo Patrick, a bailiff in St. Eustatias on behalf of Citi as ship mortgagee.

92.     As required under Local Bankruptcy Rule 1007-2(a)(9), Exhibit F provides a list of the premises owned, leased, or held under other arrangement from which the Debtors operate their business.

93.     As required under Local Bankruptcy Rule 1007-2(a)(10), Exhibit G provides the location of the Debtors' substantial assets, the location of their books and records, and the nature and location of assets held by the Debtors outside the territorial limits of the United States.

94.     As required under Local Bankruptcy Rule 1007-2(a)(11), to the best of the Debtors' knowledge and belief, there are no actions or proceedings, pending or threatened, against the Debtors or their property where a judgment against the Debtors

or a seizure of the Debtors' property may be imminent other than with regard to the aforementioned arrest of United Journey.

95.     As required under Local Bankruptcy Rule 1007-2(a)(12), <u>Exhibit H</u> provides a list of the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

96.     Local Bankruptcy Rule 1007-2(b)(1)-(2) requires the estimated amount, on a consolidated basis, to be paid to the Debtors' employees (not including officers, directors, and stockholders) for the 30-day period following the filing of the Debtors' chapter 11 petitions and the amount paid and proposed to be paid to officers, stockholders and directors and financial consultants for services for the thirty day period following the petition date. The estimated amount to be paid to non-officer employees is $24,500.  The estimated amount, on a consolidated basis, to be paid to the Debtors' officers for the 30-day period following the Petition Date is $0. Estimated payments to be made to the Debtors' directors are approximately $0.  Furthermore, the Debtors have budgeted approximately $805,000 to be paid to the Debtors' professionals for the 30-day period following the Petition Date.

*[concluded on the following page]*

97.     As required under Local Bankruptcy Rule 1007-2(b)(3), Exhibit I, the Debtors' cash collateral budget, provides a list of estimated cash receipts and disbursements, and net cash gain or loss other than professional fees, on a consolidated basis for the 4-week period following the Petition Date. The Debtors do not believe that they will accrue material obligations during such 4-week period that will not be satisfied in the ordinary course of business.

I swear under penalty of perjury that the foregoing is true and correct.

Dated:      January 29, 2017

By:   /s/ Robert Hennebry
      Name:  Robert Hennebry
      Title:    Chief Financial Officer