TOGUT, SEGAL & SEGAL LLP
One Penn Plaza
Suite 3335
New York, New York 10119
(212) 594-5000
Albert Togut
Frank A. Oswald
Brian F. Moore
Kyle J. Ortiz

*Proposed Counsel to the*
*Debtors and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                             :

In re:                         :        Chapter 11
                             :

TOISA LIMITED, *et al.*,       :        Case No. 17-10184 (___)
                             :

            Debtors.[1]    :        (Joint Administration Pending)
                             :
-------------------------------------------------------------x

## DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING CONTINUED USE OF EXISTING CASH MANAGEMENT PRACTICES, BANK ACCOUNTS, AND BUSINESS FORMS, (II) WAIVING INVESTMENT AND DEPOSIT REQUIREMENTS, AND (III) AUTHORIZING CONTINUANCE OF INTERCOMPANY TRANSACTIONS

Toisa Limited and certain of its affiliates and subsidiaries, the debtors and

debtors in possession in the above-captioned cases (collectively, the "Debtors" and,

together with their non-Debtor affiliates, the "Company"), hereby apply (this "Motion")

for entry of an interim order (the "Interim Order"), substantially in the form attached

hereto as Exhibit A, and a final order, substantially in the form of the Interim Order (the

"Final Order" and, together with the Interim Order, the "Orders") under sections 105,

345, 362, 363, 503, 1107, and 1108 of title 11 of the United States Code (the "Bankruptcy

---

[1]    The Debtors are as follows:  Trade Prosperity, Inc.;  Toisa Limited;  United Courage, Inc.;  Trade Vision, Inc.;  United Journey, Inc.;  United Kalavryta, Inc.;  Trade Sky, Inc.;  Trade Industrial Development Corporation;  United Honor, Inc.;  Trade Will, Inc.;  United Leadership Inc.;  United Seas, Inc.;  United Dynamic, Inc.;  United Emblem, Inc.;  United Ideal Inc.;  Trade Unity, Inc.;  Trade Quest, Inc.;  Trade Spirit, Inc.;  Trade Resource, Inc.;  United Ambassador, Inc.;  Edgewater Offshore Shipping, Ltd.;  United Banner, Inc.;  Toisa Horizon, Inc.;  and Trade and Transport Inc.

Code"):  (a) authorizing, but not directing, the Debtors to continue using their existing cash management practices (including the continued utilization of non-Debtor affiliate managing agents, Marine Management Bulk Services Inc. ("MMBS"), Marine Management Services M.C. ("MMS"), and Sealion Shipping Limited ("Sealion" and, together with MMBS and MMS, the "Managing Agents"), in accordance with the terms of those certain agreements by and between the Managing Agents and certain Debtor Vessel Owners (defined below) (collectively, the "Management Agreements")), bank accounts, and business forms;  (b) waiving any applicable investment and deposit requirements;  and (c) authorizing the continuance of intercompany transactions and, to the extent applicable, granting administrative expense status to postpetition intercompany claims between and among the Debtors pursuant to Bankruptcy Code section 503(b)(1).

In support of this Motion, the Debtors rely upon and incorporate by reference the *Declaration of Robert Hennebry Pursuant to Local Bankruptcy Rule 1007-2 and in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* filed with the Court concurrently herewith (the "First-Day Declaration").[2]  In further support of the Motion, the Debtors, by and through their undersigned counsel, respectfully represent as follows:

**PRELIMINARY STATEMENT[3]**

The Debtors are a leading provider of marine transportation, construction, and support services to companies in the oil and gas exploration, production, and subsea construction, as well as subsea fiber optic cable installation industries.  The Debtors'

---

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the First-Day Declaration.

[3]    Capitalized terms used but not defined in this Preliminary Statement shall have the meaning ascribed to such term in the Motion.

fleet consists of twenty-six (26) offshore vessels, thirteen (13) tankers, and seven (7) bulkers (collectively, the "Vessels"). The Vessels are owned by various Debtor entities (collectively, the "Vessel Owners"), including Toisa Limited, which owns twenty-three (23) of the Company's twenty-six (26) offshore vessels.

The Debtors' operations are divided into two segments: (i) dry bulk and tanker (collectively, the "Oceangoing Segment"); and (ii) offshore shipping (the "Offshore Segment"). Given the size of the Debtors' fleet and the complexity of their operations, the Debtors' business segments are managed day-to-day by distinct non-Debtor affiliate Managing Agents, in accordance with the terms and conditions of the Management Agreements. MMS and MMBS manage the tankers and bulkers, respectively, and Sealion manages the offshore vessels.

Pursuant to the Management Agreements, the Managing Agents are given virtually complete control over the hiring, management, payroll, maintenance, insurance, and chartering of the Vessels they are charged with managing. Specifically, the Management Agreements contemplate that the Managing Agents can hire all crew, coordinate services to charters and bankers, appoint agents, etc. The Managing Agents are also responsible for the Vessels' books and records and voyage books.

In order to streamline this management process, the Company designed sophisticated cash management practices (the "Cash Management Practices") to facilitate the efficient flow of funds between the Vessel Owners and Managing Agents (as well as other entities within the Company) to ensure that the Managing Agents can timely satisfy the Vessel Owners' operational needs and further the Company's corporate purpose.

