Craig A. Wolfe, Esq.
Jason R. Alderson, Esq.
**SHEPPARD MULLIN RICHTER & HAMPTON, LLP**
30 Rockefeller Plaza
New York, NY 10112
Tel: (212) 653-8700
Fax: (212) 653-8701

*Counsel for Unofficial Committee of*
*Unsecured Creditors of Toisa Limited, et al.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re:<br><br>TOISA LIMITED, *et. al.*,<br><br>           Debtors.[1] | Chapter 11<br><br>Case No. 17-10184 (SCC)<br><br>Jointly Administered<br><br>**Hearing Date: To be Determined** |

**UNOFFICIAL COMMITTEE OF UNSECURED CREDITORS' (I) MOTION
FOR AN ORDER (A) DIRECTING THE APPOINTMENT OF AN OFFICIAL
COMMITTEE OF UNSECURED CREDITORS, PURSUANT TO 11 U.S.C. §§
1102(a)(1) AND 105(a), AND (B) EXTENDING THE COMMITTEE CHALLENGE
PERIODS IN THE MULTIPLE CASH COLLATERAL ORDERS, PURSUANT TO
11 U.S.C. § 105(a); AND (II) STATEMENT PURSUANT TO BANKRUPTCY RULE 2019**

---

[1] The Debtors in these chapter 11 cases, are as follows: Edgewater Offshore Shipping, Ltd.; Toisa Horizon, Inc.; Toisa Limited; Trade And Transport Inc.; Trade Industrial Development Corporation; Trade Prosperity, Inc.; Trade Quest, Inc.; Trade Resource, Inc.; Trade Sky, Inc.; Trade Spirit, Inc.; Trade Unity, Inc.; Trade Vision, Inc.; Trade Will, Inc.; United Ambassador, Inc.; United Banner, Inc.; United Courage, Inc.; United Dynamic, Inc.; United Emblem, Inc.; United Honor, Inc.; United Ideal, Inc.; United Journey, Inc.; United Kalavryta, Inc.; United Leadership, Inc.; United Seas, Inc.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................................2

JURISDICTION ........................................................................................................4

BACKGROUND .......................................................................................................4

RELIEF REQUESTED................................................................................................5

ARGUMENT............................................................................................................5

      A.     An Official Committee Of Unsecured Creditors Should Be Appointed..................5

      B.     Three Creditors Adequately Represent the Interests of General Unsecured
           Creditors...................................................................................................6

      C.     Developments in the Cases Illustrate the Need for an Official Committee............9

      D.     Investigation of Insider Transactions is Necessary...............................................14

      E.     Bankruptcy Code Mandates Appointment of an Official Committee ..................15

      F.     Committee Challenge Periods Should Be Extended..............................................18

UNOFFICIAL COMMITTEE'S BANKRUPTCY RULE 2019 STATEMENT ..........................19

# TABLE OF AUTHORITIES

**Page(s)**

Cases

In re Circle Z Pressure Pumping, LLC
    Bankr. E.D. Tex., Case No. 16-60633 (BP) (Dkt. No. 21) ......................................................17

In re Columbia Gas Sys.
    33 F. 3d 294(3d Cir. 1994)....................................................................................................15

In re Edge Pennsylvania, LLC
    Bankr. M.D. Pa., Case No. 15-04869 (Dkt. No. 102)..............................................................17

In re Egenix, Inc.
    Bankr. D. Del., Case. No. 14-12818 (BLS) (Dkt. No. 58) ......................................................17

In re Evergreen Solar, Inc.
    Case No. 11-12590 (MFW) (Bankr. D. Del. Oct. 28, 2011) ....................................................18

In re Exaeris, Inc.
    Bankr. D. Del., Case No. 07-10887 (KG) (Dkt. No. 422) .......................................................17

In re Excel Maritime Carriers Ltd, et al.
    Bankr. S.D.N.Y., Case No. 13-23060 (RDD)....................................................................13, 14

In re Gawker Media LLC, et al.
    Bankr. S.D.N.Y., Case No. 16-11700 (SMB) (Dkt. No. 62) ......................................................9

In re Midwest Asphalt Corp.
    Bankr. D. Minn., Case No. 17-40075 (WJF) (Dkt. No. 41) ....................................................17

In re Open Range Commc'ns Inc.
    Case No. 11-13188 (KJC) (Bankr. D. Del. Jan. 13, 2012) ......................................................18

In re Residential Capital, LLC
    Case No. 12-12020 (MG) (Bankr. S.D.N.Y. Dec. 26, 2012)....................................................18

In re Revco D.S., Inc.
    898 F.2d 498 (6th Cir. 1990) .................................................................................................15

In re ScripsAmerica
    Bankr. D. Del., Case No. 16-11991 (LSS) (Dkt. No. 71) .......................................................17

In re Sharon Steel Corp.
    110 B.R. 205 (Bankr. W.D. Pa. 1990) ...................................................................................18

In re Siga Technologies, Inc.
   Bankr. S.D.N.Y., Case No. 14-12623 (SHL) (Dkt. No. 403 at p.4) ...............................16, 17

In re SW Liquidation, LLC
   Bankr. D. Del., Case No. 15-10327 (LSS) (Dkt. No. 386) .....................................................17

In re Taylor-Wharton International, LLC, et al.
    Bankr. D. Del., Case No. 15-12075 (BLS) (Dkt. 197) ...........................................................17

In re Texaco, Inc.
   79 B.R. 560 (Bankr. S.D.N.Y. 1987) .....................................................................................15

In re Triple C Flatbed Holdings, LLC
   Bankr. N.D. Ga., Case No. 16-58984 (PMB) (Dkt. No. 123)................................................17

In re Vermillion, Inc.
   Bankr. D. Del., Case. No. 09-11091 (CSS) (Dkt. No. 210)...................................................17

Statutes

11 U.S.C. § 105(a) .......................................................................................................................2, 6

11 U.S.C. § 345(b) ..........................................................................................................................15

11 U.S.C. § 541(a)(1).......................................................................................................................12

11 U.S.C. § 549 ...............................................................................................................................13

11 U.S.C. § 1102(a)(1)....................................................................................2, 3, 5, 6, 15, 17

11 U.S.C. § 1107(a) ...........................................................................................................................4

11 U.S.C. § 1108 ...............................................................................................................................4

28 U.S.C. § 157 .................................................................................................................................4

28 U.S.C. § 157(b)(2) .......................................................................................................................4

28 U.S.C. § 1334 ...............................................................................................................................4

28 U.S.C. § 1408 ...............................................................................................................................4

28 U.S.C. § 1409 ...............................................................................................................................4

Other Authorities

Bankrruptcy Rule 9006(b)(1) ..........................................................................................................18

Bankruptcy Rule 2015.3 ...................................................................................................................14

Bankruptcy Rule 2019 ...................................................................................................2, 19

Bankruptcy Rule 9006(b)....................................................................................................18

Local Rule 1007.............................................................................................................8, 14

*United States Trustee Program Policy and Practices Manual* (July 2016), at § 3-
4.4.8....................................................................................................................................8