As described more fully in the First Day Declaration, since the downturn of the Debtors' operations in Q3 2016, revenues on account of the Vessel Owners' charter

receipts and receivables have been notified to be remitted directly to the accounts of the Managing Agents, who, in turn, (i) pay the Vessel Owners' operating expenses as they come due (including paying the interest on the Company's funded debt obligations to the extent such interest is being paid), and (ii) otherwise transfer funds between and among the Company's various bank accounts, as needed. Importantly, each and every deposit, payment, and other transfer pursuant to the Cash Management Practices is documented and accounted for on both a per Vessel and a per entity basis. These accounting procedures ensure that: (a) cash flow attributable to the Debtors' distinct business segments is not commingled, as each segment has its own Management Agent; and (b) the proceeds of each Vessel Owners' charter receivables can be easily traced by virture of the Debtors' Cash Management Practices to ensure that any cash (or corresponding liability) is allocated to the appropriate Vessel and, in turn, Vessel Owner.

The Cash Management Practices are integral to the stability and efficiency of the Debtors' operations, as they ensure charter receivables are easily collected and the Company's operating expenses are timely satisfied in a way that minimizes the Company's administrative costs. Thus, the preservation of the Cash Management Practices post-petition, particularly with respect to the Managing Agents, is critical. Indeed, given the Debtors' complex internal structure and the unique industry in which they operate, any loss or interruption of the Managing Agents' services or the Cash Management Practices — even temporarily — would immediately halt operation of the Company, thereby causing irreparable harm not only to the Debtors' ongoing operations (and, therefore, to their ability to generate revenue during these cases), but also to the continued maintenance and care of the Vessels. Such damage would be detrimental at this critical early stage of the Debtors' Chapter 11 Cases.

The Debtors therefore request that the Court authorize them to continue using their existing Cash Management Practices, which entail the continued use of the Managing Agents' services under the Management Agreements, and to continue to transfer funds into, out of, and through the Company's Bank Accounts, consistent with their prepetition Cash Management Practices.

The Debtors further request that they be authorized to implement any changes to the Cash Management Practices that they deem appropriate in their sole discretion, including, without limitation, closing Bank Accounts or opening new bank accounts, subject to the terms and conditions as set forth in the applicable bank account agreements ("Bank Account Agreements").  As necessary, the Debtors request that the applicable Banks be authorized and directed to honor the Debtors' directions with respect to the opening or closing of any bank account.

The remainder of the Motion requests customary first-day relief, including entry of Interim and Final Orders:  (a) authorizing the Debtors to continue using their existing Bank Accounts and Business Forms, in each case subject to changes that they may make thereto in their sole discretion;  (b) waiving any applicable investment and deposit requirements imposed by section 345(b) of the Bankruptcy Code or otherwise;  and (c) authorizing the Debtors to continue their Intercompany Transactions in the ordinary course of business and, to the extent applicable, granting administrative expense status to Postpetition Intercompany Claims between and among the Debtors pursuant to Bankruptcy Code section 503(b)(1).  The Debtors also request that the Court schedule a final hearing on the Motion within forty-five (45) days of the entry of Interim Order.

## **BACKGROUND**

1.      The factual background regarding the Debtors is set forth in the First-Day Declaration. On the date hereof (the "Petition Date"), the Debtors each commenced a

5

case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases").  The Debtors continue to operate their business and manage their property as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108.  The Debtors have requested joint administration of these Chapter 11 Cases by motion filed concurrently herewith.  No trustee or examiner has been appointed in these Chapter 11 Cases.  As of the date hereof, no creditors' committee has been appointed.

## A.     The Management Agreements

2.       In order to effectively and profitably manage the Vessels, the Debtors entered into Management Agreements with the Managing Agents.  For all intents and purposes, the Managing Agents are in full control of the Vessels' operations.

3.       The Management Agreements can be divided into two categories:  (i) the MMS and MMBS Agreements, which govern the Oceangoing Segment;  and (ii) the Sealion Management Agreement, which governs the Offshore Segment.  Set forth below are summaries of the key terms of these two categories of Management Agreements:

### i.   The MMS and MMBS Agreements

4.       MMS and MMBS operate as the managers of the Debtors' oceangoing fleet of tanker and bulkers.  In that connection, MMS and MMBS provide chartering accounting, financial, and legal support on behalf of the Debtors to facilitate the operations of the Debtors' thirteen (13) tankers and seven (7) bulkers.

5.       Each individual Vessel entered into a Management Agreement with either MMS or MMBS (depending on the type of Vessel).  The terms and conditions of these agreements are substantially similar, except for the Vessel description and compensation amount, which differ slightly.  Under these Management Agreements,

the respective Management Agent provides administrative, operational, and ship management services, including charter negotiations and repair.

6.     In return for these services, a daily management fee ranging from $1,500 to $2,000 is paid to MMS and MMBS, as appropriate, which fees are paid monthly.

7.     In addition to the daily management fee, MMS and MMBS are entitled to a 1% commission of the aggregate transaction value of the:  (i) disposition of the Vessel; (2) acquisition of new vessels;  or (3) advisory services in connection with the Vessels and any future vessels.

8.     Each of the Management Agreements between MMS or MMBS and a Vessel Owner has a five-year term, with the option to renew.  A complete list of the Management Agreements between the Debtors and MMS or MMBS is attached hereto as Schedule 1.

9.     For reference purposes, a copy of one of the Management Agreements with MMS is attached hereto as Exhibit B (the "MMS Management Agreement").[4] Copies of each Management Agreement are available upon request by a party in interest.