The unofficial committee of unsecured creditors consisting of three creditors (the "Unofficial Committee") of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by and through the undersigned counsel, respectfully submits this (I) motion (the "Motion") for entry of an order (A) directing the appointment of an official committee of unsecured creditors in the above-captioned chapter 11 cases, pursuant to 11 U.S.C. §§ 1102(a)(1) and 105(a), and (B) extending the committee challenge periods in the multiple cash collateral orders entered in these cases, pursuant to 11 U.S.C. § 105(a); and (II) statement pursuant to Bankruptcy Rule 2019 (the "2019 Statement").  The declaration of Craig A. Wolfe in support of this Motion and 2019 Statement (the "Wolfe Declaration") is being filed concurrently herewith, and in support of the Motion and 2019 Statement, the Unofficial Committee respectfully submits as follows:

## PRELIMINARY STATEMENT

1.      These mega cases have been pending for more than three months and the Office of the United States Trustee (the "U.S. Trustee") has yet to appoint an official committee of unsecured creditors (an "Official Committee").  This is despite the Congressional mandate to do so in section 1102(a)(1) of the Bankruptcy Code and sufficient creditors willing, ready and able to serve.  There are three creditors seeking membership to an Official Committee that hold claims in an aggregate amount of approximately $116 million against three individual Debtors. The Unofficial Committee has been informed that a fourth general unsecured creditor holding a multimillion dollar claim will be submitting a questionnaire to the U.S. Trustee early next week and will serve on the Unofficial Committee in connection with this Motion.  The Unofficial Committee has made several requests of the U.S. Trustee to form the Official Committee, but to date, no Official Committee has be formed.  Because there are multiple creditors willing to

serve, an official committee of unsecured creditors "shall" be appointed under section

1102(a)(1).  Appointment is mandatory.

2.      But even if appointment were discretionary, there are numerous reasons why an

Official Committee will add value to these cases and is thus desirable.  An Official Committee

will (a) be a constructive party in the ongoing negotiations with the secured lenders, (b) give

meaning to the otherwise pointless lien challenge periods contained in this Court's multiple

cash collateral orders, and (c) enable the Court to enter findings of fact and a plan confirmation

order (when the time comes) knowing that the interests of unsecured creditors were represented

in these cases.  This is crucial in light of the section 1102(a)(1) mandate.

3.      The Unofficial Committee will bring a positive element to the cases if made

official.  Each of the three creditors have expertise in different aspects of the shipping and

offshore service vessel ("OSV") industries (e.g., shipbuilding, OSV crew issues and operations,

and tanker and bulker operations).  The Unofficial Committee has also sought counsel, who has

attended the hearings, has 13 years of business side experience in both the OSV and shipping

industries, and has represented a multitude of official creditors' committees in maritime and

shipping chapter 11 cases in this District and others.  No case is more illustrative than the B+H

Ocean Carriers chapter 11 cases before this Court, which was by all accounts a resounding

success for both secured and unsecured creditors alike.  Distributions of nearly 70% were made

to the general unsecured creditors of certain of the B+H debtors.  This was accomplished

without value-destroying litigation.

4.      As with the official committee in B+H, the Unofficial Committee here (if

conferred official status) anticipates being constructive and value additive rather than

improperly litigious focusing on holdup value.  The Unofficial Committee shares the Debtors'

desire to resolve the parties' potential differences without unnecessary intervention from the Court.

5.      It is indeed crucial, for the reasons below, that an Official Committee be appointed to serve as a key constituent in negotiations that to date have been between the competing interests of the secured lenders and the equity holder without meaningful regard to the large claims of the general unsecured creditors.  The Unofficial Committee thus requests that the Court order the appointment of an Official Committee constituted by all or part of the Unofficial Committee or one or more other general unsecured (non-deficiency claimant) creditors.

## JURISDICTION

6.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

7.      On January 29, 2017 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Court").  The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No statutory committee, trustee or examiner has been appointed in these cases.

8.      The following three creditors responded to the solicitation sent by the U.S. Trustee that sought volunteers for serving on an Official Committee:  (i) Hyundai Heavy Industries Co., Ltd., (ii) Paul Hebert, and (iii) Pequod Associates USA LLC.  Each of the creditors indicated its willingness to serve on the committee by returning executed

questionnaires to the U.S. Trustee.  The questionnaires are attached as exhibits to the Wolfe
Declaration.

9.      On March 16, 2017, the Unofficial Committee sent a letter to the U.S. Trustee
requesting the appointment of an Official Committee for the reasons set forth herein.  On
March 27, 2017, a similar follow-up request was made, and ultimately, the Unofficial
Committee provided the U.S. Trustee with an earlier draft of this motion.  No Official
Committee has been appointed, and today, the Unofficial Committee completed a unanimous
vote that authorized the filing forthwith of this Motion and 2019 Statement.  With time running
short on the various lien challenge periods granted in multiple cash collateral orders, the
Unofficial Committee believes that the interests of unsecured creditors will be irreparably
harmed if an Official Committee is not promptly appointed.

## RELIEF REQUESTED

10.     By this Motion, the Unofficial Committee seeks an order or orders of this Court
(A) directing the appointment of an Official Committee constituted by all or part of the
members of the Unofficial Committee or one or more other general unsecured creditors that are
non-deficiency claimants, and (B) extending the committee challenge period deadlines
contained in the Court's multiple cash collateral orders by a time period reasonably sufficient
for the Official Committee to complete an investigation and to seek standing, if necessary, to
bring claims.

## ARGUMENT

### A.      An Official Committee Of Unsecured Creditors Should Be Appointed

11.     Section 1102(a)(1) of the Bankruptcy Code requires that the U.S. Trustee appoint
a committee if there are creditors willing to serve.  Section 1102(a)(1) provides as follows:

> Except as provided in paragraph (3), as soon as practicable after the order for relief under chapter 11 of this title, the United States trustee **shall** appoint a committee of creditors holding unsecured claims and may appoint additional committees of creditors or of equity security holders as the United States trustee deems appropriate.

11 U.S.C. § 1102(a)(1) (emphasis added).  Section 1102(a)(1) uses the term "shall" and is thus mandatory rather than discretionary.  The reference to paragraph 3 in the beginning of the sentence is inapplicable as it relates to small business debtor cases, which these are not.

    12.    Section 105(a) of the Bankruptcy Code provides:

> The court may issue any order, process, or judgment that is necessary or appropriate **to carry out the provisions of this title**.  No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a) (emphasis added).  The Court therefore has authority to require the appointment of an Official Committee by using its express powers to carry out the mandatory provisions of section 1102(a)(1) of the Bankruptcy Code.