**ii. The Sealion Management Agreement**

10.     Sealion is the Managing Agent for the Debtors' Offshore Segment and facilitates the operations of twenty-six (26) offshore Vessels, twenty-three of which Toisa Limited owns directly.  The remaining three (3) offshore Vessels are wholly-owned by separate, direct subsidiaries of Toisa Limited.

---

[4]    The MMS Management Agreement is representative of the other Management Agreements between a Vessel Owner and either MMS or MMBS.

11.     Rather than having each individual Vessel enter into a separate Management Agreement, Sealion has a master Management Agreement with Toisa Limited (as amended, the "Sealion Management Agreement" attached hereto as Exhibit C).  The original Sealion Management Agreement between Sealion and Toisa was executed in 1989 and has continually been amended and renewed, as needed, to include additional Vessels and to extend the term.  A list of the Vessels managed under the Sealion Management Agreement is attached hereto as Schedule 2.

12.     Sealion arranges the employment of more than 800 seastaff and employees and more than 90 onshore personnel.  Sealion is an accredited ISM (International Safety Management) ship management company and provides a full range of ship management functions, including operations, technical, chartering, crewing, project management, safety, purchasing and logistics, and accounting services to the offshore fleet.  Sealion would then pay all invoices for these services to third-parties and then invoice the Vessel Owners for reimbursement.

13.     Currently, however, Sealion invoices charters on behalf of Toisa Limited and several other Debtor subsidiaries, and the collection of charter receipts are made directly into either a bank account at Toisa Limited or Sealion, as the Management Agent.  Sealion records a comprehensive range of nominal ledger account entries that are used to record all transactions that Sealion undertakes on behalf of the Debtors for which it serves as the Management Agent.  This includes the recording of all revenues, operational expenses, accruals, prepayments, debtors, creditors, assets, drydocking, stock, and any movements of cash between the two entities.

14.     In addition, Sealion earns commission and management fees on account of the Vessels it manages in accordance with the Management Agreements.  These commission and management fees are invoiced on a quarterly basis and settled on

commercial terms.  In this regard, the compensation structure is different with Sealion than it is with MMS and MMBS.  Specifically, Toisa Limited pays Sealion an annual fee on account of each Vessel based on the schedule to the Management Agreement, payable each month.

15.    Sealion also provides ship management services to Toisa Limited subsidiary and Debtor entity Edgewater Offshore Limited, and the intercompany relationship is managed the same way as MMS and MMBS intercompany claims are handled.

16.    Compensation structures aside, the duties and responsibilities of Sealion are substantially identical to those of MMS and MMBS.

**B.    The Cash Management Practices**

17.    To support their expansive global operations and their fleet of tankers, bulkers and offshore Vessels, the Company (including the Managing Agents) maintains sophisticated Cash Management Practices that link certain bank accounts of the Debtors and their non-Debtor affiliates to facilitate cash flow between these entities, while minimizing administrative costs.   A chart illustrating the receipt of revenues and disbursement of expenses through the Bank Accounts for the Company (the "Chart") is attached hereto as Exhibit D.

18.    The Cash Management Practices are managed primarily by personnel of the Managing Agents.  On a daily basis, the Company processes large numbers of deposits, withdrawals, and other transfers in accordance with the Cash Management Practices.  Accordingly, the Company maintains current and accurate records of all transactions processed by way of the Cash Management Practices to track the funds involved in the Company's operations and efficiently manage its resources.  Thus, the Cash Management Practices are a critical component of the comprehensive system that

supports the Company's overall business enterprise. Set forth below is a summary of the Cash Management Practices.

      *i.*    *The Bank Accounts*

19.    In connection with the Cash Management Practices, the Debtors and certain of their Managing Agents maintain several dozen bank accounts (collectively, the "Bank Accounts") at various banks (collectively, the "Banks"), some of which are also lenders to the Debtors.  A list of the Bank Accounts (the "Account List") is attached hereto as Schedule 3.[5]   The Account List identifies the account, the financial institution at with the account is located, and the owner of each Bank Account.

20.    Each of the Vessel Owners generally maintains a Bank Account in its own name (collectively, the "Vessel Accounts") with the financial institution that financed the construction or purchase of the Vessel owned by the Vessel Owner.   As a general matter, the Vessel Accounts are subject to the control of the lenders under the Vessel Owners' respective loan facilities and funds therein are part of the collateral package securing the loan.

21.    In addition, the Managing Agents each maintain a Bank Account (collectively, the "Management Accounts") that the Managing Agents use to pay each Vessels' vendors, suppliers and other third parties directly for supporting the Debtors' operations, as well to make payroll for certain seaborne crew and pay certain suppliers for the provision of lubricating oils, insurance and classification society fees and other select vessel operating costs (collectively, "Day-to-Day Expenses").

---

[5]   The Debtors believe that Schedule 3 contains a complete list of their Bank Accounts.  To the extent that any Bank Account has been omitted from that list, the Debtors request that the order granting the relief sought herein apply to any and all Bank Accounts of the Company that are used consistent with the Cash Management Practices.