**B.    Three Creditors Adequately Represent the Interests of General Unsecured Creditors**

    13.    The members of the Unofficial Committee are representative of the interests of unsecured creditors generally.  As shown in the chart below, the aggregate amount of claims held by members of the Unofficial Committee exceeds $116 million and are asserted against three of the Debtors:

| Creditor Name: | **HYUNDAI HEAVY INDUSTRIES CO., LTD. ("HHI")** |
|---|---|
| Address: | 1000 Bangeojinsunhwan-doro, Dong-gu Ulsan, Korea |
| Disclosable Economic Interest: | On January 31, 2013, HHI entered into a shipbuilding contract with Toisa Limited ("Toisa") for the construction by HHI of one offshore construction vessel.  On April 28, 2016, Toisa purported to terminate the contract by providing HHI with a notice of cancellation.  On May 10, 2016, HHI |

| | commenced an arbitration in London for wrongful termination and repudiatory breach of the contract by Toisa. In the arbitration, HHI has asserted that it is owed by Toisa not less than US$90,098,441 after application of all payments made by Toisa. Toisa has sought the return of its payments under the contract and HHI denies that they are subject to refund. HHI thus asserts a claim for such amount in addition to any additional fees, costs, and/or interest that may be allowable. |
|---|---|

| Creditor Name: | **PAUL HEBERT**, an individual ("Mr. Hebert") |
|---|---|
| Address: | 125 Garrett Lane<br>Houma, LA 70364 |
| Disclosable Economic Interest: | On April 20, 2010, the offshore drilling rig Deepwater Horizon exploded, caught fire, and caused a lengthy and prolific oil spill in the U.S. Gulf of Mexico. Toisa Limited and Toisa Horizon, Inc. provided the well test vessel Toisa Pisces to assist in the disaster mitigation process. Paul Hebert was a crew member on the Toisa Pisces and alleges that he sustained personal injury in that capacity. In 2011, Mr. Hebert commenced a lawsuit against Toisa Limited and certain other affiliated and unaffiliated defendants in the United States District Court for the Eastern District of Louisiana, Case No. 11-01200, seeking US$25 million. The action remains unresolved and pending. Mr. Hebert thus asserts a claim for such amount in addition to any additional fees, costs, and/or interest that may be allowable. |

| Creditor Name: | **PEQUOD ASSOCIATES USA LLC** ("Pequod") on behalf of BP PRODUCTS NORTH AMERICA INC. |
|---|---|
| Address: | c/o Pequod Associates USA LLC<br>708 3rd Avenue. 5th Floor<br>New York, NY 10017 |
| Disclosable Economic Interest: | In April 2012, the tanker United Emblem allegedly owned by United Emblem, Inc. transported crude oil for BP Products North America Inc. ("BP") from Egypt to the United States. The shipment resulted in a shortage of 8,641 barrels of crude oil with a value of US$1,031,441.61. BP thus asserts a claim for such amount in addition to any additional fees, costs, and/or interest that may be allowable. |

14.     The proposed creditor mix is ideal as the three creditors represent a cross-section of the Debtors' businesses. HHI, which holds a claim against Debtor Toisa Limited, builds OSVs and all types of ships, including tankers and bulkers of the same type and class as those owned by the Debtors. Mr. Hebert, who holds claims against Debtors Toisa Horizon, Inc. and Toisa Limited, served as a crew member on the Debtors' vessel, DSV Toisa Pisces, and is thus

familiar with vessel operations.  Pequod, which is responsible for the cargo shortage claim

against Debtor United Emblem, Inc., serves as a cargo claims adjuster and collection agent in

the shipping industry and is deeply familiar with all aspects of cargo carriage issues and vessel

operations.  The three creditors provide an excellent mix of experience, claim type and size, and

cross-section of Debtors.  See Wolfe Declaration.

15.    The Unofficial Committee understands that the U.S. Trustee's office has

expressed concerns with the appointment of Pequod despite BP having authorized and directed

Pequod to serve as the collection agent on its behalf back in 2012 and having more recently

executed a power of attorney that includes serving on an Official Committee.  Compared to BP,

however, Pequod is understood to have a greater familiarity with respect to the Debtors and the

cargo shortage claim specifically, and has been working for several years to resolve the claim.

Moreover, the Debtors have already acknowledged Pequod as the claimholder pursuant to the

litigation schedule attached to the first day Local Rule 1007 affidavit (See Docket No. 3, Ex. J,

item No. 16 on pg. 3).

16.    The fact that all three creditors wishing to serve on the Official Committee hold

disputed claims is of no consequence.  As the U.S. Trustee states in its United States Trustee

Program Policy and Practices Manual:

> The mere fact that a creditor holds a claim that is contingent,
> unliquidated, or disputed does not disqualify the creditor from
> appointment to the committee.  This is clear from the definitions of
> "claim" and "creditor" set forth in the Code. 11 U.S.C. §§ 101(5), (10).
> See generally In re Barney's, Inc., 197 B.R. 431 (Bankr. S.D.N.Y.
> 1996).

See United States Trustee Program Policy and Practices Manual (July 2016), at Section 3-4.4.8.

To illustrate this point, the U.S. Trustee in this District recently appointed a three-member

committee of 100% litigation creditors who were suing the debtor (i.e., Terry Gene Bollea (aka

"Hulk Hogan"), Shiva Ayyadurai, and Ashley A. Terrill, who were all individuals).  See In re

Gawker Media LLC, et al., Bankr. S.D.N.Y., Case No. 16-11700 (SMB) (Dkt. No. 62).

17.    The Unofficial Committee is primed to provide all general unsecured creditors

with a necessary voice in these proceedings.  Excluding the substantial claims held by the

Unofficial Committee members, there are also millions of dollars of other unsecured claims at

issue.  The Internal Revenue Service recently filed over $355 million in unsecured claims.  And,

as noted above, the Unofficial Committee is aware that a fourth creditor holding substantial

claims intends to submit a questionnaire to the U.S. Trustee early next week.  Substantially

more claims are likely at stake once the Debtors obtain a claims bar date and additional proofs

of claim are filed.  Given the Unofficial Committee's broad industry composition that includes

shipbuilding, vessel crewing and operations, as well as cargo and charter issues, no group is

better positioned to advocate for the rights of all general unsecured creditors if conferred official

status.

**C.**    **Developments in the Cases Illustrate the Need for an Official Committee**

18.    Toisa is Encumbering Cash that it Previously Reported was Unencumbered.  At

the first day hearing that occurred on January 30, 2017, Debtors' counsel confirmed that there is

"no cash collateral" and that the Debtors had approximately $100 million in cash that was

unencumbered.  See January 30, 2017 Hearing Tr. 14:12-25.  A true and correct copy of the

relevant portion of the January 30, 2017 Hearing Transcript is attached hereto as **Exhibit 1**.

Notwithstanding such representation, the Debtors subsequently filed a consensual motion

granting Citibank adequate protection for use of alleged cash collateral related to purported liens

on such "unencumbered" cash without any explanation as to the basis for the Debtors' change

in position.  See Docket Nos. 33, 39, 80 and 128 (includes interim and final orders).

19.    It did not stop there.  On March 13, 2017, DVB Bank and Danish Ship Finance filed pleadings indicating that the Debtors promised these and all other lenders the same protections.  See Docket Nos. 63 and 64.  The next day, on March 14, 2017, the Debtors filed a motion seeking to grant Crédit Agricole adequate protection for its purported lien on cash. Docket Nos. 70, 78 and 91.  The Unofficial Committee is unaware from the record as to why the Debtors' changed their position with respect to any of these lenders.  Accordingly, cash originally characterized by the Debtors as "liquidity" and "unencumbered" at the first day hearing is apparently now being used for the protection of the lenders without sufficient visibility or any scrutiny by an Official Committee.  Hr'g Tr. 14:13 and 19.