22.     Finally, Toisa Limited maintains Bank Accounts at Goldman Sachs (the "GS Account") and Lloyds in London.   These accounts accumulate the Company's net earnings, pay Management Agent fees, and, as necessary, make distributions to holders of the Company's equity interests when duly authorized under the Company's corporate organizational documents.  When necessary, funds at Goldman Sachs and Lloyds can be transferred to Toisa Limited's wholly-owned subsidiary, Trade and Transport Inc., which, through its agency Trade and Transport (UK) Ltd., provide sale and purchase support for new vessels to be acquired for the Company's fleet.

        ii.     _The Company's Cash Management Practices_

23.     Until the downturn in the Debtors' Oceangoing Segment in Q3 2016, the Vessel Accounts had been used to deposit revenue earned in connection with charters of their respectively owned Vessel (such revenue is commonly referred to as "Freights"). Freights deposited into the Vessel Accounts could then be disbursed directly from the Vessel Accounts to pay certain third party suppliers for, among other things, (i) bunkers (i.e., the fuel burned by the Vessels) and (ii) lubrication for the Vessels' engines and mechanical workings, as well as to (iii) fund secured lender retention accounts established in order to service any debt obligations of the Vessel Owner.

24.     In addition, a portion of the Freights deposited into the Vessel Accounts would also be transferred to other Bank Accounts, including Management Accounts on an as-needed basis to, _inter alia_, pay the Day-to-Day Expenses (other than fuel and lubrication expenses) of the Vessels.

25.     However, following the downturn in the Oceangoing Segment and beginning in September 2016, in an effort to better manage and conserve the Debtors' cash, Freights were instructed to be remitted directly to the Management Accounts,

rather than Vessel Accounts.[6]   As in the past, however, the Managing Agent would then use funds in the Management Accounts to pay each Debtors' Day-to-Day-Expenses.

26.      Since then, the Managing Agents have been directly collecting the receipts for their respective Vessels and paying expenses from the respective Management Accounts – MMS and MMBS each make disbursements for the benefit of the tankers and bulkers they respectively manage (including disbursements made by MMS's New York-based agent Broker & Management Corporation, a non-Debtor affiliate), and Sealion makes disbursements for the benefit of the Offshore Vessels it manages.  The Cash Management Practices, as currently structured, are an integral component of how the Debtors manage their affairs and their cash.

27.      With these practices in place, the Managing Agents routinely deposit, withdraw, and otherwise transfer money to, from, and between certain of the Bank Accounts by various methods (collectively, the "Ordinary Transfer Methods"), including, but not limited to, wires, automated clearing house transfers, and other electronic funds transfers.

28.      The Debtors are thus able to manage and trace funds moving through the Bank Accounts in accordance with their Cash Management Practices via the Managing Agents and are able to track and reconcile payments made to third party vendors on their behalf such that all transactions made on the Debtors' behalf both within the enterprise and to outside and third party vendors can be ascertainable.

29.      As of the Petition Date, the Debtors believe there are sufficient funds in the Management Accounts maintained by the Managing Agents for the Debtors to

---

[6]     As an exception, the Freights associated with Toisa Limited offshore Vessel, the Paladin, are remitted to the GS Account, which in turn are remitted to Sealion for management of the Vessel.

continue to operate their business for at least next three (3) months, based on the Debtors' current forecasts.

### iii.   *Intercompany Transactions*

30.     In the ordinary course of business, the Company engages in routine intercompany financial transactions with Debtors and non-Debtor affiliates (collectively, the "Intercompany Transactions"). The Intercompany Transactions include, but are not limited to payments or transfers from a Debtor to another Debtor or a non-Debtor affiliate, giving rise to claims ("Intercompany Claims").

31.     Specifically, the Debtors maintain ordinary business relationships with their non-Debtor affiliates, particularly the Managing Agents, which involve routine transfers of cash to and from each entity's Bank Accounts.  Intercompany Claims arise from such transfers, which may be completed in connection the various obligations the Managing Agents satisfy on behalf of the Debtors (as well as certain non-Debtor affiliates), such as payroll obligations, payments to harbormasters and other docking charges, refueling costs, and other operational expenses.

32.     The Debtors maintain records of transfers of cash to trace and account for these Intercompany Transactions. The continuance of these transactions postpetition (each a "Postpetition Intercompany Transaction") is an essential component of the Cash Management Practices, particularly in light of the Company's complex corporate and operational structure. The Debtors will continue to maintain records of such Postpetition Intercompany Transactions and respectfully request, pursuant to Bankruptcy Code sections 364(b) and 503(b), that postpetition payments on account of such Postpetition Intercompany Transactions among Debtors be granted administrative expense status.

C.    <u>**The Business Forms**</u>

33.    In the ordinary course of business, the Debtors use a number of checks, business letterhead, purchase orders, invoices, envelopes, promotional materials, and other business forms and correspondence (collectively, the "<u>Business Forms</u>").  Given that the Business Forms were used prepetition, they do not include references to the Debtors' current status as debtors in possession.  Most parties doing business with the Debtors will undoubtedly be aware of the Debtors' status as debtors in possession as a result of the publicity surrounding these Chapter 11 Cases and the notice of commencement of these Chapter 11 Cases that has been or will soon be provided to parties in interest.   As is the case with the existing Cash Management Practices, requiring the Debtors to change their existing Business Forms would unnecessarily distract the Debtors from their restructuring efforts and impose needless expenses on the estates, without any meaningful corresponding benefit.

## JURISDICTION AND VENUE

34.    This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

35.    The predicates for the relief requested herein are sections 105, 345, 363, 364, 503(b), 1107, and 1108 of the Bankruptcy Code.