20.    <u>Lien Challenge Periods are Expiring</u>.  The Debtors' reversal on adequate protection after insisting its cash was unencumbered is being accomplished without the protection of an Official Committee investigating the purported underlying liens.  The final Crédit Agricole cash collateral order entered on March 29, 2017 contains a May 30 deadline for an Official Committee to investigate, obtain standing to challenge the liens, and file a complaint.  Docket No. 91.  The amended and restated final Citibank cash collateral order entered on April 28, 2017 contains an May 16 deadline.  Docket No. 128.  The Citibank interim order contained a much shorter period for the Debtors to investigate and challenge the liens, but such deadline has already expired.  Docket No. 39.

21.    There is precious little remaining time for an Official Committee to conduct a comprehensive lien investigation on account of the Crédit Agricole and Citibank facilities across a multitude of foreign jurisdictions and six foreign ship registries.  The investigation is expected to involve a complex conflict of laws and perhaps choice of law analysis on perfection of liens on cash held in certain jurisdictions outside the U.S. but is also subject to liens or

security interests arising under the laws of other jurisdictions.  Compounding the urgency, the

Debtors recently filed a cash collateral motion on account of its remaining secured lenders.

Docket No. 126.  The order granting the latest cash collateral motion on an interim basis

contains a 60 day challenge period (measured from the May 4 entry date) for an Official

Committee to investigate, obtain standing and file complaint(s) in connection with 15 different

loan facilities.  Docket No. 137.[2]  And if no Official Committee is appointed, there will be no

party to perform this critical task on behalf of general unsecured creditors that have markedly

different interests than the deficiency claimants who will likely be seeking to maximize their

collateral valuations.

22.    Toisa is Paying Millions of Dollars of Prepetition Claims Without Court

Authority.  The Unofficial Committee is also deeply concerned with the Debtors' cash

management system.  See cash management motion at Docket No. 8 (the "Cash Management

Motion").  One of its most patent problems stems from the Debtors' fundamental assumption

that the millions in cash held by the three non-debtor affiliated management companies (Marine

Management Services M.C., Marine Management Bulk Services Inc., and Sealion Shipping

Ltd.) is either not property of the estate or can somehow be used to pay prepetition claims of

creditors (and presumably for other purposes outside the ordinary course of business) without

court oversight and perhaps approval.

23.    The record on this issue is concerning.  Soon after the Petition Date, the Debtors

apparently paid millions of dollars of prepetition general unsecured claims with what appears to

be estate cash without making any factual showing that the claimants were maritime

lienholders, the payments satisfied the critical vendor/doctrine of necessity test that is the law of

---

[2] The interim order contains a 30 day review period for the Debtors that expires on June 3, 2017.

this Circuit, or were made pursuant to any court order whatsoever.  At the first day hearing on

January 30, the Debtors merely stated that the vendors were being paid by the non-debtor

affiliated management companies, and thus no critical vendor motion was

necessary.  January 30, 2017 Hr'g Tr. 16:13-18.  But that argument wrongly assumes that when

a non-debtor uses property of the estate to pay a prepetition claim of the debtor, no court

approval is necessary.  That is not the case.

24.    While the Unofficial Committee agrees that the cash held by the non-debtor

affiliated management companies may in fact be outside the control of the lenders and thus

unencumbered, such funds remain property of the estate under section 541(a)(1)'s expansive

definition:

> The commencement of a case under section 301, 302, or 303 of this
> title creates an estate.  Such estate is comprised of all the following
> property, wherever located and **by whomever held**:  (1) Except as
> provided in subsections (b) and (c)(2) of this section, all legal or
> equitable interests of the debtor in property as of the commencement
> of the case.

11 U.S.C. ¶ 541(a)(1) (emphasis added).

25.    Exhibit B of the Cash Management Motion illustrates this point.  Exhibit B is the

Marine Management Agreement between one of the non-debtor affiliated management

companies (Marine Management Services M.C.) and one of the Debtors.  See Docket No. 8,

Exhibit B to which is attached hereto as **Exhibit 2**.  Beginning at the bottom of page two, the

agreement shows that the management company collects all charter proceeds on behalf of the

Debtor (see Section 3(j)), pays the vessel expenses with the Debtor's own funds, and is merely

entitled to a $2,000 per day fee for such services (see Section 9(a)).  Nothing in the management

agreement (nor what the Unofficial Committee anticipates will be found in the relevant charter

or other documents) would effectuate any transfer of title to the charter proceeds from the

-12-

Debtor to the management company. The Debtors thus appear to have caused the payment of prepetition claims with property of the estate without any court authority to do so. If so, these are avoidable transfers under section 549 of the Bankruptcy Code and need to be investigated.

26.     The Unofficial Committee has deep and immediate concerns that as adequate protection is granted on a lender-by-lender basis, the $100 million in unencumbered cash will be incrementally shifted for the benefit of the secured creditors. It is crucial that an Official Committee is appointed to promptly address, among other things, the problems with adequate protection, review the purported liens on the cash and the vessels, and address certain problematic features of the Cash Management Motion and the unauthorized payment of prepetition claims. Once these critical items are accomplished, the Official Committee will be positioned to address the plan process and the remainder of the cases.

27.     <u>Anticipated Absolute Priority Problems</u>. It is well-settled among those who advise privately-held foreign shipping companies that a U.S. bankruptcy is typically only contemplated to accommodate some portion of equity being transferred to existing shareholders under a plan. It is not always successful, but that is typically the goal. It is unlikely that the Debtors' primary equity holder intends to proceed differently. If that were the case, the shareholder would have caused the filing in Greece or one of the many other jurisdictions where the assets would have been conveyed to a trustee, administrator or similar person or entity for disposition rather than remaining with a debtor in possession. The Unofficial Committee therefore anticipates that the Debtors will eventually file a plan that contemplates some portion of the new equity transferring directly or indirectly to the existing shareholder.

28.     This is essentially what happened in <u>In re Excel Maritime Carriers Ltd, et al.</u>, Bankr. S.D.N.Y., Case No. 13-23060 (RDD). Yet in Excel, an official creditors' committee had

been appointed and was able to challenge absolutely priority issues. The Excel creditors'
committee argued in the context of a plan exclusivity dispute that the proposed plan violated the
absolutely priority rule by providing the controlling shareholders the exclusive right to buy back
their shares at less than the market value while leaving unsecured creditors a slim chance of
recovery. Ultimately the committee's concerns were resolved and a modified plan was
confirmed. See Excel Maritime (Docket No. 562-1). Here, unless an Official Committee is
promptly appointed, unsecured creditors are left without a voice to challenge a plan that is
expected to transfer at least some portion of the new equity to the existing shareholder.