## RELIEF REQUESTED

36.    By this Motion, the Debtors request entry of interim and final orders:  (a) authorizing the Debtors to continue using their existing Cash Management Practices, Bank Accounts, and Business Forms, in each case subject to changes that they may make thereto in their sole discretion;  (b) waiving any applicable investment and deposit requirements imposed by section 345(b) of the Bankruptcy Code or otherwise;  and

(c) authorizing the Debtors to continue their Intercompany Transactions in the ordinary course of business and, to the extent applicable, granting administrative expense status to postpetition intercompany claims between and among the Debtors pursuant to Bankruptcy Code section 503(b)(1).

37.     The Debtors also request that the Court schedule a final hearing on the Motion within forty-five (45) days of the entry of Interim Order.

## BASIS FOR RELIEF

**A.     The Court Should Authorize Continued Use of the Existing Cash Management Practices in the Ordinary Course of Business**

38.     The Cash Management Practices and applicable procedures employed by the Debtors constitute customary and essential business practices.  The Cash Management Practices afford the Debtors significant benefits, including, among other things, the ability to:  (a) centrally control corporate funds;  (b) ensure the availability of funds when necessary;  and (c) minimize administrative expenses by facilitating a more efficient movement of funds and monitoring of balance and presentment information. It would be unduly difficult and expensive for the Debtors to establish new cash management practices.  The Debtors therefore request permission to continue their existing Cash Management Practices on an interim basis for forty-five (45) days and, ultimately, on a final basis.

39.     Moreover, given that the services provided by the Managing Agents are essential to the Vessels' operations, approval of the Cash Management Practices necessarily entails the Debtors' continued utilization of the Managing Agents' services under the Management Agreements.  Indeed, without these services, the Debtors' entire business would cease operations, dooming the Debtors before even being given the opportunity to utilize and benefit from the Bankruptcy Code.  Without core services

such as hiring, securing docking papers, securing charters, and the payment of employee wages, the Vessels would be unable to operate or service its charters. A loss or interruption of Managing Agents' services — even on a temporary basis — could immediately undermine operations of the Vessels, adversely and permanently impacting the service. This could result in irreparable damage to the Debtors' ability to operate the Vessels during this critical early stage of the Debtors' Chapter 11 Cases. Accordingly, the Managing Agents and the services they provide with respect to managing the Debtors' Vessels are an integral part of the Debtors' Cash Management Practices.

40.     Allowing the existing Cash Management Practices to remain in place will facilitate a smoother transition into chapter 11 and will aid the Debtors' restructuring efforts. Notably, the Cash Management Practices include the necessary accounting controls to enable the Debtors, as well as creditors and the Court, if necessary, to trace amounts through the system and ensure that all transactions are adequately documented and readily ascertainable. The continuation of the Company's existing Cash Management Practices and related Bank Accounts ensure the ongoing concern of the Debtors and Debtors' operations.

41.     In order to effectuate the purposes of this Motion, the Debtors request that all Banks be authorized and directed to: (a) continue administering the Bank Accounts in the usual and ordinary course of business in accordance with the Debtors' instructions and pursuant to the Bank Account Agreements; (b) pay any and all checks, drafts, wires, or electronic funds transfers presented, issued, or drawn on the Bank Accounts on account of any claims arising prepetition or postpetition, so long as sufficient funds are available in such Bank Accounts unless the Debtors specifically issue "stop payment" instructions with respect to such items in accordance with the

16

terms of the Bank Account Agreements; (c) honor the Debtors' directions with respect to the opening or closing of any Bank Account; (d) accept and hold, or invest, the Debtors' funds in accordance with the Debtors' instructions; and (e) pay to the Managing Agents any fees associated with the Managemenet Agents' services provided under the Management Agreements.

42.     The Debtors propose that such Banks be allowed to rely on any order entered granting this Motion and on the Debtors' representations and instructions as to the payments and transfers that may be honored or dishonored in accordance with the terms of the Bank Account Agreements. The Debtors further propose that the Banks not be liable to any party on account of: (a) following the Debtors' instructions or representations as to any order of the Court and (b) honoring any checks, drafts, wires, or electronic funds transfers presented in a good faith belief that this Court has authorized the honoring of such checks, drafts, wires, or electronic funds transfers.

43.     Section 363(c)(1) of the Bankruptcy Code authorizes the debtors in possession to "use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1). The purpose of section 363(c)(1) of the Bankruptcy Code is to provide debtors in possession with the flexibility to engage in ordinary course transactions required to operate their businesses, without unneeded oversight by its creditors or the Court. *See, e.g.*, *Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 384 (2d Cir. 1997); *In re Enron Corp.*, No. 01-16034 (AJG), 2003 WL 1562202, at *15 (Bankr. S.D.N.Y. Mar. 21, 2003); *Chaney v. Official Comm. of Unsecured Creditors of Crystal Apparel, Inc. (In re Crystal Apparel, Inc.)*, 207 B.R. 406, 409 (S.D.N.Y. 1997).

44.     The Debtors' ability to continue their Cash Management Practices and engaging in related routine transactions falls within the parameters of section 363(c) of

the Bankruptcy Code. *See Amdura Nat'l Distribution Co. v. Amdura Corp. (In re Amdura Corp.)*, 75 F.3d 1447, 1453 (10th Cir. 1996); *Charter Co. v. Prudential Ins. Co. of Am. (In re Charter Co.)*, 778 F.2d 617, 621 (11th Cir. 1985) (holding that a debtor's request for authority to continue using its existing cash management system is consistent with section 363(c)(1) of the Bankruptcy Code).