**D.      Investigation of Insider Transactions is Necessary**

29.    These are very large chapter 11 cases involving aggregate asset book value of
$1.6 billion, secured debt of approximately $1 billion, and general unsecured (non-deficiency)
debt of at least $116 million. As noted above, the Unofficial Committee anticipates existing
equity will be expecting to receive new equity under a plan. With no chapter 11 trustee in
place, only with the prompt appointment of an Official Committee can the numerous insider
transactions be impartially investigated, analyzed, and pursued if appropriate. Although the
corporate organization chart attached to the Debtors' Local Rule 1007 affidavit shows that two
of the non-debtor affiliated management companies (Marine Management Services M.C. and
Sealion Shipping Ltd.) are either direct or indirect subsidiaries of Toisa Limited, the third
management company (Marine Management Bulk Services Inc.) is not shown. One could
assume that it is held by the insiders. See Docket No. 3-1. In fact, such entity does not appear
on the Debtors' Bankruptcy Rule 2015.3 Report of Financial Information on Entities in Which a
Chapter 11 Estate Holds a Controlling or Substantial Interest. See Docket No. 115. It is
unrealistic to expect the Debtors' professionals to properly investigate transactions opposite the
very insiders who hired them.

30.     These cases raise other red flags with respect to insider transactions.  The Debtors still maintain two jet aircraft, which in this seriously distressed shipping and OSV market, may be unjustified even under the liberal business judgment standard.  There is concern that management should be traveling commercial rather than flying by private jet, much less the two private business jets currently owned.  Jet aircraft of this caliber require regular (extraordinarily expensive) exercise, and if not flown, costly maintenance is necessary to make and keep them airworthy.  Accordingly, aircraft of this type are typically an extravagance, regardless of whether flown or hangered.  An Official Committee will need to evaluate whether they are being kept primarily for the benefit of the insiders rather than the creditors to which they owe duties.

**E.      Bankruptcy Code Mandates Appointment of an Official Committee**

31.     As discussed above, at least three creditors of the Debtors are willing, ready and able to serve on an Official Committee.  "The appointment of one committee of creditors holding unsecured claims against a Chapter 11 debtor is mandated under 11 U.S.C. §1102(a)(1) if there are creditors willing to serve."  In re Texaco, Inc., 79 B.R. 560, 566 (Bankr. S.D.N.Y. 1987); 7 Collier on Bankruptcy ¶ 1102.02[1] (16th ed.) ("Appointment of unsecured creditors' committee is mandatory and the United States Trustee must appoint one in all chapter 11 cases . . . .").

32.     The word "shall" in the Bankruptcy Code denotes compulsion and mandatory obligation, not discretion.  In re Revco D.S., Inc., 898 F.2d 498, 501 (6th Cir. 1990); In re Columbia Gas Sys., 33 F. 3d 294, 299-303(3d Cir. 1994) (describing the mandatory nature of section 345(b) which instructs that "the trustee shall require from an entity with which such money is deposited or invested").  Shall means shall.

33.     As the U.S. Trustee for this District correctly stated in the <u>Siga Technologies</u>

cases:

> Section 1102(a)(1), the governing statute, states that the United States
> trustee "shall" appoint a committee of creditors holding unsecured
> claims. . . ." 11 U.S.C. § 1102(a)(1).  The language in that provision is
> mandatory . . ..

<u>In re Siga Technologies, Inc.</u>, Bankr. S.D.N.Y., Case No. 14-12623 (SHL) (Dkt. No. 403 at p.4).

<u>Siga</u> involved a motion of the debtor to disband an official committee after the debtor had

obtained a court order authorizing the payoff of two of the three committee members.  In

response to the debtor's motion, the U.S. Trustee further stated:

> In support of [the Debtor's] argument that the appointment of a
> creditors' committee in this case is inappropriate, the Debtor argues
> that PharmAthene is the only creditor willing to serve on the
> Committee.  That, however, is not the case, as Patheon, a contingent
> creditor that has replaced Albemarle on the Committee, wishes to
> serve on the Committee as well.  Moreover, the departures of Catalent
> and Albemarle are attributable to the Debtor's successful efforts to
> obtain this Court's authorization to satisfy the unsecured pre-petition
> claims these and other creditors.  Although the Debtor has never stated
> that its purpose in paying these creditors' claims was to frustrate the
> United States Trustee's efforts to form and maintain the Committee,
> the effect is the same.  <u>In any event, at least two creditors wish to serve
> on the Committee.  In the face of the Bankruptcy Code's mandate,
> neither the United States Trustee nor the Debtor can bar them from
> doing so.</u>

<u>Id.</u> at p.5 (emphasis added) (internal citations omitted).

34.     As in <u>Siga</u>, the Unofficial Committee here is comprised of three creditors willing,

ready and able to serve on the creditors' committee.  Even if Pequod were deemed unqualified

to serve because it is serving only in the capacity as BP's collection agent, there are two other

creditors who wish to serve.  "In the face of the Bankruptcy Code's mandate, neither the United

States Trustee nor the Debtor can bar them from doing so."  <u>Id.</u> at p.5.

35.     There is no requirement for a minimum three member committee and, in fact, the U.S. Trustee in this District and in other districts have appointed two member official committees pursuant to the statutory mandate set forth in section 1102(a)(1) of the Bankruptcy Code as long as there are willing creditors to serve.  See, e.g., In re Siga Technologies, Inc., Bankr. S.D.N.Y., Case No. 14-12623 (SHL) (Dkt. No. 403) (discussed above); see also In re ScripsAmerica, Bankr. D. Del., Case No. 16-11991 (LSS) (Dkt. No. 71);  In re Taylor-Wharton International, LLC, et al., Bankr. D. Del., Case No. 15-12075 (BLS) (Dkt. 197); In re SW Liquidation, LLC, Bankr. D. Del., Case No. 15-10327 (LSS) (Dkt. No. 386); In re Egenix, Inc., Bankr. D. Del., Case. No. 14-12818 (BLS) (Dkt. No. 58); In re Vermillion, Inc., Bankr. D. Del., Case. No. 09-11091 (CSS) (Dkt. No. 210); In re Exaeris, Inc., Bankr. D. Del., Case No. 07-10887 (KG) (Dkt. No. 422); In re Edge Pennsylvania, LLC, Bankr. M.D. Pa., Case No. 15-04869 (Dkt. No. 102); In re Midwest Asphalt Corp., Bankr. D. Minn., Case No. 17-40075 (WJF) (Dkt. No. 41); In re Triple C Flatbed Holdings, LLC, Bankr. N.D. Ga., Case No. 16-58984 (PMB) (Dkt. No. 123); In re Circle Z Pressure Pumping, LLC, Bankr. E.D. Tex., Case No. 16-60633 (BP) (Dkt. No. 21).

36.     While the Siga case dealt with a three-member committee that had already been formed with two creditors subsequently resigning, the case implicated the same issue that exists here:  a debtor having paid off prepetition creditors otherwise able and willing to serve on a creditors' committee.  But there is a key difference between Siga and the Debtors here.  Siga obtained court approval to pay the resigning creditors while the Debtors have been paying off their prepetition creditors without court oversight or approval.  Ensuring that all creditors are treated fairly and equitably is an even more compelling reason to appoint an Official Committee.

37.     For the foregoing reasons, the Unofficial Committee requests that the Court order the formation of an Official Committee (i) in time for it to conduct a lien search before the expiration of the relevant challenge periods, and (ii) before the remainder of the $100 million in unencumbered cash is committed for the benefit of secured creditors and the insider and to the detriment of general unsecured creditors.