45.     To the extent that continuing the existing Cash Management Practices is beyond the ordinary course of the Debtors' business, such use is permitted by sections 363(b)(1) and 105(a) of the Bankruptcy Code. Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 105(a) of the Bankruptcy Code further provides that the Court may "issue any order . . . that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code. 11 U.S.C. § 105(a).

46.     As another court situated in this District has previously stated, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). Where there is a valid business justification for using property outside the ordinary course of business, the law presumes that, "'in making a business decision the directors of a corporation acted on an informed basis, in good faith[,] and in the honest belief that the action taken was in the best interests of the company.'" *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

47.     Under the circumstances, and in light of the Debtors' belief that continuation of the Cash Management Practices is in the best interests of the estates, the Debtors request that the Court authorize them to continue using their Cash Management Practices.

**B.     The Court Should Authorize Continued Use of the Bank Accounts and the Business Forms on an Interim Basis**

48.     The U.S. Trustee Guidelines, among other restrictions and requirements, prohibit disbursements other than by numbered checks, which checks must bear the applicable debtor's case name and case number, a "debtor in possession" designation, and an indication of the account type.  However, rigid adherence to the U.S. Trustee Guidelines would require, among other things, closure of prepetition bank accounts, the opening of new accounts, and the immediate printing of new checks with a "Debtors in Possession" designation on them.  Thus, enforcement of the U.S. Trustee Guidelines in these Chapter 11 Cases would disrupt the Debtors' business operations, impose burdensome expenses on the estates, and unnecessarily distract the Debtors from their reorganization efforts.

49.     In the ordinary course of business, the Debtors may also use other various Business Forms, including, but not limited to, business letterhead, purchase orders, invoices, envelopes, promotional materials, and other business forms and correspondence.  To minimize expenses, the Debtors seek authority to continue using the Business Forms, substantially in the forms existing immediately before the Petition Date and without any reference in such forms to the Debtors' status as debtors in possession.  As with the Bank Accounts, requiring the Debtors to change their existing Business Forms would unnecessarily distract the Debtors from their restructuring efforts and impose needless expense.

50.    Here, authorizing continued use of both the Bank Accounts and the Business Forms will make the Debtors' transition into chapter 11 smoother, less costly, and more orderly.  Accordingly, the Debtors request that the Court exercise its equitable powers under section 105(a) of the Bankruptcy Code to waive compliance with the U.S. Trustee Guidelines and to authorize the Debtors to continue using their existing Bank Accounts and existing Business Forms in the ordinary course of business on an interim basis for a period of forty-five (45) days and, ultimately, on a final basis. Notwithstanding this waiver, the Debtors will make reasonable best efforts to include a reference to their status as debtors in possession on the Business Forms.

**C.    The Court Should Authorize the Debtors to Honor Certain Prepetition Obligations Related to the Cash Management Practices**

51.    In connection with the Cash Management Practices, the Debtors incur fees and other charges in connection with Bank services (the "<u>Service Charges</u>"), dishonored or returned checks, and other obligations under the Bank Account Agreements (collectively, the "<u>Bank Account Claims</u>").

52.    As with the Cash Management Practices, payment of the Bank Account Claims will minimize disruption to the Debtors' operations and is therefore in the best interests of the estates.  Absent payment of the Bank Account Claims, the Banks might assert setoff rights against the funds in the Bank Accounts on account of the Bank Account Claims, freeze the Bank Accounts, and/or refuse to provide services to the Debtors.  The payment of Bank Account Claims will not prejudice unsecured creditors given that, as noted above, the Banks may have setoff rights with respect to the Bank Account Claims.

53.    In addition, as discussed more fully above, the Management Agreements provide that the Managing Agents be paid certain fees in exchange for the services the

Managing Agents provide in connection with management of the Debtors' Vessels (the "<u>Management Fees</u>"). The Debtors' operations are dependent upon the Managing Agents providing management services with respect to the Debtors Vessels, and any disruption to that arrangement could prove ruinous to the Debtors' business.

54.    Accordingly, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, the Debtors seek authority, in their sole discretion, to continue to pay and/or reimburse the Banks in the ordinary course of business for any Bank Account Claims and allow payment of any outstanding Management Fees from the respective Management Accounts.

**D.    The Court Should Authorize the Debtors to Engage in the Intercompany Transactions in the Ordinary Course of Business**

55.    The Debtors routinely engage in the Intercompany Transactions in the ordinary course of business, and submit that the continuation of the Postpetition Intercompany Transactions would be within the ordinary course of business. However, in an abundance of caution, the Debtors seek authority to enter into such Postpetition Intercompany Transactions in the ordinary course of business.  If the Debtors are permitted to continue entering into the Postpetition Intercompany Transactions in the ordinary course, the Debtors will continue to maintain records of Postpetition Intercompany Transactions, including records of intercompany accounts receivable and accounts payable on a per entity basis.

56.    As noted above, pursuant to Bankruptcy Code section 363(b)(1), debtors in possession are authorized to use property of the estate other than in the ordinary course of business after notice and a hearing.  The Intercompany Transactions facilitate the Debtors' day-to-day operations, as well as the day-to-day operations of the non-Debtor affiliates, which are responsible for managing the Debtors' affairs. Thus, the Debtors

submit that such relief under Bankruptcy Code section 363(b)(1) is appropriate, as entrance into Postpetition Intercompany Transactions is well within the sound business judgment of the Debtors.