## F.     Committee Challenge Periods Should Be Extended

38.     Courts have granted challenge deadline extensions on non-consensual basis. See, e.g., In re Residential Capital, LLC, Case No. 12-12020 (MG) (Bankr. S.D.N.Y. Dec. 26, 2012) [Docket No. 2518 ¶ 4] (extending deadline by two months after order granting standing to committee); In re Open Range Commc'ns Inc., Case No. 11-13188 (KJC) (Bankr. D. Del. Jan. 13, 2012) [Docket No. 493 at ¶ 2] (period to file complaint extended after order granting standing); In re Evergreen Solar, Inc., Case No. 11-12590 (MFW) (Bankr. D. Del. Oct. 28, 2011) [Docket No. 382 at ¶ 2] (same).  Indeed, Bankruptcy Rule 9006(b) empowers the Court to extend time periods set pursuant to its own orders.  See In re Sharon Steel Corp., 110 B.R. 205, 207 (Bankr. W.D. Pa. 1990).  Rule 9006(b)(1) provides, in pertinent part:

> [W]hen an act is required or allowed to be done at or within a
> specified period by these rules or by a notice given thereunder or
> by order of court, the court for cause shown may at any time in its
> discretion (1) with or without motion or notice order the period
> enlarged if the request therefor is made before the expiration of the
> period originally prescribed or as extended by a previous order…

Fed. R. Bankr. P. 9006(b)(1).

39.     Each of the cash collateral orders that have been entered or are being sought contains a deadline for a statutory committee to complete its investigation of the liens of the secured creditors and to assert any claims arising from the investigation.  The Citicorp challenge period deadline is May 16, 2017 and the Crédit Agricole deadline is May 30, 2017, both of

-18-

which are just days away.  The orders also state that the challenge periods can be extended for

cause.  For such provisions to be afforded any meaning and to avoid the interests of the general

unsecured claimants that hold claims of at least $116 million being completely ignored, the

challenge periods should be extended for a period reasonably necessary for an Official

Committee to complete its investigation and seek standing, if appropriate, to bring claims.

Because the deadlines are imminently expiring and because there has been no Official

Committee to perform the investigation to date, cause undeniably exists for a reasonable

extension of time.

### <u>UNOFFICIAL COMMITTEE'S BANKRUPTCY RULE 2019 STATEMENT</u>

40.    Each member of the Unofficial Committee has described its claims against the

relevant Debtors to the undersigned.  The descriptions are set forth in the chart above.

Accordingly, in accordance with Rule 2019, the names, addresses, and the nature and amount of

all disclosable economic interests held by each member as of the Petition Date set forth in the

chart above.  <u>See</u> <u>also</u> Wolfe Declaration.

41.    Nothing contained in this Rule 2019 statement should be construed as (i) a

limitation upon, or waiver of, any Unofficial Committee members' rights to assert, file, and/or

amend its claims in accordance with applicable law and any orders entered in these cases

establishing procedures for filing proofs of claim or requesting expedited consideration of same,

or (ii) a limitation on the rights of the Unofficial Committee as a whole with respect to any

claim.

42.    The Unofficial Committee reserves the right to amend or supplement the

foregoing statement in accordance with the requirements set forth in Bankruptcy Rule 2019.

WHEREFORE, the Unofficial Committee respectfully requests that the Court enter an

order or orders (A) directing the appointment of an Official Committee constituted by all or part

of the members of the Unofficial Committee or one or more other general unsecured (non-

deficiency claimant) creditors, and (B) extending the committee challenge period deadlines

contained in the cash collateral orders by a period reasonably sufficient for the Official

Committee to complete an investigation and to seek standing, if necessary, to bring claims.

Dated:  May 12, 2017
New York, New York                         **SHEPPARD MULLIN RICHTER &
                                            HAMPTON LLP**

                                           By: */s/ Craig A. Wolfe*
                                           Craig A. Wolfe, Esq.
                                           Jason R. Alderson, Esq.
                                           30 Rockefeller Plaza
                                           New York, New York 10112
                                           Tel: (212) 653-8700
                                           Fax: (212) 653-8701
                                           E-mail: cwolfe@sheppardmullin.com
                                           Email: jalderson@sheppardmullin.com

                                           *Counsel for the Unofficial Committee of Unsecured
                                           Creditors*

# EXHIBIT 1

(January 30, 2017 Hearing Transcript – Relevant Pages Only)

### In Re:

*TOISA LIMITED, et al.*

*Main Case No. 17-10184-scc*

---

*January 30, 2017*

---

*eScribers, LLC*

*(973) 406-2250*

*operations@escribers.net*

*www.escribers.net*

*To purchase copies of this transcript, please contact us.*



Min-U-Script® with Word Index

1    debtors' collateral and enforcement actions being taken or

2    threatened against our fleet around the world, we believe it

3    was prudent to seek the protection of the bankruptcy court to

4    allow us to continue our discussions in a single organized

5    forum with clear ground rules and to obtain the benefit of a

6    stay.   The one order that we ask that you enter today is the

7    stay order.

8            As Your Honor knows, I've been doing for a long time.

9    When I was a young lawyer, I kept hearing that when a debtor

10   was being buffeted by things coming at it from different

11   directions, as these debtors have, the bankruptcy court offers

12   a safe harbor.   Now, in all the years I'm practicing, this

13   is --

14           THE COURT:   Oh, no --

15           MR. TOGUT:   -- the case --

16           THE COURT:   -- you're not going to say you have a

17   shipping case that's going to enjoy the safe harbor.

18           MR. TOGUT:   I am.

19           THE COURT:   Is that what you're saying?

20           MR. TOGUT:   I am.   If ever there was a need for a safe

21   harbor, this would be it.   And we need the protection of this

22   Court while we are seeking to reorganize the business.   And

23   it's --

24           THE COURT:   I will tell you that I've had a number of

25   shipping cases --

**TOISA LIMITED, et al.**

14

1        MR. TOGUT:  Yes.

2        THE COURT:  -- and the attorneys cannot help

3  themselves using the sea and underwater and other metaphors

4  that come to mind.

5        MR. TOGUT:  I understand.

6        THE COURT:  So --

7        MR. TOGUT:  Forty years ago, I heard about a safe

8  harbor.  I said, what is this?  Now I know.  This would be it

9  here.  And to use another cliché:  and being here offers a

10  level playing field, which we need, because the secured lenders

11  were being quite forceful in their positions.

12        At least we're in pretty good shape for a Chapter 11

13  debtor.  We have liquidity of approximately one hundred million

14  dollars in cash as, again, Your --

15        THE COURT:  So the cash is -- in reading the papers,

16  there is no DIP, and there's --

17        MR. TOGUT:  No, there --

18        THE COURT:  -- no cash collateral.  And that's because

19  the cash is unencumbered?

20        MR. TOGUT:  Yeah.

21        THE COURT:  The security interests appear to be the

22  vessels and, in some instances but not all, charters and

23  insurance, right?