57.     Additionally, pursuant to section 503(b) of the Bankruptcy Code, the Debtors request that all Intercompany Claims against a Debtor by another Debtor or a Non-Debtor Affiliate arising postpetition, in the ordinary course of business, as a result of a Postpetition Intercompany Transaction, be granted administrative expense priority status. If the Postpetition Intercompany Claims are accorded administrative expense priority status, each entity utilizing funds that flow through the Bank Accounts consistent with the Cash Management Practices should continue to bear ultimate repayment responsibility for such ordinary-course transactions. The Debtors expressly reserve their rights to contest the validity and/or amount of any Postpetition Intercompany Transaction and Intercompany Claim.

58.     Courts in this and other jurisdictions have routinely granted similar relief in other chapter 11 cases.  *See, e.g., In re Relativity Fashion, LLC et al.*, No. 15-11989 (Bankr. S.D.N.Y. July 30, 2015) (allowing debtors to continue intercompany transactions and granting administrative expense priority to intercompany claims arising postpetition); *In re Genco Shipping & Trading Ltd., et al.*, No. 14-11108 (Bankr. S.D.N.Y. Apr. 21, 2014) (same);  *In re Exide Tech.*, No. 13-11482 (Bankr. D. Del. June 10, 2013) (authorizing debtor to pay certain prepetition intercompany claims and continue intercompany transactions, and granting administrative expense priority to intercompany claims arising postpetition);  *In re MF Global Holdings, Ltd.*, No. 11-15059 (Bankr. S.D.N.Y. Apr. 4, 2012) (allowing debtors to continue intercompany transactions and granting administrative expense priority to intercompany claims arising postpetition).

E.    **Cause Exists to Waive the Investment and Deposit Restrictions Imposed by Section 345 of the Bankruptcy Code and the U.S. Trustee Guidelines Regarding Authorized Depositories on an Interim and Final Basis**

59.    Section 345(a) of the Bankruptcy Code authorizes deposits or investments of estate money in a manner that will "yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." 11 U.S.C. § 345(a).  For deposits or investments that are not "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States," section 345(b) of the Bankruptcy Code provides that the estate must require from the entity with which the money is deposited or invested a bond in favor of the United States secured by the undertaking of an adequate corporate surety, "unless the court for cause orders otherwise."  *Id*. at 345(b).

60.    To help Debtors comply with this section of the Bankruptcy Code, the U.S. Trustee has promulgated the Region 2 United States Trustee's Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees (Nov. 27, 2013) (the "U.S. Trustee Guidelines") as well as a list of authorized depositories (the "Authorized Depositories") at which Debtors may maintain bank accounts.  Under the U.S. Trustee Guidelines, debtors in possession must, among other things, close prepetition bank accounts and open new "debtor in possession" operating, payroll, and tax accounts at an Authorized Depository.

61.    As noted above, however, courts may waive compliance with section 345(b) of the Bankruptcy Code, and ultimately the U.S. Trustee Guidelines, for "cause." In evaluating whether "cause" exists, courts have considered a number of factors, including, among others, the sophistication and size of a debtor's business, the amounts of the investments involved, bank ratings, the complexity of the case, the debtor's safeguards for the funds, the debtor's ability to reorganize in the face of failure of one or

more of the financial institutions, the benefit to the debtor of a waiver of the section

345(b) requirements, the potential harm to the estate, and the reasonableness of such a

waiver under the circumstances. *See In re Serv. Merch. Co.*, 240 B.R. 894, 896 (Bankr. M.D.

Tenn. 1999).

62.    Congress has cautioned that the investment and deposit requirements of

section 345 of the Bankruptcy Code may be "wise in the case of a smaller debtor with

limited funds that cannot afford a risky investment to be lost, [but such requirements]

can work to needlessly handcuff larger, more sophisticated debtors."  H.R. Rep. 103-835,

103d Cong., 2d Sess. 224 (Oct. 4, 1994);  140 Cong. Rec. H10767 (Oct. 4, 1994).  Thus,

Congress added the waiver clause in section 345(b) of the Bankruptcy Code "to allow

the courts to approve investments other than those permitted by section 345(b) for just

cause." *Id.*

63.    The Debtors do not maintain any investment accounts. While none of the

Banks the Company utilizes, including two of the Banks at which the Management

Accounts (HSBC and Citi) are held, are on the U.S. Trustee's list of Authorized Bank

Depositories, the Debtors' funds are held in internationally known institutions,

including the London affiliate of HSBC Bank USA, N.A., which is an Authorized Bank

Depository.  Because these Bank Accounts, including the Management Accounts, are

vital to the Debtors' Cash Management Practices, the Debtors submit that requiring the

Debtors to transfer these funds to other U.S.-based banks would be crippling to the

Debtors' operations, which must seamlessly operate across multiple jurisdictions.  Thus,

the Debtors submit that there is cause to waive strict compliance with the U.S. Trustee's

Guidelines on an interim basis.[7]

---

[7]    The Debtors reserve the right to seek further extensions of the interim order.