24        MR. TOGUT:  Right.

25        THE COURT:  Right.  Okay.

**TOISA LIMITED, et al.**

15

1          MR. TOGUT:  Right.

2          THE COURT:  Okay.

3          MR. TOGUT:  And we also have, looking down the road,

4  some refunds that we're expecting to receive, again, in the

5  neighborhood of a hundred million dollars.  And that's

6  unencumbered.

7          THE COURT:  Okay.

8          MR. TOGUT:  Certain of the money of this hundred

9  million is at management companies.  I'm sure Your Honor

10 understands how that works.

11         THE COURT:  Yes.

12         MR. TOGUT:  But when you add it all up, it's about a

13 hundred million dollars.

14         THE COURT:  So it's at -- when you -- so this is

15 something I'll ask for clarification on when we get to cash

16 management.

17         MR. TOGUT:  Yeah.

18         THE COURT:  I understand the separate silos, but I

19 need to understand precisely the accounts and if they're debtor

20 accounts or if they're the management company accounts so that

21 I understand the cash flow in and out of debtors.

22         MR. TOGUT:  I have an expert sitting here.  And to the

23 extent he's not --

24         THE COURT:  Good.

25         MR. TOGUT:  -- Mr. Hennebry is.

**TOISA LIMITED, et al.**

16

 1          THE COURT:  Okay.

 2          MR. TOGUT:  So --

 3          THE COURT:  And at a high level, are the banks -- to

 4    the extent that the lenders, to the extent that you've

 5    discussed this with them before this afternoon, are they -- I'm

 6    going to say on board.  You'll have to -- are they on board

 7    with the continued operation of the cash management system, or

 8    have there been concerns or objections identified?

 9          MR. TOGUT:  Well, there were concerns on our part that

10    if we were having that dialogue, banks were going to arrest

11    more vessels.  So we never had that conversation.

12          THE COURT:  I see.  Okay.

13          MR. TOGUT:  Okay.  We also don't need a critical

14    vendor motion, which you customarily see in these cases --

15          THE COURT:  Yes.

16          MR. TOGUT:  -- because the vendors are paid by the

17    management companies, and they're not debtors.

18          THE COURT:  Okay.

19          MR. TOGUT:  Okay.  Your Honor knows how my firm

20    approaches cases.  Whenever we possibly can, we work with

21    creditors.  Two weeks ago, Frank Oswald and I flew to London to

22    meet with the bank steering committee that's on the phone.  And

23    while we think the conversations are moving in a better

24    direction, there are a lot of moving parts here.  And we think,

25    truly, that now that we're in Chapter 11, the conversation will

**TOISA LIMITED, et al.**

17

1   be much, much easier, as I mentioned before.

2           THE COURT:   So is there ordinary unsecured debt?

3           MR. TOGUT:   We were current with our --

4           THE COURT:   Okay.  So my --

5           MR. TOGUT:   -- vendors.

6           THE COURT:   So the committee -- so there's going to be

7   a solicitation for a committee?

8           MR. TOGUT:   Right.

9           THE COURT:   And the committee will -- I'm

10  asking -- will be comprised of --

11          MR. TOGUT:   I think comprised of lenders whose

12  collateral --

13          THE COURT:   Lenders who --

14          MR. TOGUT:   -- is not great who are going to have

15  deficiency.

16          THE COURT:   So lenders who have deficiencies?

17          MR. TOGUT:   Yeah, that would -- at least, if I were

18  the United States Trustee, that's what would make sense to me.

19          THE COURT:   Okay.  And attention, I would imagine,

20  will be paid to the complexities that you outlined in terms of

21  positions across silos.  There are complexities and nuances

22  here that I hope would be reflected in the composition of the

23  committee.

24          MR. TOGUT:   We will have a robust conversation with

25  the U.S. Trustee.  The decision to file was made Friday night,

# EXHIBIT 2

(Vessel Management Agreement with Marine Management Services M.C.)

THIS AGREEMENT is made the 16th January 2015.

BETWEEN

(1)     MARINE MANAGEMENT SERVICES M.C., a company
incorporated in the Republic of Greece and whose registered office
and principal place of business is situated at 2 Skouze Street and Akti
Miaouli, Piraeus, Greece (hereinafter called the "Managers"); and

(2)     UNITED SEAS INC., a Corporation incorporated in the Republic of
Liberia whose registered office is situated at 80 Broad street,
Monrovia, Liberia (thereinafter called the "Owners")

WHEREAS

(A)     The Ship of which particulars are set out in the Schedule hereto has
been entrusted to the management of the Managers for the period
stipulated in Clause 8 hereof, which period may not in any event
exceed the time during which she remains in the ownership of the
Owners

(B)     In this Agreement save where the context otherwise requires the
expression "disponent ownership" means that there is in relation to
the Ship vested in the Owners a right of possession and control as
would ordinarily be enjoyed by a demise charterer

(C)     For the purposes of Clause 9 (c) hereof the Ship shall not be deemed
to be lost unless she has become an actual total loss or (as the case
may be) unless and until recovery has been effected from
underwriters in respect of her constructive compromised or arranged
total loss

NOW IT IS HEREBY MUTUALLY AGREED

1.     The Owners hereby confirm the appointment of the Managers and
the Managers hereby confirm their agreement to act as Managers   of
the ship upon the terms hereinafter set forth.

2.     The Managers undertake to use their best endeavours:-

(a)     to manage the Ship on behalf of the Owners so far as
reasonably practicable in accordance with policies and
instructions from time to time communicated to them   by   the
Owners; and

1

(b)     to protect and promote the interests of the Owners in all matters relating to the efficient operation and management of the Ship

3.     The Managers shall provide all the management services specified hereunder and (without limitation and in addition to the same) shall have power in the name of the Owners or otherwise on their behalf to do all things which may be expedient or necessary for the provision of the said services or otherwise in relation to the proper and efficient management of the Ship:-

(a)     arrangements for the maintenance, survey and repair of the Ship (and the supervision thereof) as required for the purposes of classification, flag state, port regulations, ISM standards and to keep the Ship in good and efficient condition;

(b)     engagement and provision of crews (duly qualified masters, officers and ratings) and attendance to all matters pertaining to discipline, labour relations, welfare, amenities and travel arrangements;

(c)     negotiations and arrangements for victualling and storing of the Ship and placing of contracts relative thereto;

(d)     negotiations and arrangements of bunker, fuel and lubricating oil contracts for the Ship;

(e)     appointment of ship's agents;

(f)     arrangements for loading and discharging and otherwise in connection with the trading of the Ship;

(g)     negotiations and arrangements of all insurances in connection with the Ship (including hull, machinery, freights, earnings and disbursements) against usual marine and war risks;

(h)     negotiations and arrangements for entry of the Ship in protection and indemnity, defence and other such associations;

(i)     handling and (subject to final approval of the Owners) settlement of all insurance average salvage and other claims in connection with the Ship;

(j)     receipt on behalf of the Owners of all hire freight revenue or other monies of whatsoever kind to which the Owners may

from time to time be entitled arising out of the employment of or otherwise in connection with the Ship and issuance of the relevant freight / hire invoices

(k)   payment on behalf of the Owners of all expenses incurred in and about provision of the foregoing services or otherwise in relation to the proper and efficient management of the Ship; and

(l)   seeking and negotiating employment for the Ship and subject to Owners consent conclusion of charter parties or other contracts relating to the employment of the Ship.