64.     Courts in this District have authorized debtors to maintain cash management systems and use their existing depository accounts, even when such accounts are located at foreign banks. See, e.g., Interim Order, *In re Nautilus Holdings Limited, et al.*, No. 14-22885 (Bankr. S.D.N.Y. June 25, 2014), ECF No. 28 (allowing maintenance of several bank accounts in overseas banks); Interim Order, *In re Excel Maritime Carriers LLC*, No. 13-23060 (Bankr. S.D.N.Y. July 2, 2013) (allowing maintenance of several dozen bank accounts in overseas banks); Interim Order, *In re Marco Polo Seatrade B.V. et. al.*, No. 11-13634 (Bankr. S.D.N.Y. Aug. 12, 2012), ECF No. 49 and Final Order, *In re Marco Polo Seatrade B.V. et. al.*, No. 11-13634 (Bankr. S.D.N.Y. Oct. 18, 2011), ECF No. 204 (allowing debtors to maintain existing cash management system without modification for over 120 days); Interim Order, *In re Gen. Mar. Corp.*, No. 11-15285 (Bankr. S.D.N.Y. Nov. 18, 2011), ECF No. 31 and Final Order, *In re Gen. Mar. Corp. et. al.*, No. 11-15285 (Bankr. S.D.N.Y. Dec. 28, 2011), ECF No. 155 (allowing debtors to maintain existing cash management system containing many foreign bank accounts without modification for at least 40 days, including over 40 accounts at Nordea in the Cayman Islands); Interim Order, *In re B+H Carriers Ltd. et. al.*, No. 12-12356 (Bankr. S.D.N.Y. June 28, 2012), ECF No. 63 and Final Order, *In re B+H*, No. 12-12356 (Bankr. S.D.N.Y. Aug. 8, 2012), ECF No. 132 (allowing debtors to maintain existing cash management system containing many foreign bank accounts without modification for over 65 days); Order, *In re Satelites Mexicanos*, S.A. de C.V., No. 06-11868 (Bankr. S.D.N.Y. Oct. 26, 2006), ECF No. 147 (allowing maintenance of over a dozen foreign bank accounts, particularly several Mexican bank accounts).

65.     The Debtors further request that they be authorized, on an interim basis for forty-five (45) days, in their sole discretion, to close Bank Accounts and open new bank accounts on notice to parties, if such action becomes necessary for any reason. In

connection therewith, the Debtors request that the applicable Banks be authorized and directed to honor the Debtors' directions with respect to the opening or closing of any bank account. The Debtors further request that any and all accounts opened by the Debtors on or after the Petition Date at any Bank be deemed a Bank Account (as if it had been opened prior to the Petition Date and included in the Account List) and that any and all Banks at which such accounts are opened similarly be subject to the rights and obligations of any order on this Motion.

66.     For the reasons set forth above, the Debtors submit that the relief requested in this Motion is in the best interests of the Debtors, their estates, creditors, stakeholders, and other parties in interest, and therefore should be granted.

## IMMEDIATE RELIEF IS NECESSARY TO
## AVOID IMMEDIATE AND IRREPARABLE HARM

67.     Rule 6003 of the Federal Rules of Bankruptcy Procedures ("Bankruptcy Rules") provides that the relief requested in this Motion may be granted if the "relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003; *see also In re First NLC Fin. Servs., LLC*, 382 B.R. 547, 549 (Bankr. S.D. Fla. 2008) (holding that Bankruptcy Rule 6003 permits entry of retention orders on interim basis to avoid irreparable harm). The Second Circuit has interpreted the language "immediate and irreparable harm" in the context of preliminary injunctions. In that context, the Second Circuit instructed that irreparable harm "'is a continuing harm which cannot be adequately redressed by final relief on the merits' and for which 'money damages cannot provide adequate compensation.'" *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (quoting *N.Y. Pathological & X-Ray Labs., Inc. v. INS*, 523 F.2d 79, 81 (2d Cir. 1975)). Further, the "harm must be shown to be actual and imminent, not remote or speculative." *Id.* at 214; see also *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999).

26

The Debtors submit that, for the reasons already set forth herein, the relief requested in this Motion is necessary to avoid immediate and irreparable harm.

### WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h)

68.     The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate their businesses without interruption and to preserve value for their estates.  Accordingly, the Debtors respectfully request that the Court waive the fourteen-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

### NOTICE

69.     Notice of this Motion shall be given to:  (a) the United States Trustee for the Southern District of New York;  (b) the Debtors' material prepetition secured lenders; (c) the parties listed in the consolidated list of thirty (30) largest unsecured creditors filed by the Debtors in these Chapter 11 cases;  (d) the Internal Revenue Service;  and (e) any such other party entitled to notice pursuant to Local Bankruptcy Rule for the United States Bankruptcy Court for the Southern District of New York 9013-1(b).  The Debtors submit that no other or further notice need be provided.

### NO PRIOR REQUEST

70.     No previous request for the relief requested herein has been made to this Court or any other court.

## CONCLUSION

**WHEREFORE**, the Debtors respectfully request that the Court enter an interim order, substantially in the form annexed hereto as Exhibit A, granting the relief requested in this Motion and such other and further relief as may be just and proper.

DATED:  New York, New York
         January 29, 2017

                                   TOGUT, SEGAL & SEGAL LLP,
                                   *Proposed Counsel to the Debtors and Debtors in Possession*
                                   TOISA LIMITED, *et al.*,
                                   By:

                                   /s/ Albert Togut
                                   ALBERT TOGUT
                                   FRANK A. OSWALD
                                   BRIAN F. MOORE
                                   KYLE J. ORTIZ
                                   One Penn Plaza, Suite 3335
                                   New York, New York  10119
                                   (212) 594-5000