(m)   coordination of services to charterers, bankers, financial institutions and flag state authorities

4.   The Managers shall (without prejudice to the generality of the powers vested in them as aforesaid) be entitled:-

(a)   to employ any such agents, ship or insurance brokers as they may deem fit with liberty to appoint any associated company in any such capacity;

(b)   to employ or engage superintendents, consultants and experts to supervise or advise in relation to. the operation and maintenance of the ship;

(c)   to open, continue and operate such banking account or accounts as the managers may deem necessary or expedient;

(d)   to bring or defend on behalf of the Owners actions, suits or proceedings in connection with all matters hereby entrusted to the Managers; and

(e)   to obtain legal advice in relation to disputes or other matters affecting the interests of the Owners in respect of the Ship.

5.   The Managers will if so required upon reasonable notice also provide any or all of the following ancillary services subject to the parties having first agreed in writing upon the additional fee payable therefor or such other means or remuneration as may be agreed:-

(a)   negotiation or arrangement of the sale of the Ship or the purchase of another vessel and advisory services for the ship and for vessel (s) to be acquired and

3

(b)    specific work studies or other projects in connection with the Ship or otherwise in connection with the Owners' business or any contemplated development of their business.

6.   (a)    The Managers shall keep proper books, records and accounts relating to the management of the Ship and shall make the same available for inspection and audit on behalf of the Owners at such times as may be mutually agreed;

(b)    The Managers will regularly prepare and furnish to the Owners voyage accounts and management statements and will furnish such other statements or reports as the owners may from time to time reasonably require, including budgets and audited financial statements.

7.    When the Ship is bareboated, the Managers will continue to supervise all bareboat activity including assisting and placing the correct P+I / H+M Insurances, maintenance of the Ship, following up on its classification status and in general to further Owners' interest in the Ship.

8.    The appointment of the Managers will commence and take effect as from the date that the vessel will be acquired in Ownership by the Owners and shall continue for a period of 5 years from that date, unless it will be required to be terminated by either party giving to the other notice in writing to terminate the same.

(a)    the appointment of the Managers shall terminate automatically in the event that the Owners cease to have the ship in their ownership or disponent ownership; nevertheless, the Managers shall be entitled to continue with the handling of any outstanding matters referring to the Ship and coming within the scope of this Agreement;

(b)    either party may by notice in writing to the other forthwith terminate the appointment if an order be made or resolution be passed for the winding up or bankruptcy of the other (otherwise than a winding up for the purposes of reconstruction or amalgamation).

(c)    The Owners shall have the option to terminate this Agreement on ninety (90) days notice in writing.

9.    The remuneration of the Managers for their services as Managers under this Agreement shall be as follows:-

(a)   the Owners shall pay to the Managers in respect of the Ship a per day fee (and proportionately for any period less than a day) of USD 2,000.00 per day, which fee shall be payable monthly on the first day at each calendar month; such fee will be subject to annual inflation based escalators.

(b)   the remuneration in respect of the Ship shall commence to be earned as and from the date specified in Clause 8 hereof;

(c)   in event of the Ship being lost, sold or otherwise disposed of or (in the case of a Ship in disponent ownership) in event of the Owners ceasing to be invested with disponent ownership in respect of the Ship the remuneration payable in respect of the Ship shall continue to be payable for a further period or three months from the date of the loss, sale, disposal or divesting of disponent ownership or until the date (if that shall sooner occur) upon which the appointment of the Managers is terminated by the Owners pursuant to any such right of termination as is vested in the Owners under Clause 8 hereof.

(d)   The Owners shall pay to the Managers a commission of one per cent 1% of the aggregate transaction value for disposition of the Ship or acquisition of new vessel(s) and/or for advisory services for the Ship and/or future vessel(s).

10.   (a)   The Managers shall at their own expenses provide all office accommodation equipment and stationery and all office staff required for the provision of the services hereby contracted for and shall bear the cost of their internal communication expenses;

(b)   Subject as provided above the Owners shall (in addition to payment of the remuneration provided for in Clause 9 hereof) reimburse the Managers in respect of all disbursements and expenses of whatsoever kind which are incurred by the Managers in connection with the provision of the services hereby contracted for;

(c)   Without prejudice to the generality of the foregoing the owners shall so reimburse the Managers in respect of:-

(i)   expenditure incurred in and about the maintenance survey and repair of the ship and the supervision thereof;

5

(ii)   wages and all other payments made to or in respect of
the crews (master, officers and ratings) of the Ship
(including pension and insurance contributions
redundancy payments travelling and accommodation
expenses or allowances);

(iii)   disbursements and expenses of whatsoever kind
incurred in connection with the operation victualling
equipment bunkering and insurance of the Ship:_

(iv)   agency fees;

(v)   salaries of any superintendent or superintendents
engaged in supervision of the ship or a proper
proportion thereof in the case where any such person is
also so engaged in relation to other vessels managed by
the Managers;

(vi)   travelling accommodation and other expenses or
allowances incurred in respect of or paid to any such
superintendents or to officers or servants of            the
Managers in connection with performance of the
services hereby contracted for;

(vii)   all communication expenses other than those referred
to in sub-clause (a) hereof.

(viii)   Accounting, legal, financial and professional fees.

(d)   The Managers cannot use funds arising from the Ship's
operation, otherwise than for the support of the operation of
the Ship and of any other vessel owned directly or indirectly
by Trade & Transport Inc., of City of Panama, Rep. of
Panama.

11.   As between the parties hereto any superintendent master officer or
crew member employed on the Ship or in connection with the
provision of the services hereby contracted for shall be deemed to be
the servant of the   Owners and:-

(a)   the Managers shall be under no liability to the Owners in
respect of any act default or neglect of any such person as
aforesaid;

(b)   the Owners shall indemnify the Managers and hold them
harmless against all liabilities whatsoever which the Managers

6

may incur towards third parties (including costs and expenses incurred in connection with any proceedings brought by such third parties) by reason of any such act default or neglect as aforesaid, whether by reason of strict liability, tort or contract.

12.    This Agreement shall be governed by English law and the parties hereby agree to submit to the jurisdiction or the English Courts.

13.    Any notice which the Managers may require to give to the Owners shall be validly given if sent to such address and/or telex number as may from time to time be notified to the other party.

IN WITNESS whereof the parties hereto have caused this Agreement to be executed by the duly authorised representatives the day and year first above written.

THE SCHEDULE HEREINBEFORE REFERRED TO

the Ship presently owned by Fratelli d'Amico Armatori S.p.A., under the name "MARE AEGEUM" and registered under Italian flag, with IMO number 9346861 which will be acquired in ownership by the Owner and will be registered under Hellenic flag under the name "UNITED SEAS".

SIGNED by

ANASTASIA SOFIKITI                    GEORGIOS KEPPAS
                    for and on behalf of
                MARINE MANAGEMENT SERVICES M.C.

SIGNED by

ANTONIOS VARVAROS
for and on behalf of
UNITED SEAS INC.

7