UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| TOISA LIMITED, *et al.*, | 17-10184 (SCC) |
| Debtors.[1] | (Jointly Administered) |

**FIRST AMENDED SOLICITATION VERSION OF THE SECOND AMENDED
JOINT PLAN OF LIQUIDATION FOR TOISA LIMITED AND CERTAIN
OF ITS AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

Albert Togut
Frank A. Oswald
Brian F. Moore
Lauren L. Peacock

TOGUT SEGAL & SEGAL LLP
One Penn Plaza
New York, New York 10119
(212) 594-5000

Counsel for the Debtors and Debtors in
Possession

Dated:  March 1, 2019
        New York, New York

---

[1]  The Debtors in these chapter 11 cases, are as follows:  Trade Prosperity, Inc.; Toisa Limited; United Courage, Inc.; Trade Vision, Inc.; United Journey, Inc.; United Kalavryta, Inc.; Trade Sky, Inc.; Trade Industrial Development Corporation; United Honor, Inc.; Trade Will, Inc.; United Leadership Inc.; United Seas, Inc.; United Dynamic, Inc.; United Emblem, Inc.; United Ideal Inc.; Trade Unity, Inc.; Trade Quest, Inc.; Trade Spirit, Inc.; Trade Resource, Inc.; United Ambassador, Inc.; Edgewater Offshore Shipping, Ltd.; United Banner, Inc.; Toisa Horizon, Inc.; and Trade and Transport Inc.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

ARTICLE I DEFINED TERMS AND RULES OF INTERPRETATION ................................1

    1.1    Administrative Claim.................................................................1

    1.2    Administrative Claims Bar Date ..............................................1

    1.3    Administrative Claims Objection Bar Date...............................1

    1.4    Affiliate....................................................................................1

    1.5    Allowed ...................................................................................1

    1.6    Allowed Claim ........................................................................2

    1.7    Available Cash ........................................................................2

    1.8    Avoidance Action ...................................................................2

    1.9    Ballot.......................................................................................3

    1.10    Bankruptcy Code ...................................................................3

    1.11    Bankruptcy Court ..................................................................3

    1.12    Bankruptcy Rules...................................................................3

    1.13    Bar Date.................................................................................3

    1.14    BNP Credit Facility Vessels .................................................3

    1.15    Business Day..........................................................................3

    1.16    Cash.......................................................................................3

    1.17    Cash Collateral Orders..........................................................3

    1.18    Cause of Action ....................................................................3

    1.19    Chapter 11 Case(s) ................................................................4

    1.20    Citi Offshore Credit Facility Vessels ...................................4

    1.21    Citi Tanker Credit Facility Vessels ......................................4

    1.22    Citi Cash Collateral Order ...................................................4

i

# TABLE OF CONTENTS (cont'd)

**Page**

1.23    Citizens I Credit Facility Vessel................................................................4

1.24    Citizens II Credit Facility Vessel...............................................................4

1.25    Claim .........................................................................................................4

1.26    Claims Objection Deadline........................................................................4

1.27    Class ..........................................................................................................4

1.28    Class 29 General Unsecured Claim ...........................................................4

1.29    Commerzbank I Credit Facility Vessels ....................................................4

1.30    Commerzbank II Credit Facility Vessel.....................................................5

1.31    Commonwealth Bank of Australia Credit Facility Vessels ........................5

1.32    Confirmation .............................................................................................5

1.33    Confirmation Date.....................................................................................5

1.34    Confirmation Hearing................................................................................5

1.35    Confirmation Order....................................................................................5

1.36    Credit Agricole Cash Collateral Order ......................................................5

1.37    Credit Agricole Offshore Credit Facility Vessels ......................................5

1.38    Credit Agricole Tanker Credit Facility Vessel...........................................5

1.39    Creditors' Committee.................................................................................5

1.40    D&O Liability Insurance Policies ..............................................................5

1.41    Danish Ship Bulker Credit Facility Vessels...............................................5

1.42    Danish Ship Offshore Credit Facility Vessels............................................5

1.43    Danish Ship Tanker Credit Facility Vessels...............................................5

1.44    Debtors ......................................................................................................6

1.45    Diavaz .......................................................................................................6

1.46    Diavaz Settlement......................................................................................6

ii

## TABLE OF CONTENTS (cont'd)

**Page**

1.47    Diavaz Settlement Order ...................................................................6

1.48    Diavaz Settlement Proceeds ..............................................................6

1.49    Disclosure Statement ........................................................................6

1.50    Disputed Claim .................................................................................6

1.51    Distribution.......................................................................................6

1.52    Distribution Date ..............................................................................6

1.53    Distribution Record Date ..................................................................6

1.54    DNB Offshore Credit Facility Vessels...............................................6

1.55    DNB Tanker Credit Facility Vessels...................................................6

1.56    DVB Credit Facility Vessels ..............................................................7

1.57    Effective Date ...................................................................................7

1.58    Entity ................................................................................................7

1.59    Estate(s) ...........................................................................................7

1.60    Exculpated Parties ...........................................................................7

1.61    Executory Contract ..........................................................................7

1.62    Exhibit ..............................................................................................7

1.63    Existing BNP Credit Facility ............................................................7

1.64    Existing BNP Secured Claims ...........................................................7

1.65    Existing Citi Offshore Credit Facility...............................................8

1.66    Existing Citi Offshore Secured Claims .............................................8

1.67    Existing Citi Tanker Credit Facility..................................................8

1.68    Existing Citi Tanker Secured Claims ................................................8

1.69    Existing Citizens I Credit Facility.....................................................8

1.70    Existing Citizens I Secured Claims....................................................9

## TABLE OF CONTENTS (cont'd)

**Page**

1.71    Existing Citizens II Credit Facility ........................................................9

1.72    Existing Citizens II Secured Claims .....................................................9

1.73    Existing Commerzbank I Credit Facility ...............................................9

1.74    Existing Commerzbank I Secured Claims..............................................9

1.75    Existing Commerzbank II Credit Facility .............................................10

1.76    Existing Commerzbank II Secured Claims ............................................10

1.77    Existing Commonwealth Bank of Australia Credit Facility ..................10

1.78    Existing Commonwealth Bank of Australia Secured Claims.................10

1.79    Existing Credit Agricole Offshore Credit Facility................................10

1.80    Existing Credit Agricole Offshore Secured Claims ..............................11

1.81    Existing Credit Agricole Tanker Credit Facility...................................11

1.82    Existing Credit Agricole Tanker Secured Claims .................................11

1.83    Existing Danish Ship Bulker Credit Facility ........................................11

1.84    Existing Danish Ship Bulker Secured Claims.......................................12

1.85    Existing Danish Ship Offshore Credit Facility .....................................12

1.86    Existing Danish Ship Offshore Guarantee ...........................................12

1.87    Existing Danish Ship Offshore Secured Claims ...................................12

1.88    Existing Danish Ship Offshore Guarantee Secured Claims..................13

1.89    Existing Danish Ship Tanker Credit Facility .......................................13

1.90    Existing Danish Ship Tanker Secured Claims ......................................13

1.91    Existing DNB Offshore Credit Facility ................................................13

1.92    Existing DNB Offshore Secured Claims...............................................14

1.93    Existing DNB Tanker Credit Facility ...................................................14

1.94    Existing DNB Tanker Secured Claims..................................................14

iv

# TABLE OF CONTENTS (cont'd)

**Page**

1.95    Existing DVB Credit Facility ...................................................................14

1.96    Existing DVB Guarantee Claim ..............................................................14

1.97    Existing DVB Secured Claims..................................................................14

1.98    Existing ING Bulker Credit Facility ........................................................15

1.99    Existing ING Bulker Secured Claims.......................................................15

1.100   Existing ING Offshore Credit Facility .....................................................15

1.101   Existing ING Offshore Secured Claims ...................................................15

1.102   Existing NBG Credit Facility....................................................................15

1.103   Existing NBG Secured Claims ..................................................................16

1.104   Existing SPV Oversecured Claims ...........................................................16

1.105   Existing SPV Secured Tanker Claims .....................................................16

1.106   Existing Wells Fargo Credit Facility .......................................................16

1.107   Existing Wells Fargo Secured Claims ......................................................16

1.108   Final Order................................................................................................16

1.109   G550 Airplane Credit Facility ..................................................................17

1.110   G550 Airplane Credit Facility Claims......................................................17

1.111   General Unsecured Claims........................................................................17

1.112   General Unsecured Claims Distribution Reserve .........................................17

1.113   Holder........................................................................................................17

1.114   Impaired ....................................................................................................17

1.115   Informal Committee ..................................................................................17

1.116   Informal Committee Cash Collateral Order .................................................17

1.118   ING Bulker Credit Facility Vessels .........................................................17

1.119   ING Offshore Credit Facility Vessels......................................................17

## TABLE OF CONTENTS (cont'd)

**Page**

1.120   Intercompany Claims..................................................................................18

1.121   Intercompany Interest................................................................................18

1.122   Interest........................................................................................................18

1.123   Lien..............................................................................................................18

1.124   Management Companies............................................................................18

1.125   Management Company Released Parties..................................................18

1.126   NBG Credit Facility Vessel.......................................................................18

1.127   Newbuild Tanker Construction Contracts..............................................18

1.128   Newbuild Tanker Credit Facility .............................................................18

1.129   Newbuild Tanker Credit Facility Secured Claims.................................19

1.130   Newbuild Tanker Credit Facility Vessels ...............................................19

1.131   Newbuild Tanker Sale Order.....................................................................19

1.132   Newbuild Tanker Sale Proceeds...............................................................19

1.133   Oceangoing Sale Procedures.....................................................................19

1.134   Oceangoing Sale Procedures Order .........................................................19

1.135   Oceangoing Vessels....................................................................................19

1.136   Oceangoing Vessel Sales Proceeds...........................................................19

1.137   Offshore Sale Procedures..........................................................................19

1.138   Offshore Sale Procedures Order ..............................................................19

1.139   Offshore Vessels.........................................................................................19

1.140   Offshore Vessel Sales Proceeds................................................................20

1.141   Other Priority Claims................................................................................20

1.142   Parent..........................................................................................................20

1.143   Person..........................................................................................................20

# TABLE OF CONTENTS (cont'd)

**Page**

1.144  Personal Injury Claims......................................................................20

1.145  Petition Date....................................................................................20

1.146  Plan................................................................................................20

1.147  Plan Administrator............................................................................20

1.148  Plan Supplement..............................................................................20

1.149  Post-Effective Toisa..........................................................................20

1.150  Priority Tax Claim.............................................................................21

1.151  Pro Rata..........................................................................................21

1.152  Professional.....................................................................................21

1.153  Professional Compensation – Accrued.................................................21

1.154  Professional Fee Claim......................................................................21

1.155  Professional Fee Escrow Account.......................................................21

1.156  Professional Fee Reserve Amount.......................................................21

1.157  Proof of Claim..................................................................................21

1.158  Protocol..........................................................................................21

1.159  Reconstituted Toisa Board.................................................................22

1.160  Released Party.................................................................................22

1.161  Releasing Parties.............................................................................22

1.162  Retained Actions..............................................................................22

1.163  Schedules.......................................................................................22

1.164  Sealion...........................................................................................22

1.165  Secured Claim.................................................................................23

1.166  Secured Lender................................................................................23

1.167  Secured Lenders' Deficiency Claims...................................................23

## TABLE OF CONTENTS (cont'd)

**Page**

1.168    Secured Lenders' Guarantee Claims ...................................................................23

1.169    Secured Lenders' SPV Deficiency Claims ..........................................................23

1.170    Secured Lenders' SPV Superpriority Claims .....................................................23

1.171    Secured Lenders' Superpriority Claims .............................................................23

1.172    Secured Lenders' T&T Superpriority Claims ....................................................23

1.173    Secured Lenders' T&T Guarantee Claims ........................................................23

1.174    Secured Lenders' Toisa Deficiency Claims .......................................................23

1.175    Secured Lenders' Toisa Guarantee Claims .......................................................24

1.176    Secured Lenders' Toisa Superpriority Claims ..................................................24

1.177    Secured Lenders' Toisa GUCs ...........................................................................24

1.178    SPV Debtors ........................................................................................................24

1.179    Shareholder ..........................................................................................................24

1.180    Shareholder Nominee ..........................................................................................24

1.181    Toisa .....................................................................................................................24

1.182    T&T ......................................................................................................................24

1.183    T&T General Unsecured Claim ..........................................................................24

1.184    Unimpaired ...........................................................................................................24

1.185    Wells Fargo Credit Facility Vessel ....................................................................24

ARTICLE II ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS ............................26

2.1    Administrative Claims ...........................................................................................26

2.2    Priority Tax Claims ...............................................................................................26

2.3    Professional Fee Claims ........................................................................................26

2.4    Secured Lenders' Superpriority Claims. ..............................................................26

2.5    Payment of Informal Committee Professionals. ..................................................27

## TABLE OF CONTENTS (cont'd)

ARTICLE III CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS..27

3.1    Classification and Settlement...............................................................27

3.2    Remaining Cash After Payment of Claims. ........................................28

3.3    Summary of Classification. ................................................................28

3.4    Treatment of Classes. ........................................................................30

3.5    No Substantive Consolidation. ..........................................................41

3.6    Reimbursement of Payment for Legal Services.................................41

3.7    Distribution of Diavaz Settlement Proceeds......................................41

3.8    Unencumbered Funds Received Post-Effective Date.........................41

3.9    Enforcement of Subordination Agreements. ......................................42

3.10    Alternative Treatment.......................................................................42

3.11    Special Provision Regarding Unimpaired Claims. ...........................42

ARTICLE IV ACCEPTANCE OR REJECTION OF THIS PLAN .........................................42

4.1    Acceptance by Class Entitled to Vote. ...............................................42

4.2    Presumed Acceptance of This Plan. ...................................................42

4.3    Presumed Rejection of This Plan. ......................................................42

4.4    Elimination of Classes........................................................................42

4.5    Cramdown. ..........................................................................................43

ARTICLE V MEANS FOR IMPLEMENTATION OF THIS PLAN ....................................43

5.1    Plan Administrator..............................................................................43

5.2    Merger of Debtors; Closing Cases of Debtor Affiliates.....................45

5.3    Corporate Action. ...............................................................................45

5.4    Withholding and Reporting Requirements. ........................................45

5.5    Exemption from Certain Transfer Taxes. ...........................................46

## TABLE OF CONTENTS (cont'd)

5.6   Preservation of Retained Actions. ..........................................................46

5.7   Provisions of Cash Collateral Orders Binding. .................................................47

5.8   Sources of Cash for Distributions and Operations. ...........................................47

5.9   New Board of Post-Effective Toisa.........................................................47

5.10   Effectuating Documents; Further Transactions.............................................47

5.11   Further Authorization...........................................................................47

5.12   Cancellation of Existing Securities and Agreements.....................................47

ARTICLE VI PROVISIONS GOVERNING DISTRIBUTIONS ...........................................48

6.1   Distribution Record Date...............................................................................48

6.3   Distributions for Claims Allowed as of the Effective Date.............................48

6.4   Interest and Penalties on Claims. .......................................................................48

6.5   Delivery of Distributions. .................................................................................48

6.6   Manner of Payment Under Plan.......................................................................49

6.7   General Unsecured Claims Distribution Reserve. ...........................................49

6.8   Minimum Cash Distributions. .........................................................................49

6.9   Setoffs. .............................................................................................................49

6.10   Payment of Disputed Claims. .......................................................................49

ARTICLE VII PROCEDURES FOR DISPUTED CLAIMS....................................................49

7.1   Allowance of Claims. .....................................................................................49

7.2   Objections to Claims........................................................................................50

7.3   Estimation of Claims. ......................................................................................50

7.4   Establishment of Reserve Account...................................................................50

7.5   No Distributions Pending Allowance...............................................................50

7.6   Resolution of Claims. ......................................................................................50

# TABLE OF CONTENTS (cont'd)

**Page**

7.7    Disallowed Claims.................................................................................51

ARTICLE VIII TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES........................................................................................................51

8.1    Rejection of Executory Contracts and Unexpired Leases. ...............51

8.2    D&O Liability Insurance Policies. ......................................................52

8.3    Insurance Policies. ...............................................................................52

8.4    Cure of Defaults Under Assumed Contracts.....................................52

8.5    Reservation of Rights. .........................................................................52

ARTICLE IX CONDITIONS PRECEDENT TO THE CONFIRMATION AND
EFFECTIVE DATES....................................................................................53

9.1    Conditions Precedent to the Confirmation Date...............................53

9.2    Conditions Precedent to the Effective Date. .....................................53

9.3    Waiver of Conditions Precedent.........................................................54

9.4    Effect of Failure of Conditions to Effective Date..............................54

ARTICLE X EFFECT OF PLAN CONFIRMATION ..............................................54

10.1    Binding Effect......................................................................................54

10.2    Revesting of Assets.............................................................................54

10.3    Compromise and Settlement of Claims, Interests, and Controversies. ........55

10.4    Releases and Related Matters. ...........................................................55

10.5    Injunction ............................................................................................60

10.6    Exculpation and Limitation of Liability ............................................60

10.7    Term of Bankruptcy Injunction or Stays. .........................................61

10.8    Post-Effective Date Retention of Professionals................................61

ARTICLE XI RETENTION OF JURISDICTION ....................................................61

11.1    Retention of Jurisdiction. ...................................................................61

# TABLE OF CONTENTS (cont'd)

**Page**

ARTICLE XII MISCELLANEOUS PROVISIONS ...................................................................62

    12.1    Payment of Statutory Fees..................................................................................62

    12.2    Amendment or Modification of this Plan. .........................................................63

    12.3    Substantial Consummation. ...............................................................................63

    12.4    Severability of Plan Provisions. ........................................................................63

    12.5    Successors and Assigns......................................................................................63

    12.6    Revocation, Withdrawal, or Non-Consummation.............................................63

    12.7    Dissolution of Creditors' Committee.................................................................64

    12.8    Governing Law. .................................................................................................64

    12.9    Time. ..................................................................................................................64

    12.10   Immediate Binding Effect..................................................................................64

    12.11   Entire Agreement...............................................................................................64

    12.12   Notice.................................................................................................................64

    12.13   Exhibits..............................................................................................................65

    12.14   Filing of Additional Documents.........................................................................65

## INTRODUCTION

Toisa Limited and certain of its affiliates, as debtors and debtors in possession, propose the following joint plan for the resolution of the outstanding Claims against and Interests in the Debtors.  Reference is made to the Disclosure Statement for a discussion of (i) the Debtors' history, business, and operations, (ii) a summary and analysis of this Plan, and (iii) certain related matters, including risk factors relating to the consummation of this Plan.  Subject to Section 12.2 of this Plan, certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, and Bankruptcy Rule 3019, the Debtors reserve the right to alter, amend, modify, revoke, or withdraw this Plan prior to its substantial consummation.

## ARTICLE I
## DEFINED TERMS AND RULES OF INTERPRETATION

Defined Terms.  As used herein, capitalized terms shall have the meanings set forth below.  Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

1.1     *Administrative Claim* means a Claim for costs and expenses of administration of the Chapter 11 Cases under sections 328, 330, 363, 364(c)(1), 365, or 503(b) of the Bankruptcy Code, including, but not limited to: (a) any actual and necessary costs and expenses, incurred on or after the Petition Date and through the Effective Date, of preserving the Estates and operating the businesses of the Debtors; (b) Professional Fee Claims; (c) all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code; and (d) all other claims entitled to administrative claim status pursuant to an order of the Bankruptcy Court.  For the avoidance of doubt, the Administrative Claims shall not include the Secured Lenders' Superpriority Claims.

1.2     *Administrative Claims Bar Date* means the earlier of any interim date to be set by the Bankruptcy Court or the first Business Day that is thirty (30) days following the Effective Date, which is the date by which each Holder of an Administrative Claim against any of the Debtors must have filed a Proof of Claim against such Debtor(s).

1.3     *Administrative Claims Objection Bar Date* means the first Business Day that is 120 days following the Effective Date; *provided, however,* that the Administrative Claims Objection Bar Date may be extended pursuant to an order of the Bankruptcy Court upon a motion filed by Post-Effective Toisa after notice and a hearing.  The Administrative Claims Objection Bar Date is the date by which Post-Effective Toisa may file an objection to an Administrative Claim.

1.4     *Affiliate* means "affiliate" as defined in section 101(2) of the Bankruptcy Code.

1.5     *Allowed* means, with respect to a Claim against any Debtor, except as otherwise provided herein, (a) a Claim that is (i) listed in the Schedules as of

the Effective Date as neither disputed, contingent, nor unliquidated, and for which no Proof of Claim has been timely filed, or (ii) evidenced by a valid Proof of Claim or request for payment of Administrative Claim, as applicable, filed by the applicable Bar Date, and as to which the Debtors or other parties-in-interest have not filed an objection to the allowance thereof by the applicable Claims Objection Deadline, or (b) a Claim that is allowed under the Plan, any Cash Collateral Order, or any stipulation or settlement approved by, or Final Order of, the Bankruptcy Court; *provided, however,* that any Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court will not be considered "Allowed" under the Plan. Notwithstanding the foregoing, a Claim shall not be Allowed and shall not be entitled to a distribution under the Plan to the extent it has been satisfied prior to the Effective Date. If a Claim is Allowed only in part, references to Allowed Claims include and are limited to the Allowed portion of such Claim. Notwithstanding anything to the contrary herein, no Claim that is disallowed in accordance with section 502(d) of the Bankruptcy Code or Bankruptcy Rule 3003 is "Allowed" and each such Claim shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.

1.6    *Allowed Claim* means a Claim that is Allowed as set forth in the applicable Class in Section 3 below.

1.7    *Available Cash* means all Cash of a Debtor or Post-Effective Toisa not subject to a Lien, including when relevant, the remaining Oceangoing Vessel Sales Proceeds or Offshore Vessel Sales Proceeds, and proceeds of other dispositions of its assets after satisfaction of any applicable Secured Claim(s), the interest earned on its invested funds, recoveries from Causes of Action or from any other source less (a) amounts necessary to pay Holders of Allowed Administrative Claims, Priority Tax Claims, and Other Priority Claims, against such Debtor in accordance with the Plan and less (b) amounts estimated and reserved by such Debtor or Post-Effective Toisa, as applicable, to (i) fund the reasonable and necessary costs to carry out the provisions of the Plan with respect to such Debtor on and after the Effective Date, including to fund the Professional Fee Escrow Account and the wind-down of the Estates, (ii) pay all fees payable under section 1930 of chapter 123 of title 28 of the United States Code, and (iii) fund and maintain any postpetition reserve requirements in connection with any agreements or otherwise, in each case with the consent of the Informal Committee. Available Cash shall include (a) any amounts not subject to a Lien that are recovered or received by the applicable Debtor(s) or Post-Effective Toisa prior to or after the Effective Date, from any source whatsoever, (b) excess amounts retained for Disputed Claims that become available in accordance with Section 7.4 of this Plan, and (c) amounts represented by undeliverable Distributions in accordance with Section 6.5 of this Plan.

1.8    *Avoidance Action* means any claim or Cause of Action of an Estate arising out of or maintainable pursuant to sections 510, 541, 542, 543, 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code or under any other similar applicable non-bankruptcy law, regardless of whether or not such action has been commenced prior to the Effective Date.

1.9     *Ballot* means each of the ballot forms distributed to each Holder of a Claim that is entitled to vote to accept or reject this Plan and on which the Holder is to indicate, among other things, acceptance or rejection of this Plan.

1.10     *Bankruptcy Code* means Title 11 of the United States Code, as now in effect or hereafter amended, to the extent such amendments apply to the Chapter 11 Cases.

1.11     *Bankruptcy Court* means the United States Bankruptcy Court for the Southern District of New York or any other court of competent jurisdiction over the Chapter 11 Cases.

1.12     *Bankruptcy Rules* means the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as now in effect or hereafter amended.

1.13     *Bar Date* means the date by which each Holder of a Claim against any of the Debtors must have filed a Proof of Claim against such Debtor(s), which was August 8, 2017 at 5:00 p.m. (Prevailing Eastern Time), unless such Claim falls within one of the following exceptions: (a) the Claim arises from the rejection of an executory contract or unexpired lease, in which case the deadline shall fall on the later of (i) August 8, 2017 at 5:00 p.m. (Prevailing Eastern Time) or (ii) 5:00 p.m. (Prevailing Eastern Time) on the date that is sixty (60) days after entry of a Court order pursuant to which the applicable executory contracts or unexpired leases are rejected; (b) the Claim is affected by an amendment or supplement to the Schedules, in which case the deadline shall fall on the later of (i) August 8, 2017 at 5:00 p.m. (Prevailing Eastern Time) or (ii) 5:00 p.m. (Prevailing Eastern Time) on the date that is sixty (60) days after the date that notice of the applicable amendment or supplement to the Schedules is served on the Holder of the Claim; (c) the Holder of the Claim is a governmental unit, in which case the deadline was July 28, 2017 at 5:00 p.m. (Prevailing Eastern Time); or (d) the Claim is an Administrative Claim, in which case the deadline shall be the Administrative Claims Bar Date.

1.14     *BNP Credit Facility Vessels* means collectively the vessels *Toisa Pegasus* and *Toisa Paladin.*

1.15     *Business Day* means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

1.16     *Cash* means legal tender of the United States of America and equivalents thereof.

1.17     *Cash Collateral Orders* means the Informal Committee Cash Collateral Order, the Credit Agricole Cash Collateral Order, and the Citi Cash Collateral Order, in each case as subsequently extended.

1.18     *Cause of Action* means any action, proceeding, agreement, Claim, cause of action, controversy, demand, debt, right, action, Avoidance Action, Lien, indemnity, guarantee, suit, obligation, liability, damage, judgment, account, defense,

offset, power, privilege, recoupment, crossclaim, counterclaim, third-party claim, indemnity claim, contribution claim, or any other claim known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether pending in litigation or otherwise, in contract or in tort, in law or in equity, or pursuant to any other theory of law, based in whole or in part upon any act or omission or other event occurring prior to the Effective Date.

1.19 *Chapter 11 Case(s)* means (a) when used with reference to a particular Debtor, the case under Chapter 11 of the Bankruptcy Code commenced by such Debtor in the Bankruptcy Court and (b) when used with reference to all Debtors, the cases under Chapter 11 of the Bankruptcy Code commenced by the Debtors in the Bankruptcy Court.

1.20 *Citi Offshore Credit Facility Vessels* means collectively the vessels *Toisa Envoy*, *Toisa Explorer*, *Toisa Elan*, and *Toisa Wave*.

1.21 *Citi Tanker Credit Facility Vessels* means collectively the vessels *United Journey* and *United Seas*.

1.22 *Citi Cash Collateral Order* means the Amended and Restated Final Order Pursuant to Debtors' Motion for Entry of Interim and Final Orders Upon Consent of the Debtors and Citibank N.A., London Branch (I) Authorizing the Debtors' Use of Citibank's Cash Collateral, (II) Granting Citibank Adequate Protection, (III) Releasing Vessel, *United Journey*, to the Debtors, and (IV) Granting Related Relief, entered on April 28, 2017 [Dkt. No. 128], as extended from time to time.

1.23 *Citizens I Credit Facility Vessel* means the vessel *Toisa Independent*.

1.24 *Citizens II Credit Facility Vessel* means the vessel *Toisa Coral*.

1.25 *Claim* means a "claim" as defined in section 101(5) of the Bankruptcy Code.

1.26 *Claims Objection Deadline* means (i) ninety (90) days following the Effective Date or (ii) such other later date that the Bankruptcy Court may establish upon a motion by Post-Effective Toisa on notice to all parties.

1.27 *Class* means a category of Claims or Interests, as described in Article III hereof.

1.28 *Class 29 General Unsecured Claim* means any General Unsecured Claim that may exist against a Debtor except (1) any General Unsecured Claim held by a Secured Lender and (2) Allowed Claims in Classes 11, 20, 26, 27, and 28, and which for the avoidance of doubt, exclude any Secured Lenders' Deficiency Claim or Personal Injury Claims except to the extent provided in Class 29 – Personal Injury Claims.

1.29 *Commerzbank I Credit Facility Vessels* means collectively the vessels named *United Banner*, *United Carrier*, and *United Ambassador*.

4

1.30    ***Commerzbank II Credit Facility Vessel*** means the vessel named *United Honor*.

1.31    ***Commonwealth Bank of Australia Credit Facility Vessels*** means the vessels named *Toisa Solitaire* and *Toisa Warrior*.

1.32    ***Confirmation*** means the confirmation of this Plan by the Bankruptcy Court under section 1129 of the Bankruptcy Code.

1.33    ***Confirmation Date*** means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

1.34    ***Confirmation Hearing*** means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider Confirmation, as such hearing may be adjourned or continued from time to time.

1.35    ***Confirmation Order*** means the order of the Bankruptcy Court, confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

1.36    ***Credit Agricole Cash Collateral Order*** means the Final Order Pursuant to Debtors' Motion for Entry of Interim and Final Orders, Upon Consent of the Debtors and Credit Agricole Corporate and Investment Bank, (I) Authorizing the Debtors' Limited Use of Cash Collateral, (II) Granting Adequate Protection to Credit Agricole, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief entered on March 29, 2017 [Dkt. No. 91], as extended from time to time.

1.37    ***Credit Agricole Offshore Credit Facility Vessels*** means collectively the vessels *Toisa Valiant*, *Toisa Vigilant*, and *Toisa Voyager*.

1.38    ***Credit Agricole Tanker Credit Facility Vessel*** means the vessel *United Grace*.

1.39    ***Creditors' Committee*** means the statutory committee of unsecured creditors appointed pursuant to section 1102(a) of the Bankruptcy Code in the Chapter 11 Cases.

1.40    ***D&O Liability Insurance Policies*** means all insurance policies for directors' and officers' liability maintained by the Debtors, including any directors' and officers' "tail policy."

1.41    ***Danish Ship Bulker Credit Facility Vessels*** means collectively the vessels *Trade Vision* and *Trade Will.*

1.42    ***Danish Ship Offshore Credit Facility Vessels*** means collectively the vessels *Toisa Defiant*, *Toisa Daring*, and *Toisa Dauntless.*

1.43    ***Danish Ship Tanker Credit Facility Vessels*** means collectively the vessels *United Leadership* and *United Kalavryta.*

1.44    **Debtors** means Trade Prosperity, Inc.; Toisa Limited; United Courage, Inc.; Trade Vision, Inc.; United Journey, Inc.; United Kalavryta, Inc.; Trade Sky, Inc.; Trade Industrial Development Corporation; United Honor, Inc.; Trade Will, Inc.; United Leadership, Inc.; United Seas, Inc.; United Dynamic, Inc.; United Emblem, Inc.; United Ideal, Inc.; Trade Unity, Inc.; Trade Quest, Inc.; Trade Spirit, Inc.; Trade Resource, Inc.; United Ambassador, Inc.; Edgewater Offshore Shipping, Ltd.; United Banner, Inc.; Toisa Horizon, Inc.; and Trade and Transport, Inc.

1.45    **Diavaz** means Constructora Subacuática Diavaz, S.A. de C.V.

1.46    **Diavaz Settlement** means the settlement between Sealion and Diavaz, dated November 3, 2017, resolving disputes related to Diavaz's chartering of certain of the Debtors' vessels.

1.47    **Diavaz Settlement Order** means the Order Approving Settlement Agreement with Diavaz Pursuant to Bankruptcy Rule 9019, entered on November 5, 2018 [Dkt. No. 890].

1.48    **Diavaz Settlement Proceeds** means the proceeds from the Diavaz Settlement received and to be received by Toisa pursuant to the Diavaz Settlement Order.

1.49    **Disclosure Statement** means the disclosure statement (including all exhibits and schedules thereto) relating to this Plan, as amended, modified, or supplemented from time to time, and distributed contemporaneously herewith.

1.50    **Disputed Claim** means (a) any Claim as to which the Debtors have interposed an objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules, or any Claim otherwise disputed by the Debtors, Post-Effective Toisa, or other party in interest in accordance with applicable law, which objection has not been withdrawn or determined by a Final Order, (b) any Claim scheduled by the Debtors as contingent, unliquidated, or disputed, (c) any Claim which amends a Claim scheduled by the Debtors as contingent, unliquidated, or disputed, or (d) any Claim prior to it having become an Allowed Claim.

1.51    **Distribution** means a distribution that either the Debtors or Post-Effective Toisa, as applicable, makes to Holders of Allowed Claims.

1.52    **Distribution Date** means a date or dates, including the initial distribution date as determined by the disbursing agent in accordance with the terms of this Plan, on which the disbursing agent makes a distribution to Holders of Allowed Claims.

1.53    **Distribution Record Date** means December 30, 2018.

1.54    **DNB Offshore Credit Facility Vessels** means collectively the vessels *Toisa Proteus*, *Toisa Intrepid*, and *Toisa Conqueror*.

1.55    **DNB Tanker Credit Facility Vessels** means collectively the vessels *United Emblem*, *United Dynamic*, *Toisa Invincible*, and *United Ideal*.

1.56    *DVB Credit Facility Vessels* means collectively the vessels *Toisa Pisces* and *Toisa Perseus*.

1.57    *Effective Date* means the Business Day this Plan becomes effective as provided in Article IX hereof.

1.58    *Entity* means "entity" as defined in section 101(15) of the Bankruptcy Code.

1.59    *Estate(s)* means, individually, the estate of any of the Debtors and, collectively, the estates of all of the Debtors created under section 541 of the Bankruptcy Code.

1.60    *Exculpated Parties* means collectively: (a) the Debtors and their Professionals, (b) the Reconstituted Toisa Board, (c) the Shareholder, (d) the Management Companies, (e) the Informal Committee, (f) the Creditors' Committee, and (g) each of the Secured Lenders, and with respect to each of the Persons referred to in clauses (d), (e), (f), and (g), such Person's predecessors, successors, and assigns, subsidiaries, Affiliates, current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, and other professionals, and such Person's respective heirs, executor, estates, servants, and nominees, in each case in their capacity as such.

1.61    *Executory Contract* means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.62    *Exhibit* means an exhibit annexed to either this Plan or the Plan Supplement, as amended, modified, or supplemented from time to time.

1.63    *Existing BNP Credit Facility* means that certain senior secured credit facility, under that certain loan agreement, dated as of March 11, 2008, which has a term of twelve (12) years from the drawdown date and has a rate of Libor + 1.50%, and all related amendments, supplements, ancillary agreements, notes, pledges, collateral agreements, loan and security documents, instruments, and mortgages executed or delivered in connection thereto, in each case as amended, restated, supplemented, or modified prior to the date hereof, provided for the purpose of financing debt secured by the BNP Credit Facility Vessels. The unpaid principal balance on the Existing BNP Credit Facility as of the Petition Date was not less than $78,869,046. The borrowings and the obligations under the Existing BNP Credit Facility are secured by first priority liens on, and security interests in, the BNP Credit Facility Vessels and the related earnings, insurance, requisition compensation, charters, and charter guarantees related thereto as set forth in the Informal Committee Cash Collateral Order.

1.64    *Existing BNP Secured Claims* means all Secured Claims outstanding or arising under or with respect to the Existing BNP Credit Facility as of

the Petition Date. For the avoidance of doubt, such Claims do not include the Secured Lenders' Superpriority Claims or the Secured Lenders' Deficiency Claims.

1.65    ***Existing Citi Offshore Credit Facility*** means that certain senior secured credit facility, under that certain loan agreement, dated as of December 30, 2009, which has a term of ten (10) years with a rate of Libor + 3%, and all related amendments, supplements, ancillary agreements, notes, pledges, collateral agreements, loan and security documents, instruments, and mortgages executed or delivered in connection thereto, in each case as amended, restated, supplemented, or modified prior to the date hereof, provided for the purpose of financing debt secured by the Citi Offshore Credit Facility Vessels. The unpaid principal balance on the Existing Citi Offshore Credit Facility as of the Petition Date was not less than $99,492,857. The borrowings and the obligations under the Existing Citi Offshore Credit Facility are secured by first priority liens on, and security interests in, the Citi Offshore Credit Facility Vessels and the related earnings, insurance, requisition compensation, charters, and charter guarantees related thereto as set forth in the Informal Committee Cash Collateral Order.

1.66    ***Existing Citi Offshore Secured Claims*** means all Secured Claims outstanding or arising under or with respect to the Existing Citi Offshore Credit Facility as of the Petition Date. For the avoidance of doubt, such Claims do not include the Secured Lenders' Superpriority Claims or the Secured Lenders' Deficiency Claims.

1.67    ***Existing Citi Tanker Credit Facility*** means that certain senior secured credit facility, under that certain loan agreement, dated as of January 26, 2015, which has a term of five (5) years and a rate of Libor + 2%, and all related amendments, supplements, ancillary agreements, notes, pledges, collateral agreements, loan and security documents, instruments, and mortgages executed or delivered in connection thereto, in each case as amended, restated, supplemented, or modified prior to the date hereof, provided for the purpose of financing debt secured by the Citi Tanker Credit Facility Vessels. The unpaid principal balance on the Existing Citi Tanker Credit Facility as of the Petition Date was not less than $46,094,548. The borrowings and the obligations under the Existing Citi Tanker Credit Facility are secured by first priority liens on, and security interests in, the Citi Tanker Credit Facility Vessels and the related earnings, insurance, requisition compensation, charters, and charter guarantees related thereto as set forth in the Citi Cash Collateral Order.

1.68    ***Existing Citi Tanker Secured Claims*** means all Secured Claims outstanding or arising under or with respect to the Existing Citi Tanker Credit Facility as of the Petition Date. For the avoidance of doubt, such Claims do not include the Secured Lenders' Superpriority Claims, the Secured Lenders' Guarantee Claims, or the Secured Lenders' Deficiency Claims.

1.69    ***Existing Citizens I Credit Facility*** means that certain senior secured credit facility, under that certain loan agreement, dated as of July 28, 2010, which has a term of seven (7) years and rate of Libor + 2.5%, and all related amendments, supplements, ancillary agreements, notes, pledges, collateral agreements, loan and security documents, instruments, and mortgages executed or delivered in connection thereto, in each case as amended, restated, supplemented, or modified prior

to the date hereof, provided for the purpose of financing debt secured by the Citizens I Credit Facility Vessel. The unpaid principal balance on the Existing Citizens I Credit Facility as of the Petition Date was not less than $12,260,416. The borrowings and the obligations under the Existing Citizens I Credit Facility are secured by first priority liens on, and security interests in, the Citizens I Credit Facility Vessel and the related earnings, insurance, requisition compensation, charters, and charter guarantees related thereto as set forth in the Informal Committee Cash Collateral Order.

1.70    ***Existing Citizens I Secured Claims*** means all Claims outstanding or arising under or with respect to the Existing Citizens I Credit Facility as of the Petition Date. For the avoidance of doubt, such Claims do not include the Secured Lenders' Superpriority Claims or the Secured Lenders' Deficiency Claims.

1.71    ***Existing Citizens II Credit Facility*** means that certain senior secured credit facility, under that certain loan agreement, dated as of July 28, 2010, which has a term of seven (7) years and rate of Libor + 2.5%, and all related amendments, supplements, ancillary agreements, notes, pledges, collateral agreements, loan and security documents, instruments, and mortgages executed or delivered in connection thereto, in each case as amended, restated, supplemented, or modified prior to the date hereof, provided for the purpose of financing debt secured by the Citizens II Credit Facility Vessel. The unpaid principal balance on the Existing Citizens II Credit Facility as of the Petition Date was not less than $6,535,258. The borrowings and the obligations under the Existing Citizens II Credit Facility are secured by first priority liens on, and security interests in, the Citizens II Credit Facility Vessel and the related earnings, insurance, requisition compensation, charters, and charter guarantees related thereto as set forth in the Informal Committee Cash Collateral Order.

1.72    ***Existing Citizens II Secured Claims*** means all Secured Claims outstanding or arising under or with respect to the Existing Citizens II Credit Facility as of the Petition Date. For the avoidance of doubt, such Claims do not include the Secured Lenders' Superpriority Claims or the Secured Lenders' Deficiency Claims.

1.73    ***Existing Commerzbank I Credit Facility*** means that certain senior secured credit facility, under that certain loan agreement, dated as of June 13, 2007, which has a term of ten (10) years and a rate of Libor + 1%, and all related amendments, supplements, ancillary agreements, notes, pledges, collateral agreements, loan and security documents, instruments, and mortgages executed or delivered in connection thereto, in each case as amended, restated, supplemented, or modified prior to the date hereof, provided for the purpose of financing debt secured by the Commerzbank I Credit Facility Vessels. The unpaid principal balance on the Existing Commerzbank I Credit Facility as of the Petition Date was not less than $53,237,261. The borrowings and the obligations under the Existing Commerzbank I Credit Facility are secured by first priority liens on, and security interests in, the Commerzbank I Credit Facility Vessels and the related earnings, insurance, requisition compensation, charters, and charter guarantees related thereto as set forth in the Informal Committee Cash Collateral Order.

1.74    ***Existing Commerzbank I Secured Claims*** means all Secured Claims outstanding or arising under or with respect to the Existing Commerzbank I

Credit Facility as of the Petition Date. For the avoidance of doubt, such Claims do not include the Secured Lenders' Superpriority Claims, the Secured Lenders' Guarantee Claims, or the Secured Lenders' Deficiency Claims.

1.75    ***Existing Commerzbank II Credit Facility*** means that certain senior secured credit facility, under that certain loan agreement, dated as of March 3, 2010, which has a term of ten (10) years and a rate of Libor + 2.5%, and all related amendments, supplements, ancillary agreements, notes, pledges, collateral agreements, loan and security documents, instruments, and mortgages executed or delivered in connection thereto, in each case as amended, restated, supplemented, or modified prior to the date hereof, provided for the purpose of financing debt secured by the Commerzbank II Credit Facility Vessel. The unpaid principal balance on the Existing Commerzbank II Credit Facility as of the Petition Date was not less than $25,609,035. The borrowings and the obligations under the Existing Commerzbank II Credit Facility are secured by first priority liens on, and security interests in, the Commerzbank I Credit Facility Vessel and the related earnings, insurance, requisition compensation, charters, and charter guarantees related thereto as set forth in the Informal Committee Cash Collateral Order.

1.76    ***Existing Commerzbank II Secured Claims*** means all Secured Claims outstanding or arising under or with respect to the Existing Commerzbank II Credit Facility as of the Petition Date. For the avoidance of doubt, such Claims do not include the Secured Lenders' Superpriority Claims, the Secured Lenders' Guarantee Claims, or the Secured Lenders' Deficiency Claims.

1.77    ***Existing Commonwealth Bank of Australia Credit Facility*** means that certain senior secured credit facility, under that certain loan agreement, dated as of February 21, 2014, which has term of seven (7) years and rate of Libor + 2.35%, and all related amendments, supplements, ancillary agreements, notes, pledges, collateral agreements, loan and security documents, instruments, and mortgages executed or delivered in connection thereto, in each case as amended, restated, supplemented, or modified prior to the date hereof, provided for the purpose of financing debt secured by the Commonwealth Bank of Australia Credit Facility Vessels. The unpaid principal balance of the Existing Commonwealth Bank of Australia Credit Facility as of the Petition Date was not less than $22,750,000. The borrowings and the obligations under the Existing Commonwealth Bank of Australia Credit Facility are secured by first priority liens on, and security interests in, the Commonwealth Bank of Australia Credit Facility Vessels and the related earnings, insurance, requisition compensation, charters, and charter guarantees related thereto as set forth in the Informal Committee Cash Collateral Order.

1.78    ***Existing Commonwealth Bank of Australia Secured Claims*** means all Secured Claims outstanding or arising under or with respect to the Existing Commonwealth Bank of Australia Credit Facility as of the Petition Date. For the avoidance of doubt, such Claims do not include the Secured Lenders' Superpriority Claims or the Secured Lenders' Deficiency Claims.

1.79    ***Existing Credit Agricole Offshore Credit Facility*** means that certain senior secured credit facility, under that certain loan agreement, dated as of

September 21, 2007, which has a term of twelve (12) years from the drawdown date and a rate of Libor + 0.65%, and all related amendments, supplements, ancillary agreements, notes, pledges, collateral agreements, loan and security documents, instruments, and mortgages executed or delivered in connection thereto, in each case as amended, restated, supplemented, or modified prior to the date hereof, provided for the purpose of re-financing existing debt secured by the Credit Agricole Offshore Credit Facility Vessels. The unpaid principal balance on the Credit Agricole Offshore Credit Facility as of the Petition Date was not less than $47,400,000. The borrowings and the obligations under the Existing Credit Agricole Offshore Credit Facility are secured by first priority liens on, and security interests in, the Credit Agricole Offshore Credit Facility Vessels and the related earnings, insurance, requisition compensation, charters, and charter guarantees related thereto as set forth in the Credit Agricole Cash Collateral Order.

1.80    ***Existing Credit Agricole Offshore Secured Claims*** means all Secured Claims outstanding or arising under or with respect to the Existing Credit Agricole Offshore Credit Facility as of the Petition Date. For the avoidance of doubt, such Claims do not include the Secured Lenders' Superpriority Claims, the Secured Lenders' Guarantee Claims, or the Secured Lenders' Deficiency Claims.

1.81    ***Existing Credit Agricole Tanker Credit Facility*** means that certain senior secured credit facility, under that certain loan agreement, dated as of November 7, 2008 (as amended on April 21, 2010 and June 17, 2010), which has a term of ten (10) years and a rate of Libor + 1.0%, and all related amendments, supplements, ancillary agreements, notes, pledges, collateral agreements, loan and security documents, instruments, and mortgages executed or delivered in connection thereto, in each case as amended, restated, supplemented, or modified prior to the date hereof, provided for the purpose of re-financing existing debt secured by the Credit Agricole Tanker Credit Facility Vessel. The unpaid principal balance on the Existing Credit Agricole Tanker Credit Facility as of the Petition Date was not less than $25,976,000. The borrowings and the obligations under the Existing Credit Agricole Tanker Credit Facility are secured by first priority liens on, and security interests in, the Credit Agricole Tanker Credit Facility Vessel and the related earnings, insurance, requisition compensation, charters, and charter guarantees related thereto as set forth in the Credit Agricole Cash Collateral Order.

1.82    ***Existing Credit Agricole Tanker Secured Claims*** means all Secured Claims outstanding or arising under or with respect to the Existing Credit Agricole Tanker Credit Facility as of the Petition Date. For the avoidance of doubt, such Claims do not include the Secured Lenders' Superpriority Claims, the Secured Lenders' Guarantee Claims, or the Secured Lenders' Deficiency Claims.

1.83    ***Existing Danish Ship Bulker Credit Facility*** means that certain senior secured credit facility, under that certain loan agreement, dated as of March 22, 2013 (as supplemented, amended, and restated or otherwise modified from time to time), between Trade Will Inc. and Trade Vision Inc., as joint and several borrowers, the banks and financial institutions thereto, as lenders, and Danish Ship Finance A/S, as agent and security trustee, which has a term four (4) years and nine (9) months and a rate of Libor + 2.95%, and all related amendments, supplements, ancillary agreements, notes, pledges, collateral agreements, loan and security documents, instruments, and

11

mortgages executed or delivered in connection thereto, in each case as amended, restated, supplemented, or modified prior to the date hereof, provided for the purpose of re-financing part of the debt incurred in acquiring the Danish Ship Bulker Credit Facility Vessels.  The unpaid principal balance on the Existing Danish Ship Bulker Credit Facility as of the Petition Date was not less than $22,000,000.  The borrowings and the obligations under the Existing Danish Ship Bulker Credit Facility are secured by first priority liens on, and security interests in, the Danish Ship Bulker Credit Facility Vessels and the related earnings, insurance, requisition compensation, charters, and charter guarantees related thereto as set forth in the Informal Committee Cash Collateral Order.

1.84    ***Existing Danish Ship Bulker Secured Claims*** means all Secured Claims outstanding or arising under or with respect to the Existing Danish Ship Bulker Credit Facility as of the Petition Date.  For the avoidance of doubt, such Claims do not include the Secured Lenders' Superpriority Claims, the Secured Lenders' Guarantee Claims, or the Secured Lenders' Deficiency Claims.

1.85    ***Existing Danish Ship Offshore Credit Facility*** means that certain senior secured credit facility, under that certain loan agreement, dated as of November 11, 2014 (as supplemented, amended, and restated or otherwise modified from time to time), between Toisa Limited, as borrower, the banks and financial intuitions thereto, as lenders, and Danish Ship Finance A/S, as agent and security trustee, which has a term of seven (7) years and a rate of Libor + 1.90%, and all related amendments, supplements, ancillary agreements, notes, pledges, collateral agreements, loan and security documents, instruments, and mortgages executed or delivered in connection thereto, in each case as amended, restated, supplemented, or modified prior to the date hereof, provided for the purpose of refinancing debt secured by the Danish Ship Offshore Credit Facility Vessels and to provide additional liquidity to the borrower for general corporate purposes.  The unpaid principal balance on the Existing Danish Ship Offshore Credit Facility as of the Petition Date was not less than $64,643,000.  The borrowings and the obligations under the Existing Danish Ship Offshore Credit Facility are secured by first priority liens on, and security interests in, the Danish Ship Offshore Credit Facility Vessels and the related earnings, insurance, requisition compensation, charters, and charter guarantees related thereto as set forth in the Informal Committee Cash Collateral Order.

1.86    ***Existing Danish Ship Offshore Guarantee*** means that certain guarantee dated as of April 28, 2016 (as supplemented, amended, and restated or otherwise modified from time to time) between United Leadership Inc., as guarantor, and Danish Ship Finance A/S, as security trustee, in relation to the Existing Danish Ship Offshore Credit Facility.  The borrowings and the obligations under the Existing Danish Ship Offshore Guarantee are secured by second priority liens on, and security interests in, the *United Leadership* vessel and the related earnings, insurance, requisition compensation, charters, and charter guarantees related thereto to the extent set forth in the previously agreed upon and entered Informal Committee Cash Collateral Order.

1.87    ***Existing Danish Ship Offshore Secured Claims*** means all Secured Claims outstanding or arising under or with respect to the Existing Danish Ship Offshore Credit Facility as of the Petition Date.  For the avoidance of doubt, such Claims

do not include the Secured Lenders' Superpriority Claims or the Secured Lenders' Deficiency Claims.

      1.88    ***Existing Danish Ship Offshore Guarantee Secured Claims*** means all Secured Claims outstanding or arising under or with respect to the Existing Danish Ship Offshore Guarantee as of the Petition Date. For the avoidance of doubt, such claims do not include the Secured Lenders' Superpriority Claims or the Secured Lenders' Deficiency Claims.

      1.89    ***Existing Danish Ship Tanker Credit Facility*** means that certain senior secured credit facility, under that certain loan agreement, dated as of February 28, 2014 (as supplemented, amended, and restated or otherwise modified from time to time), between United Kalavryta Inc. and United Leadership Inc., as joint and several borrowers, the banks and financial institutions thereto, as lenders, and Danish Ship Finance A/S, as agent and security trustee, which has a term of seven (7) years with a rate of Libor + 1.8%, and all related amendments, supplements, ancillary agreements, notes, pledges, collateral agreements, loan and security documents, instruments, and mortgages executed or delivered in connection thereto, in each case as amended, restated, supplemented, or modified prior to the date hereof, provided for the purpose of financing or re-financing debt secured by the Danish Ship Tanker Credit Facility Vessels. The unpaid principal balance on the Existing Danish Ship Tanker Credit Facility as of the Petition Date was not less than $35,285,720. The borrowings and the obligations under the Existing Danish Ship Tanker Credit Facility are secured by first priority liens on, and security interests in, the Danish Ship Tanker Credit Facility Vessels and the related earnings, insurance, requisition compensation, charters, and charter guarantees related thereto as set forth in the Informal Committee Cash Collateral Order.

      1.90    ***Existing Danish Ship Tanker Secured Claims*** means all Secured Claims outstanding or arising under or with respect to the Existing Danish Ship Tanker Credit Facility as of the Petition Date. For the avoidance of doubt, such Claims do not include the Secured Lenders' Superpriority Claims, the Secured Lenders' Guarantee Claims, or the Secured Lenders' Deficiency Claims.

      1.91    ***Existing DNB Offshore Credit Facility*** means that certain senior secured credit facility, under that certain loan agreement, dated as of December 16, 2014, which has a term of five (5) years and a rate of Libor + 2.25%, and all related amendments, supplements, ancillary agreements, notes, pledges, collateral agreements, loan and security documents, instruments, and mortgages executed or delivered in connection thereto, in each case as amended, restated, supplemented, or modified prior to the date hereof, provided for the purpose of financing debt secured by the DNB Offshore Credit Facility Vessels. The unpaid principal balance on the Existing DNB Offshore Credit Facility as of the Petition Date was not less than $58,411,354. The borrowings and the obligations under the Existing DNB Offshore Credit Facility are secured by first priority liens on, and security interests in, the DNB Offshore Credit Facility Vessels and the related earnings, insurance, requisition compensation, charters, and charter guarantees related thereto as set forth in the Informal Committee Cash Collateral Order.

13

1.92    ***Existing DNB Offshore Secured Claims*** means all Secured Claims outstanding or arising under or with respect to the Existing DNB Offshore Credit Facility as of the Petition Date.  For the avoidance of doubt, such Claims do not include the Secured Lenders' Superpriority Claims or the Secured Lenders' Deficiency Claims.

1.93    ***Existing DNB Tanker Credit Facility*** means that certain senior secured credit facility, under that certain loan agreement, dated as of September 20, 2010, which has a term of ten (10) years and a rate of Libor + 0.650% - 0.90% depending on the interest coverage ratio, and all related amendments, supplements, ancillary agreements, notes, pledges, collateral agreements, loan and security documents, instruments, and mortgages executed or delivered in connection thereto, provided for the purpose of financing debt secured by the DNB Tanker Credit Facility Vessels.  The unpaid principal balance on the Existing DNB Tanker Credit Facility as of the Petition Date was not less than $110,703,990.  The borrowings and the obligations under the Existing DNB Tanker Credit Facility are secured by first priority liens on, and security interests in, the DNB Tanker Credit Facility Vessels and the related earnings, insurance, requisition compensation, charters, and charter guarantees related thereto as set forth in the Informal Committee Cash Collateral Order.

1.94    ***Existing DNB Tanker Secured Claims*** means all Secured Claims outstanding or arising under or with respect to the Existing DNB Tanker Credit Facility as of the Petition Date.  For the avoidance of doubt, such Claims do not include the Secured Lenders' Superpriority Claims, the Secured Lenders' Guarantee Claims, or the Secured Lenders' Deficiency Claims.

1.95    ***Existing DVB Credit Facility*** means that certain senior secured credit facility, under that certain loan agreement, dated as of December 19, 2014, which has a term of five (5) years and a rate of Libor + 2.15%, and all related amendments, supplements, ancillary agreements, notes, pledges, collateral agreements, loan and security documents, instruments, and mortgages executed or delivered in connection thereto, provided for the purpose of financing debt secured by the DVB Credit Facility Vessels.  The unpaid principal balance on the Existing DVB Credit Facility as of the Petition Date was not less than $73,978,000.  The borrowings and the obligations under the Existing DVB Credit Facility are secured by first priority liens on, and security interests in, the DVB Credit Facility Vessels and the related earnings, insurance, requisition compensation, charters, and charter guarantees related thereto as set forth in the Informal Committee Cash Collateral Order.

1.96    ***Existing DVB Guarantee Claim*** means the General Unsecured Claim held by DVB Bank America N.V. against Toisa Horizon, Inc. arising out of the guarantee agreement under the Existing DVB Credit Facility.  For the avoidance of doubt, the Existing DVB Guarantee Claim does not include any Secured Lenders' Toisa Superpriority Claims held by DVB Bank America N.V.

1.97    ***Existing DVB Secured Claims*** means all Secured Claims outstanding or arising under or with respect to the Existing DVB Credit Facility as of the Petition Date.  For the avoidance of doubt, such Claims do not include the Secured Lenders' Superpriority Claims or the Secured Lenders' Deficiency Claims.

14

1.98    *Existing ING Bulker Credit Facility* means that certain senior secured credit facility, under that certain loan agreement, dated as of May 7, 2015, which has a term of seven (7) years and a rate of Libor + 1.9%, and all related amendments, supplements, ancillary agreements, notes, pledges, collateral agreements, loan and security documents, instruments, and mortgages executed or delivered in connection thereto, provided for the purpose of financing debt secured by the ING Bulker Credit Facility Vessels.  The unpaid principal balance on the Existing ING Bulker Credit Facility as of the Petition Date was not less than $72,265,104.  The borrowings and the obligations under the Existing ING Bulker Credit Facility are secured by first priority liens on, and security interests in, the ING Bulker Credit Facility Vessels and the related earnings, insurance, requisition compensation, charters, and charter guarantees related thereto as set forth in the Informal Committee Cash Collateral Order.

1.99    *Existing ING Bulker Secured Claims* means all Secured Claims outstanding or arising under or with respect to the Existing ING Bulker Credit Facility as of the Petition Date.  For the avoidance of doubt, such Claims do not include the Secured Lenders' Superpriority Claims, the Secured Lenders' Guarantee Claims, or the Secured Lenders' Deficiency Claims.

1.100    *Existing ING Offshore Credit Facility* means that certain senior secured credit facility, under that certain loan agreement, dated as of February 21, 2014, which has a term of seven (7) years and a rate of Libor + 2.3%, and all related amendments, supplements, ancillary agreements, notes, pledges, collateral agreements, loan and security documents, instruments, and mortgages executed or delivered in connection thereto, provided for the purpose of financing debt secured by the ING Offshore Credit Facility Vessels.  The unpaid principal balance on the Existing ING Offshore Credit Facility as of the Petition Date was not less than $42,315,000.  The borrowings and the obligations under the Existing ING Offshore Credit Facility are secured by first priority liens on, and security interests in, the ING Offshore Credit Facility Vessels and the related earnings, insurance, requisition compensation, charters, and charter guarantees related thereto as set forth in the Informal Committee Cash Collateral Order.

1.101    *Existing ING Offshore Secured Claims* means all Secured Claims outstanding or arising under or with respect to the Existing ING Offshore Credit Facility as of the Petition Date.  For the avoidance of doubt, such Claims do not include the Secured Lenders' Superpriority Claims or the Secured Lenders' Deficiency Claims.

1.102    *Existing NBG Credit Facility* means that certain senior secured credit facility, under that certain loan agreement, dated as of November 13, 2008, which has a term of ten (10) years and a rate of Libor + 1%, and all related amendments, supplements, ancillary agreements, notes, pledges, collateral agreements, loan and security documents, instruments, and mortgages executed or delivered in connection thereto, provided for the purpose of financing debt secured by the NBG Credit Facility Vessel.  The unpaid principal balance on the Existing NBG Credit Facility as of the Petition Date was not less than $29,925,000.  The borrowings and the obligations under the Existing NBG Credit Facility are secured by first priority liens on, and security interests in, the NBG Offshore Credit Facility Vessel and the related earnings, insurance,

requisition compensation, charters, and charter guarantees related thereto as set forth in the Informal Committee Cash Collateral Order.

1.103    ***Existing NBG Secured Claims*** means all Secured Claims outstanding or arising under or with respect to the Existing NBG Credit Facility as of the Petition Date.  For the avoidance of doubt, such Claims do not include the Secured Lenders' Superpriority Claims, the Secured Lenders' Guarantee Claims, or the Secured Lenders' Deficiency Claims.

1.104    ***Existing SPV Oversecured Claims*** means the Claims in Classes 8-10 in this Plan.

1.105    ***Existing SPV Secured Tanker Claims*** means the Claims in Classes 2-7 in this Plan.

1.106    ***Existing Wells Fargo Credit Facility*** means that certain senior secured credit facility, under that certain loan agreement, dated as of July 28, 2010, which has a term of seven (7) years from the drawdown date and a rate of Libor + 2.5%, and all related amendments, supplements, ancillary agreements, notes, pledges, collateral agreements, loan and security documents, instruments, and mortgages executed or delivered in connection thereto, provided for the purpose of financing debt secured by the Wells Fargo Credit Facility Vessel.  The unpaid principal balance on the Existing Wells Fargo Credit Facility as of the Petition Date was not less than $6,756,000. The borrowings and the obligations under the Existing Wells Fargo Credit Facility are secured by first priority liens on, and security interests in, the Wells Fargo Offshore Credit Facility Vessel and the related earnings, insurance, requisition compensation, charters, and charter guarantees related thereto as set forth in the Informal Committee Cash Collateral Order.

1.107    ***Existing Wells Fargo Secured Claims*** means all Secured Claims outstanding or arising under or with respect to the Existing Wells Fargo Credit Facility as of the Petition Date.  For the avoidance of doubt, such Claims do not include the Secured Lenders' Deficiency Claims.

1.108    ***Final Order*** means an order or judgment, the operation or effect of which has not been reversed, stayed, modified, or amended, and as to which order or judgment (or any reversal, stay, modification, or amendment thereof) (a) the time to appeal, seek certiorari, or request reargument or further review or rehearing has expired and no appeal, petition for certiorari, or request for reargument or further review or rehearing has been timely filed, or (b) any appeal that has been or may be taken or any petition for certiorari or request for reargument or further review or rehearing that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed, from which certiorari was sought, or to which the request was made, and no further appeal or petition for certiorari or request for reargument or further review or rehearing has been or can be granted;  *provided*, *however*, with respect to either of the foregoing, no order or judgment shall fail to be a Final Order solely because of the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 may be filed with respect to such order or judgment.

1.109  *G550 Airplane Credit Facility* means that certain senior secured credit facility, under that certain loan agreement, dated as of June 16, 2015, and all related amendments, supplements, ancillary agreements, notes, pledges, collateral agreements, loan and security documents, instruments, and mortgages executed or delivered in connection thereto, utilized to finance the acquisition of the G550 Airplane. The G550 Airplane Credit Facility has a term of eight (8) years and a rate of Libor + 1.95%.

1.110  *G550 Airplane Credit Facility Claims* means all Claims under the G550 Airplane Credit Facility.

1.111  *General Unsecured Claims* means any Claim against any Debtor other than an Administrative Claim, a Secured Lenders' Superpriority Claim, a Priority Tax Claim, an Other Priority Claim, a Secured Claim, or an Intercompany Claim.

1.112  *General Unsecured Claims Distribution Reserve* means the account established and funded in accordance with Section 6.7 of this Plan on or as soon as reasonably practicable after the Effective Date by the Debtors or Post-Effective Toisa to be maintained in trust for the benefit of Holders of Allowed Class 29 General Unsecured Claims.

1.113  *Holder* means a holder of a Claim or Interest, as applicable.

1.114  *Impaired* means, when used in reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

1.115  *Informal Committee* means the informal committee of Secured Lenders consisting of BNP Paribas S.A.; Citibank Europe PLC, UK Branch; Citibank N.A., London Branch; Commerzbank AG; Commonwealth Bank of Australia; Credit Agricole Corporate and Investment Bank; Danish Ship Finance A/S; DNB Bank ASA; DVB Bank of America N.V.; Export-Import Bank of China; HSH Nordbank AG; ING Bank N.V., London Branch; National Bank of Greece. S.A.; Royal Bank of Scotland PLC; and Unicredit Bank AG.

1.116  *Informal Committee Cash Collateral Order* means the Final Order, Upon Consent of the Debtors and the Informal Committee of Secured Lenders (I) Authorizing the Debtors' Limited Use of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief, entered on July 18, 2017 [Dkt. No. 246], as extended from time to time.

1.117  *Informal Committee Professionals* means Cadwalader, Wickersham & Taft LLP and AMA Capital Partners LLC.

1.118  *ING Bulker Credit Facility Vessels* means collectively the vessels *Trade Quest*, *Trade Spirit*, *Trade Unity*, *Trade Prosperity*, and *Trade Resource.*

1.119  *ING Offshore Credit Facility Vessels* means collectively the vessels *Toisa Serenade*, *Toisa Warrior*, and *Toisa Sonata.*

17

1.120    *Intercompany Claims* means any and all Claims of a Debtor against another Debtor or non-Debtor affiliate.

1.121    *Intercompany Interest* means an Interest in a Debtor held by another Debtor.

1.122    *Interest* means any equity security, including a limited liability company membership interest, in a Debtor as defined in section 101(16) of the Bankruptcy Code, including all issued, unissued, authorized, or outstanding shares of capital stock of the Debtors, together with any warrants, options, or contractual rights to purchase or acquire such equity securities at any time and all rights arising with respect thereto.

1.123    *Lien* has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.124    *Management Companies* means collectively Sealion, Marine Management Services M.C., Marine Management Bulk Services Inc., Brokerage and Management, Inc., Trade and Transport (UK) Ltd., and Sealion Do Brasil Navegação LTDA.

1.125    *Management Company Released Parties* means collectively the Management Companies and their employees, officers and directors, agents, financial advisors, restructuring advisors, accountants, investment bankers, consultants, attorneys, representatives, and other professionals, in each case, only in their capacity as such.

1.126    *NBG Credit Facility Vessel* means the vessel *United Fortitude*.

1.127    *Newbuild Tanker Construction Contracts* means the contracts for the construction of the Newbuild Tanker Credit Facility Vessels with China Shipping Industry Co., Ltd. and China Shipping Industry (Jiangsu) Co., Ltd. to be listed in the Plan Supplement.

1.128    *Newbuild Tanker Credit Facility* means that certain senior secured credit facility, under that certain loan agreement, dated as of June 14, 2016, which has a term of seven (7) years post-delivery or up to 9.5 years from signing and a rate of Libor + 1.95% for the Citi tranche and 4.35% fixed for the Cexim tranche, and all related amendments, supplements, ancillary agreements, notes, pledges, collateral agreements, loan and security documents, instruments, and mortgages executed or delivered in connection thereto, in each case as amended, restated, supplemented, or modified prior to the date hereof, provided for the purposes of financing the construction of the Newbuild Tanker Credit Facility Vessels.  The unpaid principal balance on the Newbuild Tanker Facility as of the Petition Date was not less than $24,034,500.  The borrowings and the obligations under the Newbuild Tanker Credit Facility are secured by first priority liens on, and security interests in, among other things, the Newbuild Tanker Construction Contracts and related refund guarantees as set for in the Informal Committee Cash Collateral Order.

18

1.129    ***Newbuild Tanker Credit Facility Secured Claims*** means all Secured Claims outstanding or arising under or with respect to the Newbuild Tanker Credit Facility as of the Petition Date.  For the avoidance of doubt, such Claims do not include the Secured Lenders' Superpriority Claims, the Secured Lenders' Guarantee Claims, or the Secured Lenders' Deficiency Claims.

1.130    ***Newbuild Tanker Credit Facility Vessels*** means six (6) vessels: three (3) Aframax tankers and three (3) Suezmax tankers currently being built by China Shipping Industry Co., Ltd. and China Shipping Industry (Jiangsu) Co., Ltd.

1.131    ***Newbuild Tanker Sale Order*** means the order entered by the Bankruptcy Court on November 13, 2018, that, among other things, approved the sale and assumption and assignment of the Newbuild Tanker Construction Contracts [Dkt. No. 906].

1.132    ***Newbuild Tanker Sale Proceeds*** means all proceeds for the sale of the Newbuild Tanker Construction Contracts pursuant to the Newbuild Tanker Sale Order.

1.133    ***Oceangoing Sale Procedures*** means the sale and bidding procedures set forth and described in the Oceangoing Sale Procedures Order.

1.134    ***Oceangoing Sale Procedures Order*** means an order entered by the Bankruptcy Court on March 30, 2018 that, among other things, established procedures for the sale of the Debtors' Oceangoing Vessels pursuant to section 363 of the Bankruptcy Code and the assignment of the Newbuild Tanker Construction Contracts pursuant to section 365 of the Bankruptcy Code [Dkt. No. 526].

1.135    ***Oceangoing Vessels*** means collectively the oceangoing tankers and bulkers subject to the Oceangoing Sale Procedures Order.

1.136    ***Oceangoing Vessel Sales Proceeds*** means all proceeds from the sales of the Oceangoing Vessels pursuant to the Oceangoing Sale Procedures Order.

1.137    ***Offshore Sale Procedures*** means the sale and bidding procedures set forth and described in the Offshore Sale Procedures Order.

1.138    ***Offshore Sale Procedures Order*** means an order entered by the Bankruptcy Court on July 3, 2018 that, among other things, established procedures for the sale of the Debtors' Offshore Vessels pursuant to section 363 of the Bankruptcy Code [Dkt. No. 671].

1.139    ***Offshore Vessels*** means collectively BNP Credit Facility Vessels, Citi Offshore Facility Vessels, the Citizens I Credit Facility Vessel, the Citizens II Credit Facility Vessel, the Commonwealth Bank of Australia Credit Facility Vessel, Credit Agricole Offshore Credit Facility Vessels, Danish Ship Offshore Credit Facility Vessels, DNB Offshore Credit Facility Vessels, DVB Credit Facility Vessels, ING Offshore Credit Facility Vessels, and the Wells Fargo Credit Facility Vessel.

1.140    *Offshore Vessel Sales Proceeds* means all proceeds from sales of the Offshore Vessels, if applicable.

1.141    *Other Priority Claims* means any and all Claims accorded priority in right of payment under section 507(a) of the Bankruptcy Code that are not an Administrative Claim or Priority Tax Claim.

1.142    *Parent* means the Debtor that holds the Interests in the applicable Debtor.  Toisa is the Parent of the following Debtors: United Dynamic, Inc., United Ideal, Inc., United Emblem, Inc., Trade and Transport, Inc., Edgewater Offshore Shipping, Ltd., and Toisa Horizon, Inc.  T&T is the Parent of the following Debtors: United Ambassador, Inc., United Courage, Inc., United Banner, Inc., United Seas, Inc., United Kalavryta, Inc., United Journey, Inc., United Leadership Inc., Trade Sky, Inc., Trade Industrial Development Corporation, United Honor, Inc., Trade Will, Inc., Trade Vision, Inc., Trade Resource, Inc., Trade Prosperity, Inc., Trade Unity, Inc., Trade Spirit, Inc., and Trade Quest, Inc.

1.143    *Person* means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, or other entity.

1.144    *Personal Injury Claims* means any and all personal injury Claims against the Debtors.

1.145    *Petition Date* means January 29, 2017.

1.146    *Plan* means this *First Amended Solicitation Version of the Second Amended Chapter 11 Plan for Toisa Limited and Certain of its Affiliates Pursuant to Chapter 11 of the Bankruptcy Code,* including the Exhibits and all supplements, appendices, and schedules hereto, either in its current form or as the same may be altered, amended, supplemented, or modified from time to time.

1.147    *Plan Administrator* means [ ● ].

1.148    *Plan Supplement* means the compilation of documents and forms of documents, schedules, and exhibits to this Plan to be filed by the Debtors, in a form acceptable to the Debtors and the Informal Committee, containing the information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code, provided that, through the Effective Date, the Debtors shall have the right to amend any schedules, exhibits, and the other documents contained in, and exhibits to, the Plan Supplement, in each case with the consent of the Informal Committee and any affected Secured Lender or as otherwise ordered by the Bankruptcy Court.  The Plan Supplement shall be filed no later than ten (10) days prior to the deadline set to vote on this Plan.

1.149    *Post-Effective Toisa* means Toisa Limited from and after the Effective Date.

20

1.150    *Priority Tax Claim* means any Claim of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

1.151    *Pro Rata* means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims and Disputed Claims within such Class.

1.152    *Professional* means (a) any professional employed by the Debtors or the Creditors' Committee in these Chapter 11 Cases pursuant to sections 327, 328, 363, or 1103 of the Bankruptcy Code or otherwise and (b) any professional or other entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

1.153    *Professional Compensation – Accrued* means, at any date, and regardless of whether such amounts are billed or unbilled, all of a Professional's accrued and unpaid fees (including transaction fees, if any) and reimbursable expenses for services rendered in connection with the Chapter 11 Cases through and including such date, whether or not such Professional has filed a fee application for payment of such fees and expenses, (i) to the extent that any such fees and expenses have not been previously paid (regardless of whether a fee application has been filed for any such amount) and (ii) after applying any retainer that has been provided by the Debtors to such Professional and not previously applied.  No amount of a Professional's fees and expenses denied under a Final Order shall constitute Professional Compensation – Accrued.

1.154    *Professional Fee Claim* means an Administrative Claim of a Professional for compensation for services rendered or reimbursement of costs, expenses, or other charges to be paid solely by Post-Effective Toisa in accordance with the Protocol.

1.155    *Professional Fee Escrow Account* means an escrow account to be funded with an amount in Cash equal to the Professional Fee Reserve Amount by Post-Effective Toisa on the Effective Date solely for the purpose of paying unpaid Allowed Claims of Professionals (including Professional Fee Claims) in accordance with the Protocol.

1.156    *Professional Fee Reserve Amount* means the aggregate Professional Compensation – Accrued through the Effective Date as estimated by the Professionals of the Debtors and the Creditors' Committee, and approved by the Informal Committee in accordance with Article II of this Plan.

1.157    *Proof of Claim* means a written proof of Claim filed against any Debtor in the Chapter 11 Cases.

1.158    *Protocol* means the Bankruptcy Court's July 26, 2018 Order Supplementing the Sales Procedures to Implement a Protocol with Respect to Establishing Reserves and Making Disbursements [Dkt. No. 727].

1.159  ***Reconstituted Toisa Board*** means Len Hoskinson, David Jansing Baker, and Alan M. Jacobs.

1.160  ***Released Party*** means collectively and in each case in their capacity as such, each of the following: (a) the Debtors, (b) the Reconstituted Toisa Board, (c) the Informal Committee, (d) the Creditors' Committee, and (e) each of the Secured Lenders, and with respect to each of the Persons referred to in clauses (c), (d), and (e) hereof, such Person's current and former subsidiaries, Affiliates, members, directors, officers, principals, agents, financial advisors, restructuring advisors, accountants, investment bankers, consultants, attorneys, employees, partners, equity Holders, representatives, and other professionals, in each case, only in their capacity as such.

1.161  ***Releasing Parties*** means collectively and in each case in their capacity as such: (a) each Holder of a Claim or Interest that is Unimpaired under the Plan, (b) each Holder of a Claim or Interest that votes to accept the Plan, (c) each Holder of a Claim or Interest whose vote to accept or reject the Plan is solicited but that does not vote to accept or reject the Plan, (d) each Holder of a Claim or Interest that is deemed to reject or votes to reject the Plan but does not opt out of granting the releases set forth in the Plan, and (e) the Creditors' Committee, and with respect to each of the Persons referred to in clauses (a) through (e), such Person's current and former subsidiaries, Affiliates, members, directors, officers, principals, agents, financial advisors, restructuring advisors, accountants, investment bankers, consultants, attorneys, employees, partners, equity Holders, representatives, and other professionals, in each case, only in their capacity as such.

1.162  ***Retained Actions*** means all claims, Causes of Action, rights of action, suits, and proceedings, whether in law or in equity, whether known or unknown, which any Debtor or any Debtor's Estate may hold against any Person, including, without limitation, (a) claims and Causes of Action brought prior to the Effective Date, (b) claims and Causes of Action against any Person for failure to pay for products or services provided or rendered by any of the Debtors, (c) claims and Causes of Action seeking the recovery of any of the Debtors' or Post-Effective Toisa's accounts receivable or other receivables or rights to payment created or arising in the ordinary course of any of the Debtors' or Post-Effective Toisa's businesses, including, without limitation, claim overpayments and tax refunds, (d) all Avoidance Actions, and (e) any such claims, Causes of Action, rights of action, suits, or proceedings listed in the Disclosure Statement or any schedules filed by the Debtors in these cases, if any; *provided*, *however*, that Retained Actions shall not include those claims, Causes of Action, rights of action, suits, and proceedings, whether in law or in equity, whether known or unknown, released under Article X herein.

1.163  ***Schedules*** means the Debtors' schedules of assets and liabilities and statements of financial affairs, filed under section 521 of the Bankruptcy Code and the Bankruptcy Rules, as amended, supplemented, or modified.

1.164  ***Sealion*** means Sealion Shipping Ltd.

1.165 **Secured Claim** means a Claim that is secured by a Lien on property in which a Debtor's Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in the applicable Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506 of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code.

1.166 **Secured Lender** means a Holder of a Secured Claim (among other Claims, as applicable) that is Allowed pursuant to the terms of this Plan and, as applicable, in accordance with the provisions set forth in the Cash Collateral Orders.

1.167 **Secured Lenders' Deficiency Claims** means the Secured Lenders' SPV Deficiency Claims and the Secured Lenders' Toisa Deficiency Claims.

1.168 **Secured Lenders' Guarantee Claims** means the Secured Lenders' T&T Guarantee Claims and the Secured Lenders' Toisa Guarantee Claims, as applicable.

1.169 **Secured Lenders' SPV Deficiency Claims** means that portion of any Allowed Claim held by a Secured Lender, arising under the applicable credit facility against an SPV Debtor, that exceeds the value of the assets securing such Allowed Claim. Secured Lenders' SPV Deficiency Claims do not include the Existing DVB Guarantee Claim or the Existing Danish Ship Offshore Guarantee Secured Claims.

1.170 **Secured Lenders' SPV Superpriority Claims** means the adequate protection superpriority claims against an SPV Debtor granted to the Secured Lenders under the applicable Cash Collateral Orders.

1.171 **Secured Lenders' Superpriority Claims** means the Secured Lenders' SPV Superpriority Claims, the Secured Lenders' T&T Superpriority Claims, and the Secured Lenders' Toisa Superpriority Claims.

1.172 **Secured Lenders' T&T Superpriority Claims** means the adequate protection superpriority claims against T&T granted to the Secured Lenders under the applicable Cash Collateral Orders or under any other Final Order entered in these Chapter 11 Cases.

1.173 **Secured Lenders' T&T Guarantee Claims** means the General Unsecured Claims held by Secured Lenders against T&T arising out of guarantee agreements made in connection with the Existing Commerzbank I Credit Facility, Existing Commerzbank II Credit Facility, Existing Credit Agricole Tanker Credit Facility, Existing NBG Credit Facility, and Newbuild Tanker Credit Facility. For the avoidance of doubt, Secured Lenders' T&T Guarantee Claims do not include Secured Lenders' T&T Superpriority Claims.

1.174 **Secured Lenders' Toisa Deficiency Claims** means that portion of any Allowed Claim held by a Secured Lender, arising under the applicable credit facility against Toisa, that exceeds the value of the assets securing such Allowed Claim.

Secured Lenders' Toisa Deficiency Claims do not include Secured Lenders' Toisa Guarantee Claims or Secured Lenders' Toisa Superpriority Claims.

1.175  ***Secured Lenders' Toisa Guarantee Claims*** means the General Unsecured Claims held by Secured Lenders against Toisa arising out of guarantee agreements made in connection with the Existing Commerzbank I Credit Facility, Existing Commerzbank II Credit Facility, Existing Citi Tanker Credit Facility, Existing Citizens I Credit Facility, Existing Danish Ship Bulker Credit Facility, Existing Danish Ship Tanker Credit Facility, Existing ING Bulker Credit Facility, and Existing DNB Tanker Credit Facility.  For the avoidance of doubt, Secured Lenders' Toisa Guarantee Claims do not include Secured Lenders' Toisa Superpriority Claims.

1.176  ***Secured Lenders' Toisa Superpriority Claims*** means the adequate protection superpriority claims against Toisa granted to the Secured Lenders under the applicable Cash Collateral Orders or under any other Final Order entered in these Chapter 11 Cases.

1.177  ***Secured Lenders' Toisa GUCs*** means the Secured Lenders' Toisa Deficiency Claims and the Secured Lenders' Toisa Guarantee Claims.

1.178  ***SPV Debtors*** means United Dynamic, Inc., United Ideal, Inc., United Emblem, Inc., Edgewater Offshore Shipping, Ltd., Toisa Horizon, Inc.,  United Ambassador, Inc., United Courage, Inc., United Banner, Inc., United Seas, Inc., United Kalavryta, Inc., United Journey, Inc., United Leadership Inc., Trade Sky, Inc., Trade Industrial Development Corporation, United Honor, Inc., Trade Will, Inc., Trade Vision, Inc., Trade Resource, Inc., Trade Prosperity, Inc., Trade Unity, Inc., Trade Spirit, Inc., and Trade Quest, Inc.

1.179  ***Shareholder*** means Gregory Callimanopulos.

1.180  ***[Shareholder Nominee*** means an entity designated to hold the Interests in Post-Effective Toisa which shall be identified in the Plan Supplement; but, for the avoidance of doubt, which shall not be the Shareholder or his Affiliates.]

1.181  ***Toisa*** means Debtor Toisa Limited.

1.182  **T&T** means Debtor Trade and Transport, Inc.

1.183  ***T&T General Unsecured Claim*** means any General Unsecured Claim held against T&T, including the Secured Lenders' T&T Guarantee Claims.

1.184  ***Unimpaired*** means a Claim or Interest that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

1.185  ***Wells Fargo Credit Facility Vessel*** means the vessel *Toisa Crest*.

<u>Rules of Interpretation and Computation of Time</u>.  For purposes of this Plan, unless otherwise provided herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (b) unless otherwise provided in this Plan, any reference in this Plan to a

contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) any reference in this Plan to an existing document or schedule filed or to be filed means such document or schedule, as it may have been or may be amended, modified, or supplemented pursuant to this Plan; (d) any reference to an entity as a Holder of a Claim or Interest includes that entity's successors and assigns; (e) all references in this Plan to Sections and Articles are references to Sections and Articles of or to this Plan; (f) the words "herein," "hereunder," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (h) subject to the provisions of any contract, certificates of incorporation, by-laws, instrument, release, or other agreement or document entered into in connection with this Plan, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules; (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (j) in computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply; (k) "including" means "including without limitation;" and (l) with reference to any distribution under this Plan, "on" a date means on or as soon as reasonably practicable after that date.

Exhibits.  All Exhibits are incorporated into and are a part of this Plan as if set forth in full herein, and, to the extent not annexed hereto, such Exhibits shall be filed with the Bankruptcy Court no later than ten (10) Business Days prior to the deadline to vote on the Plan.  Holders of Claims and Interests may obtain a copy of the Exhibits upon written request to the Debtors.  Upon their filing, the Exhibits may be inspected (a) in the office of the clerk of the Bankruptcy Court or its designee during normal business hours; (b) on the Bankruptcy Court's website at http://nysb.uscourts.gov (registration required); or (c) at our noticing agent's website at http://www.kccllc.net/toisa.  The documents contained in the Exhibits shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.

Controlling Document.  In the event of an inconsistency between this Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document).  The provisions of this Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effect the purposes of each, provided that, if there is determined to be any inconsistency between any Plan or Plan Supplement provision and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern and any such provision of the Confirmation Order shall be deemed a modification of this Plan or Plan Supplement, as applicable, and shall control and take precedence.

## ARTICLE II
### ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not classified and are not entitled to vote on this Plan.

2.1    *Administrative Claims.*    On, or as soon as reasonably practicable after the later of (a) the Effective Date, (b) the date on which an Administrative Claim becomes an Allowed Administrative Claim, or (c) the date on which an Allowed Administrative Claim becomes payable under any agreement relating thereto, each Holder of such Allowed Administrative Claim against a Debtor shall receive from that Debtor, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Administrative Claim, Cash equal to the unpaid portion of such Allowed Administrative Claim.

2.2    *Priority Tax Claims.*    The legal and equitable rights of the Holders of Priority Tax Claims are Unimpaired by this Plan.  Unless the Holder of an Allowed Priority Tax Claim and the Debtors agree to a different treatment, on the Effective Date, each Holder of an Allowed Priority Tax Claim against a Debtor shall have such Claim Allowed against that Debtor and each Holder of an Allowed Priority Tax Claim shall receive from the applicable Debtor Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon as is reasonably practicable after, the later of the Effective Date, the date such Allowed Priority Tax Claim is due and payable in the ordinary course, or as otherwise permitted under section 1129(a)(9) of the Bankruptcy Code.

2.3    *Professional Fee Claims.*    Professionals shall submit final fee applications seeking approval of all Professional Fee Claims no later than sixty (60) days after the Effective Date.  These applications remain subject to Bankruptcy Court approval under the standards established by the Bankruptcy Code, including the requirements of sections 327, 328, 330, 331, 363, 503(b), and 1103 of the Bankruptcy Code, as applicable.  Any unpaid amounts to Professionals shall be made upon entry of a Final Order approving such Professional Fee Claims.

a.    Post-Effective Toisa is authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date in the ordinary course of business without the need for Bankruptcy Court approval.

b.    On the Effective Date, with the consent of the Informal Committee, Post-Effective Toisa will establish and fund the Professional Fee Escrow Account with Cash in an amount equal to the Professional Fee Reserve Amount.

2.4    *Secured Lenders' Superpriority Claims.*    The treatment of the Secured Lenders' Superpriority Claims provided for herein incorporates the terms of a settlement among the Informal Committee, the Creditors' Committee, and the Debtors. Confirmation of this Plan shall constitute approval of such settlement in accordance with Bankruptcy Rule 9019 (the "Settlement").  The Secured Lenders' Superpriority Claims shall be Allowed in the amounts set forth on Exhibit [1].

26

a.    The Holders of the Secured Lenders' Superpriority Claims shall be entitled to superpriority administrative expense status senior to all other Administrative Claims in accordance with the Cash Collateral Orders.  The Holders of Secured Lenders' Superpriority Claims shall be entitled to retain all payments made by the Debtors during the Chapter 11 Cases pursuant to the respective Cash Collateral Orders in respect of each of the Secured Lenders' respective Superpriority Claims.  Each Secured Lender shall be entitled to receive indefeasible payment in full in Cash of the Secured Lenders' Superpriority Claims in the amounts set forth on Exhibit [1] under the Settlement.  Such payments shall be made in full in Cash on the Effective Date;  *provided, however*, that if the amount of each Secured Lenders' Superpriority Claims at a Debtor is not known as of the Effective Date, then the Holders of Secured Lenders' Superpriority Claims against that Debtor shall only receive a partial Distribution on the Effective Date in an amount reflecting [__]% of the total amount expected to be distributed on account of such Secured Lenders' Superpriority Claim, and all remaining unpaid amounts owed to the applicable Secured Lenders on account of such Secured Lenders' Superpriority Claims shall be paid to such Secured Lenders as soon as practicable once the amount of all Secured Lenders' Superpriority Claims at that Debtor are known.  In the event that the amount of each Secured Lenders' Superpriority Claims at a Debtor is not known as of the Effective Date, such Debtor shall estimate and reserve, with the consent of the Informal Committee, sufficient Available Cash to be able to make all payments to Holders of Secured Lenders' Superpriority Claims required to be made pursuant to this Plan that are not made on the Effective Date.  In accordance with section 1129(a)(9) of the Bankruptcy Code, the applicable Secured Lenders have agreed to the treatment of the Secured Lenders' Superpriority Claims under the Settlement even though the Holders of the Secured Lenders' Superpriority Claims against Toisa may not receive payment in full in Cash equal to the Allowed amount of the Secured Lenders' Superpriority Claims against Toisa.

b.    On the Effective Date, Distributions made to Holders of the Existing Commerzbank I Secured Claims and Existing NBG Secured Claims on account of their Secured Lenders' Superpriority Claims will be reduced by the amounts identified in the applicable footnotes on Exhibit 1.  The amounts identified in the applicable footnotes on Exhibit 1 will be paid by T&T to Toisa to reimburse Toisa for amounts advanced during the Chapter 11 Cases on behalf of the Holders of the Existing Commerzbank I Secured Claims and the Existing NBG Secured Claims.

2.5    ***Payment of Informal Committee Professionals.***  On the Effective Date, each Informal Committee Professional shall be paid any amounts owed to such Informal Committee Professional out of Available Cash, as agreed by the Debtors and the members of the Informal Committee, without need for a further order by the Bankruptcy Court.

# ARTICLE III
# CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

3.1    ***Classification and Settlement.***  Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of classes (each a "Class" and collectively "Classes") of Claims and the Interests in the Debtors.  A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the

description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim is also placed in a particular Class for the purpose of receiving Distributions pursuant to this Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date. Subject to the payment of Allowed Professional Fee Claims and any other joint and several obligations of the Debtors, each Debtor shall be responsible for satisfying the Claims and Administrative Claims against and Interests in such Debtor from such Debtor's assets.

In accordance with section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the Distributions and other benefits provided pursuant to this Plan, the provisions of this Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any Distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests, and is fair, equitable, and reasonable.

3.2     *Remaining Cash After Payment of Claims.*   In the event that the Allowed Claims against a Debtor have been satisfied in full, any Cash remaining at that Debtor shall be transferred to that Debtor's Parent and shall be considered Available Cash at the Parent and distributed to the Holders of Allowed Claims against the Parent in accordance with the provisions of this Plan.

3.3     *Summary of Classification.*   The following table designates the Classes of Claims and specifies which of those Classes are (a) Impaired or Unimpaired by this Plan, (b) entitled to vote to accept or reject this Plan in accordance with section 1126 of the Bankruptcy Code, and (c) deemed to reject this Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in this Section 3.3.  All of the potential Classes for the Debtors are set forth herein.  Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in this Section 3.3.

| Class | Designation | Impairment | Entitled to Vote |
| --- | --- | --- | --- |
| Class 1…........ | Other Priority Claims | Unimpaired | No (deemed to accept) |
| Class 2…........ | Existing Citi Tanker Secured Claims | Impaired | Yes |

28

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| Class 3…........ | Existing Commerzbank I Secured Claims | Impaired | Yes |
| Class 4…........ | Existing Commerzbank II Secured Claims | Impaired | Yes |
| Class 5…........ | Existing Credit Agricole Tanker Secured Claims | Impaired | Yes |
| Class 6…........ | Existing NBG Secured Claims | Impaired | Yes |
| Class 7…........ | Existing DNB Tanker Secured Claims | Impaired | Yes |
| Class 8…........ | Existing Danish Ship Tanker Secured Claims | Unimpaired | No (deemed to accept) |
| Class 9…........ | Existing ING Bulker Secured Claims | Unimpaired | No (deemed to accept) |
| Class 10…....... | Existing Danish Ship Bulker Secured Claims | Unimpaired | No (deemed to accept) |
| Class 11…....... | Secured Lenders' SPV Deficiency Claims | Impaired | No (deemed to reject) |
| Class 12......... | Existing DVB Guarantee Claim | Impaired | No (deemed to reject) |
| Class 13…....... | Existing Danish Ship Offshore Guarantee Secured Claims | Impaired | Yes |
| Class 14…....... | Existing Citizens I Secured Claims | Impaired | Yes |
| Class 15…....... | Existing Citi Offshore Secured Claims | Impaired | Yes |
| Class 16…....... | Existing Citizens II Secured Claims | Impaired | Yes |
| Class 17…....... | Existing Commonwealth Bank of Australia Secured Claims | Impaired | Yes |
| Class 18…....... | Existing DNB Offshore Secured Claims | Impaired | Yes |

29

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 19…...... | Existing ING Offshore Secured Claims | Impaired | Yes |
| Class 20…...... | Existing Wells Fargo Secured Claims | Impaired | Yes |
| Class 21…...... | Existing BNP Secured Claims | Impaired | Yes |
| Class 22…...... | Existing Credit Agricole Offshore Secured Claims | Impaired | Yes |
| Class 23…...... | Existing Danish Ship Offshore Secured Claims | Impaired | Yes |
| Class 24…...... | Existing DVB Secured Claims | Impaired | Yes |
| Class 25…...... | Newbuild Tanker Credit Facility Secured Claims | Impaired | Yes |
| Class 26…...... | G550 Airplane Credit Facility Claims | Impaired | Yes |
| Class 27…...... | Secured Lenders' Toisa GUCs | Impaired | No (deemed to reject) |
| Class 28…...... | T&T General Unsecured Claims | Impaired | No (deemed to reject) |
| Class 29…...... | Class 29 General Unsecured Claims | Impaired | Yes |
| Class 30…...... | Personal Injury Claims | Impaired | Yes |
| Class 31…...... | Intercompany Claims | Impaired | No (deemed to reject) |
| Class 32…...... | Interests in Toisa | Impaired | No (deemed to reject) |
| Class 33…...... | Intercompany Interests in Other Debtors | Impaired | No (deemed to reject) |

3.4    *Treatment of Classes.*

a.    *Class 1 – Other Priority Claims*

(i)    *Claims in Class:*  Class 1 consists of all Other Priority Claims that may exist against the Debtors.

(ii)    *Treatment:*    On, or as soon as reasonably practicable after, (a) the Effective Date if such Other Priority Claim is an Allowed Other Priority Claim on the Effective Date or (b) the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive from the applicable Debtor, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Other Priority Claim, Cash equal to the unpaid portion of such Allowed Other Priority Claim.

(iii)    *Voting:*  Claims in Class 1 are Unimpaired.  Pursuant to section 1126(f) of the Bankruptcy Code, each Holder of an Allowed Other Priority Claim is conclusively deemed to have accepted the Plan.  Therefore, each Holder of an Allowed Other Priority Claim is not entitled to vote to accept or reject this Plan.

b.    *Classes 2-7 – Existing SPV Secured Tanker Claims*

(i)    *Claims in Classes:*  Existing Citi Tanker Secured Claims (Class 2); Existing Commerzbank I Secured Claims (Class 3); Existing Commerzbank II Secured Claims (Class 4); Existing Credit Agricole Tanker Secured Claims (Class 5); Existing NBG Secured Claims (Class 6); Existing DNB Tanker Secured Claims (Class 7).

(ii)    *Settlement*:  This Plan and the treatment of Existing SPV Secured Tanker Claims provided for herein incorporate the terms of a settlement between the Holders of Existing SPV Secured Tanker Claims, the Debtors, and the Creditors' Committee.  Confirmation of this Plan shall constitute approval of such settlement in accordance with Bankruptcy Rule 9019.

(iii)    *Allowance*:  Each Existing SPV Secured Tanker Claim shall be an Allowed Claim against the applicable Debtor in the amount set forth on Exhibit [2].

(iv)    *Treatment*:  The Holders of Existing SPV Secured Tanker Claims shall be entitled to retain all Cash and other Distributions previously received and to be received from the Debtors pursuant to the applicable Cash Collateral Order and the relevant Oceangoing Vessel sale order, including any Cash in the vessel accounts for the applicable vessel(s), any remaining Cash proceeds from the sale of the applicable vessel(s) that has been reserved under the relevant Oceangoing Vessel sale order but has not been utilized in accordance therewith as of the Confirmation Date, any other collateral proceeds received or to be received by the Debtors or Post-Effective Toisa, as applicable, in connection with the applicable vessel, and any other treatment as previously

31

approved by a Final Order, in full and final satisfaction of such Claims.[2]  In no event shall the Holder of an Existing SPV Secured Tanker Claim receive Distributions on account of such Claim in excess of the Allowed amount of such Claim.

(v)    *Voting*:  Claims in Classes 2-7 are Impaired.  Pursuant to section 1126 of the Bankruptcy Code, each Holder of an Allowed Existing SPV Secured Tanker Claim is entitled to vote to accept or reject this Plan.

c.    *Classes 8-10 – Existing SPV Oversecured Claims*

(i)    *Claims in Classes*:  Existing Danish Ship Tanker Secured Claims (Class 8); Existing ING Bulker Secured Claims (Class 9); Existing Danish Ship Bulker Secured Claims (Class 10).

(ii)    *Settlement*:  This Plan and the treatment of Existing SPV Oversecured Claims provided for herein incorporate the terms of a settlement between the Holders of Existing SPV Oversecured Claims, the Debtors, and the Creditors' Committee.  Confirmation of this Plan shall constitute approval of such settlement in accordance with Bankruptcy Rule 9019.

(iii)    *Allowance*:  Each Existing SPV Oversecured Claim shall be an Allowed Claim against the applicable Debtor in the amount set forth on Exhibit [2].

(iv)    *Treatment*:  The Holders of Existing SPV Oversecured Claims shall receive on or prior to the Effective Date, in full and final satisfaction of such Existing SPV Oversecured Claims, payments in Cash equal to 100% of the amount of the Existing SPV Oversecured Claims in Classes 8-10.

(v)    *Voting*:  Claims in Classes 8-10 are Unimpaired. Pursuant to section 1126 of the Bankruptcy Code, each Holder of an Allowed Existing SPV Oversecured Claim is conclusively deemed to have accepted the Plan because each Holder an Allowed Existing SPV Oversecured Claim is being paid in full in Cash on or before the Effective Date.  Therefore, each Holder of an Allowed Existing SPV Oversecured Claim is not entitled to vote to accept or reject the Plan.

d.    *Class 11 – Secured Lenders' SPV Deficiency Claims*

(i)    *Claims in Class*:  Class 11 consists of any Secured Lenders' SPV Deficiency Claims.

---

[2]    For the avoidance of doubt, the treatment and Distributions to be received by Holders of Existing NBG Secured Claims under this Plan shall be consistent with the applicable Oceangoing Vessel sale order, entered on September 13, 2018 [Dkt. No. 796].

(ii)    *Settlement*:  This Plan and the treatment of Secured Lenders' SPV Deficiency Claims herein incorporate the terms of a settlement between the Holders of Secured Lenders' SPV Deficiency Claims, the Creditors' Committee, and the Debtors.  Confirmation of this Plan shall constitute approval of such settlement in accordance with Bankruptcy Rule 9019.

(iii)    *Allowance*:  Each Secured Lenders' SPV Deficiency Claim shall be an Allowed Claim against the applicable Debtor in accordance with the Bankruptcy Code.

(iv)    *Treatment*:  Holders of Allowed Secured Lenders' SPV Deficiency Claims shall receive a ratable distribution out of the Available Cash, if any, after all Administrative Claims, Secured Lenders' SPV Superpriority Claims, Priority Tax Claims, and Other Priority Claims at the applicable Debtor have been satisfied in full in Cash, up to the total amount of the Allowed Secured Lenders' SPV Deficiency Claims in full and final satisfaction of such Claims, payable on the initial Distribution Date and from time to time thereafter and otherwise in accordance with this Plan.  In no event shall the Holder of a Secured Lenders' SPV Deficiency Claim receive Distributions on account of such Claim in excess of the Allowed amount of such Claim.

(v)    *Voting*:  Claims in Class 11 are Impaired.  Pursuant to section 1126(g) of the Bankruptcy Code, each Holder of an Allowed Secured Lenders' SPV Deficiency Claim is conclusively deemed to have rejected this Plan. Therefore, each Holder of an Allowed Secured Lenders' SPV Deficiency Claim is not entitled to vote to accept or reject this Plan.

e.    *Class 12 – Existing DVB Guarantee Claim*

(i)    *Claims in Class:*  Class 12 consists of the Existing DVB Guarantee Claim.

(ii)    *Settlement*:  This Plan and the treatment of the Existing DVB Guarantee Claim provided for herein incorporate the terms of a settlement between the Holders of the Existing DVB Guarantee Claim, the Creditors' Committee, and the Debtors.  Confirmation of this Plan shall constitute approval of such settlement in accordance with Bankruptcy Rule 9019.

(iii)    *Allowance*:  The Existing DVB Guarantee Claim shall be an Allowed Claim against Toisa Horizon, Inc. in accordance with the Bankruptcy Code.

(iv)    *Treatment*:  The Holder of the Existing DVB Guarantee Claim shall receive a Pro Rata Distribution out of the Available Cash at Toisa Horizon, Inc., if any, after Distributions to Holders of any Secured Lenders' Superpriority Claims against Toisa Horizon have been made and such Claims have been satisfied in full.  Distributions on account of the Existing DVB Guarantee Claim, if any, shall be in full and final satisfaction of such Claim, payable on the initial Distribution Date and from time to time thereafter, and

33

otherwise in accordance with this Plan and applicable Cash Collateral Order.  In no event shall the Holder of the Existing DVB Guarantee Claim receive Distributions on account of such Claim in excess of the Allowed amount of such Claim.

(v)    *Voting:*  Claims in Class 12 are Impaired.  Pursuant to section 1126(g) of the Bankruptcy Code, the Holder of the Allowed Existing DVB Guarantee Claim is conclusively deemed to have rejected this Plan.  Therefore, the Holder of the Allowed Existing DVB Guarantee Claim is not entitled to vote to accept or reject this Plan.

f.    *Class 13 – Existing Danish Ship Offshore Guarantee Secured Claims*

(i)    *Claims in Class*:  Class 13 consists of all Existing Danish Ship Offshore Guarantee Secured Claims.

(ii)    *Settlement*:  This Plan and the treatment of the Existing Danish Ship Offshore Guarantee Secured Claims provided for herein incorporate the terms of a settlement between the Holders of the Existing Danish Ship Offshore Guarantee Secured Claims, the Creditors' Committee, and the Debtors. Confirmation of this Plan shall constitute approval of such settlement in accordance with Bankruptcy Rule 9019.

(iii)    *Allowance*:  Each Existing Danish Ship Offshore Guarantee Secured Claim shall be Allowed Claim against United Leadership Inc. in accordance with the Bankruptcy Code.

(iv)    *Treatment:*  The Holders of Existing Danish Ship Offshore Guarantee Secured Claims shall be entitled to retain all Cash and other Distributions previously received and to be received from the Debtors pursuant to the applicable Cash Collateral Order and the order approving the sale of the *United Leadership* vessel, including any Cash in, or deemed in, the vessel accounts for the *United Leadership* vessel remaining after the Existing Danish Ship Tanker Secured Claims have been satisfied in full, any Cash proceeds from the sale of the *United Leadership* vessel that have been reserved under the order approving the sale of the *United Leadership* vessel but have not been utilized in accordance therewith remaining after the Existing Danish Ship Tanker Secured Claims have been satisfied in full, any other collateral proceeds received, or to be received, by the Debtors in connection with the operation or sale of the *United Leadership* vessel remaining after the Existing Danish Ship Tanker Secured Claims have been satisfied in full; *provided*, *however*, that the Cash proceeds from the sale of the *United Kalavryta* vessel (including amounts that have been reserved under the order approving the sale of the *United Kalavryta* vessel but have not been utilized in accordance therewith) and any other collateral proceeds received, or to be received, by the Debtors in connection with the operation or sale of the *United Kalavryta* vessel shall be deemed to be the proceeds applied first to satisfy the Existing Danish Ship Tanker Secured Claims (prior to any proceeds from the operation or sale of the *United Leadership* being applied to the Existing Danish Ship Tanker Secured Claims), or any other treatment as previously approved by

34

a Final Order, in full and final satisfaction of such Claims.  In no event shall the Holder of an Existing Danish Ship Offshore Guarantee Secured Claim receive Distributions on account of such Claim in excess of the Allowed amount of such Claim.

(v)    *Voting:*  Claims in Class 13 are Impaired.  Pursuant to section 1126 of the Bankruptcy Code, each Holder of an Allowed Existing Danish Ship Offshore Guarantee Secured Claim is entitled to vote to accept or reject this Plan.

g.    *Classes 14-24 – Toisa Credit Facility Claims*

(i)    *Claims in Classes:*  Existing Citizens I Secured Claims (Class 14); Existing Citi Offshore Secured Claims (Class 15); Existing Citizens II Secured Claims (Class 16); Existing Commonwealth Bank of Australia Secured Claims (Class 17); Existing DNB Offshore Secured Claims (Class 18); Existing ING Offshore Secured Claims (Class 19); Existing Wells Fargo Secured Claims (Class 20); Existing BNP Secured Claims (Class 21); Existing Credit Agricole Offshore Secured Claims (Class 22); Existing Danish Ship Offshore Secured Claims (Class 23); Existing DVB Secured Claims (Class 24).

(ii)    *Settlement*:  This Plan and the treatment of Toisa Credit Facility Claims provided for herein incorporate the terms of a settlement between the Holders of Toisa Credit Facility Claims, the Debtors, and the Creditors' Committee.  Confirmation of this Plan shall constitute approval of such settlement in accordance with Bankruptcy Rule 9019.

(iii)    *Allowance*:  Each Toisa Credit Facility Claim shall be an Allowed Claim against Toisa in the amount set forth on Exhibit [2].

(iv)    *Treatment*:  The Holders of Toisa Credit Facility Claims shall be entitled to retain all Cash and other Distributions previously received and to be received through and after the Effective Date from the Debtors or Post-Effective Toisa pursuant to the applicable Cash Collateral Order and the relevant Offshore Vessel sale order, including any Cash in the vessel accounts for the applicable vessel(s), any remaining Cash proceeds from the sale of the applicable vessel(s) that has been reserved under the relevant Offshore Vessel sale order but has not been utilized in accordance therewith as of the Confirmation Date, and any other collateral proceeds received or to be received by the Debtors or Post-Effective Toisa in connection with the applicable vessel, in full and final satisfaction of such Claims.  In no event shall the Holder of a Toisa Credit Facility Claim receive Distributions on account of such Claim (including any amounts to be received pursuant to Section 3.7 of this Plan) in excess of the Allowed amount of such Claim.

(v)    *Voting*:  Claims in Classes 14-24 are Impaired.  Pursuant to section 1126 of the Bankruptcy Code, each Holder of an Allowed Toisa Credit Facility Claim is entitled to vote to accept or reject this Plan.

h.    *Class 25 – Newbuild Tanker Credit Facility Secured Claims*

(i)    *Claims in Class:*  Class 25 consists of all Newbuild Tanker Credit Facility Secured Claims.

(ii)    *Settlement*:  This Plan and the treatment of Newbuild Tanker Credit Facility Secured Claims provided for herein incorporate the terms of a settlement between the Holders of Newbuild Tanker Credit Facility Secured Claims, the Debtors, and the Creditors' Committee.  Confirmation of this Plan shall constitute approval of such settlement in accordance with Bankruptcy Rule 9019.

(iii)    *Allowance*:  Each Newbuild Tanker Credit Facility Secured Claim shall be an Allowed Claim against Toisa in the amount set forth on Exhibit [2].

(iv)    *Treatment*:  The Holders of Newbuild Tanker Credit Facility Secured Claims shall be entitled to retain all Cash and other Distributions previously received and to be received through and after the Effective Date from the Debtors or Post-Effective Toisa pursuant to the applicable Cash Collateral Order, the Newbuild Tanker Sale Order, or any other Final Order approving the sale or assignment of any of the Newbuild Tanker Construction Contracts or Newbuild Tanker Credit Facility Vessels, including any Cash in any vessel accounts for the applicable vessel(s), any remaining Cash proceeds received from the Debtors for the sale or assignment of the Newbuild Tanker Construction Contracts or Newbuild Tanker Credit Facility Vessels that has been reserved under the Newbuild Tanker Sale Order or any other Final Order approving the sale of any of the Newbuild Tanker Construction Contracts or Newbuild Tanker Credit Facility Vessels but has not been utilized in accordance therewith as of the Effective Date, and any other collateral proceeds received or to be received by the Debtors or Post-Effective Toisa in connection with the sale or assignment of a Newbuild Tanker Construction Contract or Newbuild Tanker Credit Facility Vessel, in full and final satisfaction of such Claims.

(v)    *Voting*:  Claims in Classes 25 are Impaired.  Pursuant to section 1126 of the Bankruptcy Code, each Holder of an Allowed Newbuild Tanker Credit Facility Secured Claim is entitled to vote to accept or reject this Plan.

i.    *Class 26 – G550 Airplane Credit Facility Claims*

(i)    *Claims in Class:*  Class 26 consists of all G550 Airplane Credit Facility Claims.

(ii)    *Settlement*:  This Plan and the treatment of the G550 Airplane Credit Facility Claims provided for herein incorporates the terms of a settlement between the Holder of the G550 Airplane Credit Facility Claims and the Debtors.  Confirmation of this Plan shall constitute approval of such settlement in accordance with Bankruptcy Rule 9019.

36

(iii)  *Allowance*:  Each G550 Airplane Credit Facility Claim shall be an Allowed General Unsecured Claim in the amount of $2,937,679.83.

(iv)  *Treatment*:  The G550 Airplane Credit Facility Claims were resolved pursuant to the Stipulation and Agreed Order (A) Granting Motion of Citizens Asset Finance, Inc. for Relief from the Automatic Stay pursuant to 11 U.S.C. §§ 362 and 554 and Fed. R. Bankr. P. 6007 and (B) Authorizing Debtors to Transfer Title to and Surrender Certain Aircraft Beneficially Owned by Estate [Dkt. No. 414].  In no event shall the Holder of a G550 Airplane Credit Facility Claim receive Distributions on account of such Claim in excess of the Allowed amount of such Claim.

(v)  *Voting:*  Claims in Class 26 are Impaired.  Pursuant to section 1126 of the Bankruptcy Code, each Holder of an Allowed G550 Airplane Credit Facility Claim is entitled to vote to accept or reject this Plan.

j.  *Class 27 – Secured Lenders' Toisa GUCs*

(i)  *Claims in Class:*  Class 27 consists of all Secured Lenders' Toisa GUCs.

(ii)  *Settlement:*  This Plan and the treatment of the Secured Lenders' Toisa GUCs provided for herein, incorporates the terms of a settlement between the Holders of Secured Lenders' Toisa GUCs, the Debtors, and the Creditors' Committee.  Confirmation of this Plan shall constitute approval of such settlement in accordance with Bankruptcy Rule 9019.

(iii)  *Allowance:*  Each Secured Lenders' Toisa GUC shall be an Allowed Claim against Toisa in accordance with the Bankruptcy Code.

(iv)  *Treatment:*  The Holders of Secured Lenders' Toisa GUCs shall receive a Pro Rata Distribution out of the Available Cash at Toisa, if any, after Distributions to Holders of Secured Lenders' Toisa Superpriority Claims have been made and such Claims have been satisfied in full in Cash. Distributions on account of the Secured Lenders' Toisa GUCs, if any, shall be in full and final satisfaction of such Claims, payable on the initial Distribution Date and from time to time thereafter, and otherwise in accordance with this Plan and applicable Cash Collateral Order.  In no event shall the Holder of a Secured Lenders' Toisa GUC receive Distributions on account of such Claim in excess of the Allowed amount of such Claim.

(v)  *Voting*:  Claims in Class 27 are Impaired.  Pursuant to section 1126(g) of the Bankruptcy Code, each Holder of an Allowed Secured Lenders' Toisa GUC is conclusively deemed to have rejected this Plan. Therefore, each Holder of an Allowed Secured Lenders' Toisa GUC is not entitled to vote to accept or reject this Plan.

k.    *Class 28 – T&T General Unsecured Claims*

(i)    *Claims in Class:*  Class 28 consists of all T&T General Unsecured Claims, including Secured Lenders' T&T Guarantee Claims.

(ii)    *Settlement:*  This Plan and the treatment of the T&T General Unsecured Claims provided for herein, incorporates the terms of a settlement between the Holders of T&T General Unsecured Claims, the Debtors, and the Creditors' Committee.  Confirmation of this Plan shall constitute approval of such settlement in accordance with Bankruptcy Rule 9019.

(iii)    *Allowance:*  Each T&T General Unsecured Claim shall be an Allowed Claim against T&T in accordance with the Bankruptcy Code.

(iv)    *Treatment:*  The Holders of T&T General Unsecured Claims shall receive a Pro Rata Distribution out of the Available Cash at T&T, if any, after Distributions to Holders of Secured Lenders' T&T Superpriority Claims have been made and such Claims have been satisfied in full.  Distributions on account of T&T General Unsecured Claims, if any, shall be in full and final satisfaction of such Claims, payable on the initial Distribution Date and from time to time thereafter, and otherwise in accordance with this Plan and applicable Cash Collateral Order.  In no event shall the Holder of a T&T General Unsecured Claim receive Distributions on account of such Claim in excess of the Allowed amount of such Claim.

(v)    *Voting*:  Claims in Class 28 are Impaired.  Pursuant to section 1126(g) of the Bankruptcy Code, each Holder of an Allowed T&T General Unsecured Claim is conclusively deemed to have rejected this Plan.  Therefore, each Holder of an Allowed General T&T Unsecured Claim is not entitled to vote to accept or reject this Plan.

l.    *Class 29 – Class 29 General Unsecured Claims*

(i)    *Claims in Class:*  Class 29 consists of all Class 29 General Unsecured Claims.

(ii)    *Settlement*:  This Plan and the treatment of the Class 29 General Unsecured Claims provided for herein incorporates the terms of a settlement between the Creditors' Committee and the Debtors.  Confirmation of this Plan shall constitute approval of such settlement in accordance with Bankruptcy Rule 9019.

(iii)    *Treatment:*  Within ninety (90) days after the Effective Date or, if such Class 29 General Unsecured Claim becomes Allowed after the Effective Date, as soon as reasonably practicable after the date at which such Class 29 General Unsecured Claim becomes Allowed, each Holder of an Allowed Class 29 General Unsecured Claim shall receive, in full and final satisfaction, settlement, and release of and in exchange for, such Claim, its ratable share of the General Unsecured Claims Distribution Reserve set forth in Section 6.7 of the

Plan to be distributed to Holders of Allowed Class 29 General Unsecured Claims. Holders of Allowed Class 29 General Unsecured Claims who received any payment from the Debtors during the Chapter 11 Cases pursuant to any order of the Bankruptcy Court shall not be excluded from receiving Distributions under the Plan on account of such Claims unless such Claims were fully satisfied by any prior payments from the Debtors; *provided*, *however*, that Distributions on account of such Claims shall be made only to the extent such Claims were not previously satisfied.  The Debtors reserve all rights to challenge the legal basis and amount of any asserted Class 29 General Unsecured Claim, and each such Holder reserves all rights and defenses with respect to any such challenge.

(iv)  *Voting:*  Claims in Class 29 are Impaired.  Pursuant to section 1126 of the Bankruptcy Code, each Holder of an Allowed General Unsecured Claim is entitled to vote to accept or reject this Plan.

m.  *Class 30 – Personal Injury Claims*

(i)  *Claims in Class:*  Class 30 consists of any Personal Injury Claims.

(ii)  *Treatment:*  All injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date or the date indicated in any order providing for such injunction or stay; *provided*, *however*, that upon such conditions precedent being satisfied, Holders of Allowed Personal Injury Claims shall have recourse on account of such Allowed Personal Injury Claims only to the applicable insurance policy, subject to the terms and conditions of any applicable insurance policy and the full reservation of rights of any insurer with respect to the insured portion, if any, of such Claims.  Nothing shall preclude the Holder of a Personal Injury Claim from pursuing any applicable insurance after the injunction or stay is no longer in full force and effect, or from seeking discovery in actions against third parties, or from pursuing third-party insurance that does not cover Claims against the Debtors.  Any Holder of a Personal Injury Claim (or portion thereof) that is not the subject of insurance coverage, can elect to fix their claim to be treated as a Class 29 General Unsecured Claim, subject to ratable distribution from the General Unsecured Claims Distribution Reserve up to the total amount of such Allowed Personal Injury Claim in full and final satisfaction of such Claim, payable on the initial Distribution Date in accordance with this Plan.  In no event shall the Holder of an Allowed Personal Injury Claim receive Distributions on account of such Claim in excess of the Allowed amount of such Claim.

(iii)  *Voting:*  Claims in Class 30 are Impaired.  Pursuant to section 1126 of the Bankruptcy Code, each Holder of an Allowed Personal Injury Claim is entitled to vote to accept or reject this Plan.

n.    *Class 31 – Intercompany Claims*

(i)    *Claims in Class:*  Class 31 consists of all Intercompany Claims.

(ii)    *Treatment:*  On or prior to the Effective Date, all Intercompany Claims shall be cancelled.

(iii)    *Voting:*  Claims in Class 31 are Impaired.  Pursuant to section 1126(g) of the Bankruptcy Code, each Holder of an Intercompany Claim is conclusively deemed to have rejected this Plan.  Therefore, each Holder of an Intercompany Claim is not entitled to vote to accept or reject this Plan.

o.    [*Class 32 – Interests in Toisa*

(i)    *Interests in Class*:  Class 32 consists of all Interests in Toisa.

(ii)    *Treatment*:  On the Effective Date, all Interests shall be reinstated as Interests in Post-Effective Toisa to be held by the Shareholder Nominee while Post-Effective Toisa is wound down by the Plan Administrator pursuant to Section 5.1 herein.[3]

(iii)    *Voting*:  Interests in Class 32 are Impaired.  Pursuant to section 1126(g) of the Bankruptcy Code, each Holder of an Interest in Toisa is conclusively deemed to have rejected this Plan.  Therefore, each Holder of an Interest in Toisa is not entitled to vote to accept or reject this Plan.]

p.    *Class 33 – Intercompany Interests in Other Debtors*

(i)    *Interests in Class*:  Class 33 consists of all Intercompany Interests in each Debtor except (a) the Interests in Toisa, (b) Toisa's Interest in T&T, and (c) T&T's Interests in certain SPV Debtors.

(ii)    *Treatment*:    Except as otherwise provided herein, all Intercompany Interests in each Debtor are being cancelled on the Effective Date, except (a) the Interests in Toisa, (b) Toisa's Interest in T&T, and (c) T&T's Interest in the following SPV Debtors:  Trade Prosperity, Inc.; Trade Vision, Inc.; Trade Will, Inc.; Trade Unity, Inc.; Trade Quest, Inc.; Trade Spirit, Inc.; and Trade Resource, Inc.

(iii)    *Voting*:  Interests in Class 33 are Impaired.  Pursuant to section 1126(g) of the Bankruptcy Code, each Holders of an Intercompany

---

[3]    Subject to ongoing legal diligence and review.

Interest is conclusively deemed to have rejected the Plan. Therefore, each Holder of an Intercompany Interest is not entitled to vote to accept or reject the Plan.

3.5 *No Substantive Consolidation.* Although the Plan is presented as a joint plan of liquidation, this Plan does not provide for the substantive consolidation of the Estates, and on the Effective Date, the Estates shall not be deemed to be substantively consolidated for any reason. Nothing in this Plan or the Disclosure Statement shall constitute or be deemed to constitute an admission that any one or all of the Debtors is subject to or liable for any Claims against any other Debtor. A Claim against multiple Debtors will be treated as a separate Claim against each applicable Debtor's Estate for all purposes including voting and distribution; *provided*, *however*, that no Claim will receive value in excess of one hundred percent (100%) of the Allowed amount of such Claim.

3.6 *Reimbursement of Payment for Legal Services.* On the Effective Date, $325,000 of the Diavaz Settlement Proceeds in the Diavaz Agreement Account (as defined in the Diavaz Settlement Order) shall be distributed Pro Rata to the Holders of Secured Lenders' Superpriority Claims against Toisa as repayment for Toisa advancing $325,000 to Sealion pursuant to the Amended Twenty-Third Interim Order (I) Authorizing Continued Use of Existing Cash Management Practices, Bank Accounts, and Business Forms, (II) Waiving Investment and Deposit Requirements, and (III) Authorizing Continuance of Intercompany Transactions to Permit Debtor Toisa Limited to Advance Funds for Budgeted Items Subject to a Right of Reimbursement from the Appropriate Section 363 Sale Proceeds, entered on October 25, 2018 [Dkt. No. 873] to pay for legal services rendered to Sealion.

3.7 *Distribution of Diavaz Settlement Proceeds.* On the Effective Date, all of the Diavaz Settlement Proceeds already received and held by Post-Effective Toisa in the Diavaz Agreement Account (as defined in the Diavaz Settlement Order), minus the amounts to be distributed pursuant to Section 3.6 hereof, shall be paid to [_____] as reflected in the amounts listed on Exhibit [__]. After the Effective Date, any Diavaz Settlement Proceeds received by Post-Effective Toisa shall be distributed by the [Plan Administrator, as soon as practicable after receipt, in accordance with the terms of the agreement governing the Plan Administrator to be included in the Plan Supplement. In no event shall the Secured Lender(s) receiving Distributions pursuant to this Section 3.7 receive Distributions pursuant to this Plan in excess of the Allowed amount of such Secured Lender(s)' Claims and any Distributions received by a Secured Lender pursuant to this Section 3.7 shall count as a Distribution made pursuant to Section 3.4(g) of this Plan for purposes of determining whether such Secured Lender has received Distributions in excess of the Allowed amount of such Secured Lender's Claims.]

3.8 *Unencumbered Funds Received Post-Effective Date.* Any funds or proceeds of Toisa Limited assets, which are otherwise unencumbered and are not subject to a Lien or other security interest, and are collected after the Effective Date of this Plan, shall be used to make indefeasible payments in Cash to Holders of the Secured Lenders' Superpriority Claims against Toisa until such applicable claims are satisfied in full in Cash.

3.9    ***Enforcement of Subordination Agreements.***  Notwithstanding any provision herein to the contrary, in accordance with section 510 of the Bankruptcy Code, subordination agreements or arrangements to which any Debtor is a party, are enforceable, and nothing in this Plan shall affect or otherwise alter any such subordination agreement.

3.10    ***Alternative Treatment.***  Notwithstanding any provision herein to the contrary, any Holder of an Allowed Claim may receive, instead of the Distribution or treatment to which it is entitled hereunder, any other Distribution or treatment to which it and the Debtors may agree in writing or as otherwise provided under a Final Order; *provided, however*, that under no circumstance may the Debtor agree to provide any other Distribution or treatment to any Holder of an Allowed Claim that would adversely affect the Distribution or treatment provided to any other Holder of an Allowed Claim.

3.11    ***Special Provision Regarding Unimpaired Claims.***  Except as otherwise provided in this Plan, nothing shall affect the Debtors' rights and defenses, both legal and equitable, with respect to any Unimpaired Claims, including but not limited to all rights with respect to legal and equitable defenses to setoffs against or recoupments of Unimpaired Claims.

## ARTICLE IV
## ACCEPTANCE OR REJECTION OF THIS PLAN

4.1    ***Acceptance by Class Entitled to Vote.***  Classes 2, 3, 4, 5, 6, 7, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 29, and 30 are the Classes of Claims of the Debtors that are entitled to vote to accept or reject this Plan.  Classes 2, 3, 4, 5, 6, 7, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 29, and 30 shall have accepted this Plan if (a) the Holders of at least two-thirds in amount of the Allowed Claims actually voting in each Class have voted to accept this Plan and (b) the Holders of more than one-half in number of the Allowed Claims actually voting in each Class have voted to accept this Plan, not counting the vote of any Holder designated under section 1126(e) of the Bankruptcy Code.  If there are no votes cast in a particular Class that is entitled to vote on this Plan, then this Plan shall be deemed accepted by such Class.

4.2    ***Presumed Acceptance of This Plan.***  Classes 1, 8, 9, and 10 are Unimpaired.  Therefore, such Classes are deemed to have accepted this Plan by operation of law and are not entitled to vote to accept or reject the Plan.

4.3    ***Presumed Rejection of This Plan.***  Classes 11, 12, 27, 28, 31, 32 and 33 are Impaired and will receive no Distribution under this Plan.  Therefore, such Classes are deemed to have rejected this Plan by operation of law and are not entitled to vote to accept or reject this Plan.

4.4    ***Elimination of Classes.***  To the extent applicable, any Class that does not contain any Allowed Claims or any Claims temporarily allowed for voting purposes under Bankruptcy Rule 3018, as of the date of the commencement of the Confirmation Hearing, shall be deemed to have been deleted from this Plan for

42

purposes of (a) voting to accept or reject this Plan and (b) determining whether it has accepted or rejected this Plan under section 1129(a)(8) of the Bankruptcy Code.

4.5    *Cramdown.*  The Debtors request Confirmation of this Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to modify this Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

## ARTICLE V
## MEANS FOR IMPLEMENTATION OF THIS PLAN

The Plan is a joint chapter 11 plan for each of the Debtors, with the chapter 11 plan for each Debtor being non-severable and mutually dependent on the chapter 11 plan for each other Debtor.

5.1    *Plan Administrator.*

(a)    *Appointment.*  The Plan Administrator shall be appointed and approved as set forth in the Plan Supplement.

(b)    *Authority.*  The Plan Administrator shall have the authority and right on behalf of each of the Debtors, without the need for Bankruptcy Court approval (unless otherwise indicated in this Plan), to carry out and implement all provisions of this Plan, including, without limitation, to:

(i)    except to the extent Claims have been previously Allowed, control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise, or settle any and all Claims against the Debtors;

(ii)    make Distributions to Holders of Allowed Claims in accordance with this Plan;

(iii)    exercise his reasonable business judgment to direct and control the wind down, liquidation, sale (including, for the avoidance of doubt, completion of the sales of any Offshore Vessels or Oceangoing Vessels, as the case may be), and/or abandoning of the remaining assets of the Debtors under this Plan, and in accordance with applicable law as necessary to maximize Distributions to Holders of Allowed Claims;

(iv)    prosecute all Causes of Action on behalf of the Debtors, elect not to pursue any Causes of Action, and determine whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Causes of Action, as the Plan Administrator may determine is in the best interests of the Debtors and/or Post-Effective Toisa;

43

(v)   make payments of reasonable and documented fees and expenses of existing professionals who will continue to perform in their current capacities;

(vi)  retain professionals to assist in performing its duties under this Plan;

(vii) maintain the books and records and accounts of the Debtors and Post-Effective Toisa;

(viii) invest Cash of the Debtors and Post-Effective Toisa, including any Cash proceeds realized from the liquidation of any assets of the Debtors and Post-Effective Toisa, including any Causes of Action, and any income earned thereon;

(ix)  incur and pay reasonable, documented and necessary expenses in connection with the performance of duties under this Plan;

(x)   administer each Debtor's and Post-Effective Toisa's tax obligations, including (i) filing tax returns and paying tax obligations, (ii) requesting, if necessary, an expedited determination of any unpaid tax liability of each Debtor or its estate under section 505(b) of the Bankruptcy Code for all taxable periods of such Debtor ending after the Commencement Date through the liquidation of such Debtor as determined under applicable tax laws, and (iii) representing the interest and account of each Debtor or its estate and Post-Effective Toisa before any taxing authority in all matters including, without limitation, any action, suit, proceeding, or audit;

(xi)  prepare and file any and all informational returns, reports, statements, or disclosures relating to the Debtors and Post-Effective Toisa that are required hereunder, by any Governmental Unit or applicable law;

(xii) determine whether to create a liquidating trust for the assets of a Debtor and which assets to transfer to such liquidating trust;

(xiii) pay statutory fees in accordance with Section 12.1 of this Plan; and

(xiv) perform other duties and functions that are consistent with the implementation of this Plan.

(c)        *Indemnification*.   Each of the Debtors shall indemnify and hold harmless the Plan Administrator for any losses incurred in such capacity,

44

except to the extent such losses were the result of the Plan Administrator's gross negligence, willful misconduct, or criminal conduct.

(d)        *Procedures*.  The procedures governing the compensation, term, and reporting and oversight of the Plan Administrator will be set forth in the Plan Supplement.

5.2    ***Merger of Debtors; Closing Cases of Debtor Affiliates.***  On the Effective Date: (i) all of the Debtors shall be merged into Toisa and the Plan Administrator may dissolve such Debtors other than Post-Effective Toisa and complete the winding up of such Debtors without the necessity for any other or further actions to be taken by or on behalf of such dissolving Debtor or its shareholder or any payments to be made in connection therewith, other than the filing of a certificate of dissolution with the appropriate governmental authorities; (ii) all assets of the Debtors shall be transferred to Toisa, and all claims filed or scheduled in the affiliated Debtors' cases shall be deemed to have been filed in the Chapter 11 Case of Toisa; and (iii) the Chapter 11 Cases of each Debtor other than Toisa shall be closed.  In the discretion of Post-Effective Toisa, after the Effective Date, Toisa may engage in any other transaction in furtherance of this Plan.  Such transactions will include the wind down of Post-Effective Toisa in accordance with applicable law.  Any such transactions may be effective as of the Effective Date pursuant to the Confirmation Order without any further action by the stockholders, members, general or limited partners, or directors of any of the Debtors.

5.3    ***Corporate Action.***  Upon the Effective Date, by virtue of entry of the Confirmation Order, all actions contemplated by this Plan (including any action to be undertaken by the Plan Administrator) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, the Debtors, or any other Entity or Person.  All matters provided for in this Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Debtors or the Estates and ratified in all respects without any requirement of further action by shareholders, members, creditors, directors, or managers of the Debtors.

5.4    ***Withholding and Reporting Requirements.***  In connection with this Plan, any party issuing any instrument or making any distribution described in this Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, local, or non-U.S. taxing authority, and all Distributions pursuant to this Plan and all related agreements shall be subject to any such withholding or reporting requirements.  Notwithstanding the foregoing, each Holder of an Allowed Claim or any other Person that receives a Distribution pursuant to this Plan shall have responsibility for any taxes imposed by any Governmental Unit, including, without limitation, income, withholding, and other taxes, on account of such Distribution. Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for U.S. federal income tax purposes) and then, to the extent the Distribution exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.  Any party issuing any instrument or

45

making any distribution pursuant to this Plan has the right, but not the obligation, to not make a distribution until such Holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations. Any party entitled to receive any property as an issuance or Distribution under this Plan shall, upon request, deliver to the Plan Administrator or such other Person designated by the Plan Administrator (which entity shall subsequently deliver to the Plan Administrator any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or (if the payee is a foreign Person) Form W-8, unless such Person is exempt under the tax code and so notifies the Plan Administrator. If such request is made by the Plan Administrator or such other Person designated by the Plan Administrator and the Holder fails to comply before the date that is 180 days after the request is made, the amount of such Distribution shall irrevocably revert to the Debtors and any Claim in respect of such Distribution shall be discharged and forever barred from assertion against any Debtor and its respective property.

5.5     *Exemption from Certain Transfer Taxes.*  To the maximum extent provided by section 1146(a) of the Bankruptcy Code, any Post-Effective sale by any Debtor, or any transfer from any Entity pursuant to, in contemplation of, or in connection with this Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors; or (2) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to this Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, in each case to the extent permitted by applicable bankruptcy law, and the appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

5.6     *Preservation of Retained Actions.*  Other than Causes of Action against an Entity that are waived, relinquished, exculpated, released, compromised, or settled in this Plan or by a Bankruptcy Court order, the Debtors reserve any and all Causes of Action. On and after the Effective Date, the Plan Administrator may pursue such Causes of Action in its sole discretion. No Entity may rely on the absence of a specific reference in this Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Plan Administrator will not pursue any and all available Causes of Action against them. No preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. Prior to the Effective Date, the Debtors, and on and after the Effective Date, the Plan Administrator shall retain and shall have, including through its authorized agents or representatives, the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order,

or approval of the Bankruptcy Court. Notwithstanding anything contained herein to the contrary, the settlement of any Claims and Causes of Action which are expressly to be settled by Confirmation of this Plan itself shall be resolved only by Confirmation of this Plan itself. After the Chapter 11 Case of Debtors has been fully administered, the Plan Administrator shall seek authority from the Bankruptcy Court to close such Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules. For the avoidance of doubt, Causes of Action against the Shareholder are waived and released in accordance with and subject to the limitations in the Shareholder Release as set forth in 10.4(d) of this Plan.

5.7    ***Provisions of Cash Collateral Orders Binding.*** The provisions of the Cash Collateral Orders (including the Debtors' stipulations, admissions, and releases) are hereby binding upon the Debtors, the Creditors' Committee, Post-Effective Toisa, the Plan Administrator, and all other parties in interest for all purposes.

5.8    ***Sources of Cash for Distributions and Operations.*** Post-Effective Toisa shall make the payments required by this Plan for Post-Effective Date operations from the reserves established per this Plan.

5.9    ***New Board of Post-Effective Toisa.*** The members of the Board of Post-Effective Toisa shall be identified in the Plan Supplement.

5.10    ***Effectuating Documents; Further Transactions.*** Each of the Debtors and Post-Effective Toisa, and their respective officers and designees, is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan, or to otherwise comply with applicable law.

5.11    ***Further Authorization.*** The Debtors and Post-Effective Toisa shall be entitled to seek such orders, judgments, injunctions, and rulings as they deem necessary to carry out the intentions and purposes, and to give full effect to the provisions, of this Plan.

5.12    ***Cancellation of Existing Securities and Agreements.*** Except as provided in this Plan or in the Confirmation Order, on the Effective Date, all notes, stock, instruments, certificates, agreements, side letters, fee letters, and other documents evidencing or giving rise to Claims and Interests in the Debtors shall be cancelled, and the obligations of the Debtors thereunder or in any way related thereto shall be fully released, terminated, extinguished, and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote, or other approval or authorization by any Person. The Holders of or parties to such notes, stock, instruments, certificates, agreements, side letters, fee letters, and other documents shall have no rights arising from or relating to such notes, stock, instruments, certificates, agreements, side letters, fee letters, and other documents or the cancellation thereof, except the rights provided pursuant to this Plan and the Confirmation Order.

## ARTICLE VI
## PROVISIONS GOVERNING DISTRIBUTIONS

6.1     *Distribution Record Date.*   As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors or their respective agents, shall be deemed closed, and there shall be no further changes in the record of Holders of any of the Claims or Interests.  The Debtors and Post-Effective Toisa shall have no obligation to recognize any transfer of the Claims or Interests occurring on or after the Distribution Record Date.

6.2     *Allowed Claims*.  Notwithstanding any provision herein to the contrary, the Debtors or Post-Effective Toisa shall make Distributions only to Holders of Allowed Claims.  A Holder of a Disputed Claim shall receive a Distribution on account thereof only when and to the extent that such Holder's Disputed Claim becomes an Allowed Claim.

6.3     *Distributions for Claims Allowed as of the Effective Date.* Except as otherwise provided under this Plan or as ordered by the Bankruptcy Court, Distributions to be made on account of Claims that are Allowed Claims as of the Effective Date shall be made on the Effective Date or as soon thereafter as is reasonably practicable.  Any Distribution to be made on the Effective Date pursuant to this Plan shall be deemed as having been made on the Effective Date if such Distribution is made on the Effective Date or as soon thereafter as is reasonably practicable.  Any payment or Distribution required to be made under this Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

6.4     *Interest and Penalties on Claims.*  Unless otherwise specifically provided for in this Plan or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest and penalties shall not accrue or be paid on any Claim, and no Holder of a Claim shall be entitled to interest and penalties accruing on or after the Petition Date through the date such Claim is satisfied in accordance with the terms of this Plan.

6.5     *Delivery of Distributions.*   In the event that any Distribution to any Holder is returned as undeliverable, no Distribution to such Holder shall be made unless and until the Debtors or Post-Effective Toisa, as applicable, has determined the then current address of such Holder, at which time such Distribution shall be made to such Holder without interest; *provided, however*, such Distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six (6) months from the date the such Distribution is made.  After such date, all unclaimed property or interests in property shall revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) to Post-Effective Toisa automatically and without need for a further order by the Bankruptcy Court for distribution in accordance with this Plan and the Claim of any such Holder to such property or interest in property shall be released, settled, compromised, and forever barred.

48

6.6     **Manner of Payment Under Plan.**  At the option of the Debtors or Post-Effective Toisa, any Cash payment to be made hereunder may be made by a check or wire transfer.

6.7     **General Unsecured Claims Distribution Reserve.**  On or as reasonably practicable after the Effective Date, the Debtors or Post-Effective Toisa shall establish and fund the General Unsecured Claims Distribution Reserve which shall be an account separate and apart from the Debtors' general operating funds to be maintained in trust for the benefit of Holders of Allowed Class 29 General Unsecured Claims and funded in the amount of not less than $500,000.  Distributions from the General Unsecured Claims Distribution Reserve to Holders of Allowed Class 29 General Unsecured Claims shall be made in accordance with the provisions governing Distributions set forth in Article VII.

6.8     **Minimum Cash Distributions.**  If either (a) all Allowed Claims have been paid in full or (b) the aggregate amount of Cash available for Distributions to Holders of Allowed Claims is less than $1,000, then no further Distribution shall be made by the Plan Administrator, and the Plan Administrator can elect to give funds to a charity selected by the board of Post-Effective Toisa.

6.9     **Setoffs.**  The Debtors and Post-Effective Toisa may, but shall not be required to, set off against any Claims of any nature whatsoever that the Debtors or Post-Effective Toisa may have against the Holder of a Claim; *provided* that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or Post-Effective Toisa of any Claim the Debtors or Post-Effective Toisa may have against the Holder of such Claim.

6.10     **Payment of Disputed Claims.**  As Disputed Claims are resolved pursuant to Section 7 herein, the Debtors or Post-Effective Toisa shall make Distributions on account of such Disputed Claims as if such Disputed Claims were Allowed Claims as of the Effective Date.  Such Distributions shall be made on the first Distribution Date that is at least forty-five (45) days after the date on which a Disputed Claim becomes an Allowed Claim, or on an earlier date selected by the Debtors or Post-Effective Toisa in the Debtors' or Post-Effective Toisa's sole discretion.

## ARTICLE VII
## PROCEDURES FOR DISPUTED CLAIMS

7.1     **Allowance of Claims.**  After the Effective Date, the Debtors or Post-Effective Toisa shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claims, except with respect to any Claim deemed Allowed under this Plan or as otherwise Allowed in a Final Order of the Bankruptcy Court.  Except as expressly provided in this Plan or in any order entered in these Chapter 11 Cases prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under this Plan or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in these Chapter 11 Cases allowing such Claim.

7.2     *Objections to Claims.*  As of the Effective Date, objections to, and requests for estimation of, Claims against the Debtors may be interposed and prosecuted only by the Debtors or Post-Effective Toisa.  Such objections and requests for estimation shall be served and filed (a) on or before the 90th day following the later of (i) the Effective Date and (ii) the date that a proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a Holder of such Claim, or (b) such later date as ordered by the Bankruptcy Court upon a motion filed by the Debtors or Post-Effective Toisa.

7.3     *Estimation of Claims.*  The Debtors or Post-Effective Toisa may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtors or Post-Effective Toisa previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors or Post-Effective Toisa, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim.  All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

7.4     *Establishment of Reserve Account.*  The Debtors or Post-Effective Toisa shall reserve an amount sufficient to pay Holders of Disputed Claims the amount such Holders would be entitled to receive under this Plan if such Claims were to become Allowed Claims (the "Claims Reserve Account").  In the event the Holders of Allowed Claims have not received payment in full on account of their Claims after the resolution of all Disputed Claims, then the Debtors or Post-Effective Toisa shall make a final Distribution to all Holders of Allowed Claims or if all Allowed Claims have been paid in full, the balance of the Claims Reserve Account shall be returned to Post-Effective Toisa.  Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a Distribution in excess of the Allowed amount of such Claim plus any interest, if any, accruing on such Claim that is actually payable in accordance with this Plan.

7.5     *No Distributions Pending Allowance.*  If an objection to a Claim is filed as set forth in this Article VII, no payment or Distribution provided under this Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

7.6     *Resolution of Claims.*  Except as otherwise provided herein, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with this Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Debtors or Post-Effective Toisa shall retain and may enforce, sue on, settle, or

compromise (or decline to do any of the foregoing) all Claims, Disputed Claims, rights, Causes of Action, suits and proceedings, whether in law or in equity, whether known or unknown, that the Debtors or their estates may hold against any Person, without the approval of the Bankruptcy Court, the Confirmation Order, and any contract, instrument, indenture, or other agreement entered into in connection herewith. The Debtors or Post-Effective Toisa or their successors may pursue such retained Claims, rights, Causes of Action, suits or proceedings, as appropriate, in accordance with the best interests of the Debtors.

7.7    *Disallowed Claims.*    All Claims held by persons or entities against whom or which any of the Debtors or Post-Effective Toisa has commenced a proceeding asserting a Cause of Action under sections 542, 543, 544, 545, 547, 548, 549, or 550 of the Bankruptcy Code shall be deemed "disallowed" Claims pursuant to section 502(d) of the Bankruptcy Code and Holders of such Claims shall not be entitled to vote to accept or reject this Plan. Claims that are deemed disallowed pursuant to this section shall continue to be disallowed for all purposes until the Cause of Action under sections 542, 543, 544, 545, 547, 548, 549, or 550 of the Bankruptcy Code against such party has been settled or resolved by Final Order and any sums due to the Debtors or Post-Effective Toisa from such party have been paid.

## ARTICLE VIII
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

8.1    *Rejection of Executory Contracts and Unexpired Leases.*    Except as otherwise provided in this Plan, all Executory Contracts and Unexpired Leases of the Debtors shall be deemed rejected in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease (a) has previously been assumed or assigned by order of the Bankruptcy Court in effect as of the Effective Date (which order may be the Confirmation Order); (b) is the subject of a motion to assume or assign filed on or before the Effective Date with the consent of the Informal Committee; (c) is identified as an Executory Contract or Unexpired Lease to be assumed or assigned pursuant to the Plan Supplement before the Effective Date; or (d) has expired or terminated pursuant to its own terms.

Unless otherwise provided by an order of the Bankruptcy Court, any Proofs of Claim based on the rejection of the Debtors' Executory Contracts or Unexpired Leases pursuant to this Plan or otherwise, must be filed with Bankruptcy Court and served on the Debtors or the Plan Administrator, as applicable, no later than fourteen (14) days after the earlier of the Effective Date or the effective date of rejection of such Executory Contract or Unexpired Lease.  In addition, any objection to the rejection of an Executory Contract or Unexpired Lease must be filed with the Bankruptcy Court and served on the Debtors or the Plan Administrator, as applicable, no later than fourteen (14) days after service of the Debtors' proposed rejection of such Executory Contract or Unexpired Lease.

Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable

against the Debtors, the Plan Administrator, the Estates, Post-Effective Toisa, or the property of any of the foregoing without the need for any objection by the Debtors or the Plan Administrator, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary. All Allowed Claims arising from the rejection of the Debtors' prepetition Executory Contracts or prepetition Unexpired Leases shall be classified as General Unsecured Claims, except as otherwise provided by order of the Bankruptcy Court.

8.2    *D&O Liability Insurance Policies.*  As of the Effective Date, the D&O Liability Insurance Policies shall be treated as if they were Executory Contracts that are assumed under this Plan. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in this Plan, Confirmation of this Plan shall not discharge, impair, or otherwise modify any indemnity obligations for the Reconstituted Toisa Board or persons to be employed by Post-Effective Toisa assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtors under this Plan as to which no Proof of Claim need be filed.

8.3    *Insurance Policies.*  As of the Effective Date, the provisions of this Plan shall not diminish or impair in any manner the enforceability of coverage of any existing, paid for, insurance policies (and any agreements, documents, or instruments relating thereto) that may cover Claims against the Debtors, any directors, trustees, or officers of the Debtors, or any other Person.

8.4    *Cure of Defaults Under Assumed Contracts.*  Post-Effective Toisa shall cure any monetary defaults under any Executory Contract and Unexpired Lease to be assumed (or assumed and assigned) pursuant to this Plan with the consent of the Informal Committee or as provided previously by the Bankruptcy Court in a Final Order by paying to the non-Debtor counterparty the full amount of any monetary default in the ordinary course of business. Accordingly, no party to an assumed contract (or assumed and assigned contract) need file any cure claim and the Debtors need not file any lists of any proposed cure claims with the Bankruptcy Court. Notwithstanding the foregoing, Post-Effective Toisa and counter-parties to assumed contracts (or assumed and assigned contracts) reserve all their rights in the event of a dispute over the amount of a cure claim. If there is any such dispute that cannot be resolved consensually, then either party must file with the Bankruptcy Court a request for allowance and payment of such cure claim within seventy-five (75) days from the Effective Date. Additionally, the Debtors or Post-Effective Toisa shall be authorized to reject any Executory Contract or Unexpired Lease to the extent that, in the exercise of sound business judgment, either concludes that the amount of the cure claim as determined by the Bankruptcy Court renders assumption of such Executory Contract or Unexpired Lease unfavorable to the Debtors or Post-Effective Toisa.

8.5    *Reservation of Rights.*  Neither the exclusion nor inclusion of any contract or lease, nor anything contained in this Plan, shall constitute an admission by

the Debtors or Post-Effective Toisa that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Estates have any liability thereunder. In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Plan Administrator, as applicable, shall have 60 (sixty) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided in this Plan.

## ARTICLE IX
## CONDITIONS PRECEDENT TO THE CONFIRMATION AND EFFECTIVE DATES

9.1    *Conditions Precedent to the Confirmation Date.*  The following are conditions precedent to the occurrence of the Confirmation Date:

a.    the Bankruptcy Court shall have entered an order in form and substance reasonably acceptable to the Informal Committee approving the Disclosure Statement with respect to the Plan as containing adequate information within the meaning of section 1125 of the Bankruptcy Code;

b.    the Confirmation Order shall be in form and substance reasonably acceptable to the Informal Committee; and

c.    the Plan and the Plan Supplement, including all schedules, documents, supplements, and exhibits thereto shall be in form and substance reasonably acceptable to the Informal Committee.

9.2    *Conditions Precedent to the Effective Date.*  The Debtors shall request that the Confirmation Order include a finding by the Bankruptcy Court that, notwithstanding Bankruptcy Rule 3020(e), the Confirmation Order shall take effect immediately upon its entry.  The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived by the Debtors in accordance with the terms hereof:

a.    the Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably acceptable to the Informal Committee and shall, among other things, provide that the Debtors and Post-Effective Toisa are authorized to take all actions necessary or appropriate to enter into, implement, and consummate the agreements and documents created in connection with this Plan;

b.    the Professional Fee Escrow Account shall have been funded and all amounts authorized as of the Effective Date to be paid to Professionals pursuant to orders of the Bankruptcy Court shall have been paid;

c.    the Claims Reserve Account and the General Unsecured Claims Distribution Reserve shall have been funded;

d.    the Debtors and the Secured Lenders shall have agreed on a budget for funds necessary for the Debtors and Post-Effective Toisa to conduct the orderly

wind-down of their estates and such amounts shall have been funded into a reserve account;

   e. all actions, documents, and agreements necessary to implement and consummate this Plan and the transactions and other matters contemplated thereby shall have been effected or executed;

   f. all governmental and third party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by this Plan shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions; and

   g. the Confirmation Order shall have become a Final Order.

   9.3 ***Waiver of Conditions Precedent.*** Each of the conditions precedent in Section 9.2 may be waived in writing by the Debtors with the consent of the Informal Committee without further order of the Bankruptcy Court.

   9.4 ***Effect of Failure of Conditions to Effective Date.*** Unless otherwise extended by the Debtors, if the Effective Date does not occur or if the Confirmation Order is vacated, (a) no Distributions under this Plan shall be made, (b) the Debtors and all Holders of Claims and Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (c) all the Debtors' obligations with respect to the Claims and the Interests shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other entity or to prejudice in any manner the rights of the Debtors or any other entity in any further proceedings involving the Debtors or otherwise.

**ARTICLE X**
**EFFECT OF PLAN CONFIRMATION**

   10.1 ***Binding Effect.*** Following the Effective Date, this Plan shall be binding upon and inure to the benefit of the Debtors, their Estates, all present and former Holders of Claims and Interests whether or not such Holders voted in favor of this Plan, and their respective successors and assigns.  Confirmation of this Plan does not provide the Debtors with a discharge under section 1141 of the Bankruptcy Code because this Plan is a liquidating chapter 11 plan.  Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Effective Date, the provisions of this Plan shall bind any Holder of a Claim against, or Interest in, the Debtors and such Holder's respective successors and assigns, whether or not the Claim or Interest of such Holder is Impaired under this Plan and whether or not such Holder has accepted this Plan.

   10.2 ***Revesting of Assets.*** Except as otherwise explicitly provided in this Plan, on the Effective Date, all property comprising the Estates (including Retained

Actions, but excluding property that has been abandoned pursuant to an order of the Bankruptcy Court) shall revest in Post-Effective Toisa, free and clear of all Claims, Liens, charges, encumbrances, rights, and Interests of creditors and equity security Holders.  As of the Effective Date, the Debtors or Post-Effective Toisa may operate their businesses and use, acquire, and dispose of their property without supervision of the Bankruptcy Court, and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by this Plan or the Confirmation Order.

10.3    *Compromise and Settlement of Claims, Interests, and Controversies.*  This Plan provides for an allocation of the assets between Holders of Allowed Existing SPV Secured Tanker Claims, Existing SPV Oversecured Claims, Secured Lenders' SPV Deficiency Claims, Existing DVB Guarantee Claim, Toisa Credit Facility Claims, Newbuild Tanker Credit Facility Secured Claims, Secured Lenders' Toisa GUCs, T&T General Unsecured Claims, and Class 29 General Unsecured Claims for Distribution purposes.  The amount of Distributions that are subject to the allocation in the Plan reflects the joint determination by the Debtors, Creditors' Committee, and the Secured Lenders that there are risks to both sides if the legal and factual issues between them are fully litigated.  To avoid those risks, a compromise on those issues is appropriate and in the best interest of all economic stakeholders.

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the Distributions and other benefits provided pursuant to this Plan, the provisions of this Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any Distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of this Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, Post-Effective Toisa may compromise and settle Claims against or Interests in them and Causes of Action against other Persons.

10.4    *Releases and Related Matters*.

a.    Releases by the Debtors

Pursuant to section 1123(b) of the Bankruptcy Code and to the extent allowed by applicable law, and except as otherwise specifically provided in this Plan or the Confirmation Order, for good and valuable consideration, including the service of the Released Parties to facilitate the reorganization efforts or liquidation of the Debtors and the implementation of the Plan, on and after the Effective Date, the Released Parties and the Management Company Released Parties are deemed released by the Debtors, Post-Effective Toisa, and the Estates from any and all Claims (except for Claims of the Debtors against the Management Company Released Parties that are expressly

preserved by a stipulation or other agreement in effect as of Confirmation of the Plan), Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the Debtors, Post-Effective Toisa, or the Estates have asserted or would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the Plan Supplement, or the business or contractual arrangements between any Debtor, Estate or non-Debtor Affiliate, any Released Party or Post-Effective Toisa, the reconciliation of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of this Plan, the Disclosure Statement, the Plan Supplement, or related agreements, instruments, or other documents, or any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; *provided, however* that nothing in this Section 10.4(a) shall be construed to release any party or entity from gross negligence, intentional fraud, willful misconduct, or criminal conduct, as determined by a Final Order of a court of competent jurisdiction.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtors' release, which includes by reference each of the related provisions and definitions contained in this Plan, and, further, shall constitute the Bankruptcy Court's finding that the release is: (1) in exchange for the good and valuable consideration and substantial contributions provided by the Released Parties; (2) a good-faith settlement and compromise of the Claims released by the release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the releasing parties asserting any Claim released pursuant to the releases by the Debtors.

b.    Third-Party Releases by Holders of Claims or Interests

Except as otherwise provided in this Plan or the Confirmation Order, as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including the service of, and contributions by, the Released Parties to facilitate and implement this Plan, including all of the transactions contemplated hereunder and as an integral component of the Plan, each Releasing Party, to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, shall expressly, conclusively, absolutely, unconditionally, irrevocably, generally, individually and collectively, forever release, acquit and discharge the Debtors, Post-Effective Toisa, the Estates, the Released Parties, and the Management Company Released Parties from any and all Claims (except for Claims of the Debtors against the Management Company Released Parties that are expressly preserved by a stipulation or other agreement in effect as of Confirmation of the Plan), Interests, obligations, rights, demands, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims asserted or assertable on behalf of a Debtor, any Claim or Causes of Action asserted or assertable

56

on behalf of any Holder of any Claim against or Interest in the Debtors and any Claims or Causes of Action asserted or assertable on behalf of any other entity, whether known or unknown, matured or unmatured, foreseen or unforeseen, existing or hereafter arising, in law, equity, contract, tort or otherwise, by statute or otherwise, that such Person or Persons (whether individually or collectively), ever had, now has or hereafter can, shall, or may have, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring or liquidation efforts, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan or the Plan Supplement, the business or contractual arrangements between any Debtor, Estate or non-Debtor Affiliate, Post-Effective Toisa and any Released Party, the reconciliation of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, or preparation of this Plan, the Disclosure Statement, the Plan Supplement, or related agreements, instruments, or other documents, or any other act or omission, transaction, agreement, event or other occurrence including or pertaining to the Debtors and taking place on or before the Effective Date; *provided, however*, that nothing in this Section 10.4(b) shall be construed to release any party or entity from gross negligence, intentional fraud, willful misconduct, or criminal conduct, as determined by a Final Order of a court of competent jurisdiction; *provided further, however*, that this Section 10.4(b) shall not release the Debtors, Post-Effective Toisa, the Estates, or the Released Parties from any Cause of Action held by a governmental entity existing as of the Effective Date based on (i) the Internal Revenue Code or other domestic state, city, or municipal tax code, (ii) the environmental laws of the United States or any domestic state, city, or municipality, (iii) any criminal laws of the United States or any domestic state, city, or municipality, (iv) the Securities and Exchange Act of 1934 (as now in effect or hereafter amended), the Securities Act, or other securities laws of the United States or any domestic state, city, or municipality, (v) the Employee Retirement Income Security Act of 1974, as amended, or (vi) the laws and regulations of the Bureau of Customs and Border Protection of the United States Department of Homeland Security.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of this third party release in Section 10.4(b) of the Plan, which includes by reference each of the related provisions and definitions contained in this Plan, and, further, shall constitute the Bankruptcy Court's finding that this third party release is: (1) in exchange for the good and valuable consideration and substantial contributions provided by the Released Parties; (2) a good-faith settlement and compromise of the claims released by the third party release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the releasing parties asserting any claim released pursuant to the third party release.

c.    Third-Party Releases by the Management Companies

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including the service of, and contributions by, the Management Company Released Parties to facilitate and implement this Plan, including all of the transactions contemplated hereunder and as an integral component

of the Plan, each Management Company Released Party, to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, shall expressly, conclusively, absolutely, unconditionally, irrevocably, generally, individually and collectively, forever release, acquit and discharge the Debtors, Post-Effective Toisa, the Estates, and the Released Parties from any and all Claims, Administrative Claims, Interests, obligations, rights, demands, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims asserted or assertable on behalf of a Debtor, any Claim or Causes of Action asserted or assertable on behalf of the Management Company Released Parties, whether known or unknown, matured or unmatured, foreseen or unforeseen, existing or hereafter arising, in law, equity, contract, tort or otherwise, by statute or otherwise, that such Person or Persons (whether individually or collectively), ever had, now has or hereafter can, shall, or may have, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring or liquidation efforts, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan or the Plan Supplement, the business or contractual arrangements between any Debtor, Estate, or non-Debtor Affiliate, Post-Effective Toisa and any Management Company Released Party, the reconciliation of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, or preparation of this Plan, the Disclosure Statement, the Plan Supplement, or related agreements, instruments, or other documents, or any other act or omission, transaction, agreement, event, or other occurrence including or pertaining to the Debtors and taking place on or before the Effective Date; *provided, however*, that nothing in this Section 10.4(b) shall be construed to release any party or entity from gross negligence, intentional fraud, willful misconduct, or criminal conduct, as determined by a Final Order of a court of competent jurisdiction.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of this third party release in Section 10.4(c) of the Plan, which includes by reference each of the related provisions and definitions contained in this Plan, and, further, shall constitute the Bankruptcy Court's finding that this third party release is: (1) in exchange for the good and valuable consideration and substantial contributions provided by the Released Parties; (2) a good-faith settlement and compromise of the claims released by the third party release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the releasing parties asserting any claim released pursuant to the third party release.

d.    Release of Shareholder

Pursuant to the term sheet (the "<u>Term Sheet</u>"), which was approved by the Bankruptcy Court on January 22, 2018 pursuant to Bankruptcy Rule 9019 [Dkt. No. 457], the Debtors, the members of the Informal Committee, and the Creditors' Committee agreed that the Shareholder would be granted a release in the Plan in exchange and consideration (a) for the Shareholder's agreement to facilitate (i) corporate governance changes at the Debtors and (ii) the settlement, collection, and recovery of funds on account of vessel construction contracts or account receivables,

and (b) for his reasonable cooperation with and assistance of Toisa's Chief Restructuring Officer through the effective date of a Chapter 11 plan, as follows (the "Shareholder Release"):

> In exchange and consideration for the Shareholder's agreement to facilitate the expeditious reorganization or liquidation of the Debtors in the Chapter 11 Cases and provide other non-monetary contributions, cooperation, and support, effective on and after the Effective Date, the Debtors, the Informal Committee and the individual lender members thereon, and the Creditors' Committee, to the fullest extent permissible under applicable law, shall conclusively, absolutely, unconditionally, irrevocably, and forever release and discharge the Shareholder from any and all Causes of Action, including any derivative Causes of Action asserted or capable of assertion directly or on behalf of a Debtor or any other Person, that such Person would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' liquidation, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in a plan of reorganization or liquidation in the Chapter 11 Cases, any Cause of Action, the business or contractual arrangements (including, but not limited to, agreements with any of the Management Companies) between any Debtor, Post-Effective Toisa (as applicable), or Estate and the Shareholder, the reconciliation of Claims and Interests before or during the Chapter 11 Cases, including, but not limited to, the negotiation, formulation, or preparation of any plan of reorganization or liquidation in the Chapter 11 Cases, including any supplements or a disclosure statement related thereto or any other related agreements, instruments, or other documents, or any other act or omission, transaction, agreement, event, or other occurrence pertaining to the Debtors and taking place on or before the Effective Date; *provided, however*, that nothing contained herein shall release the Shareholder from any Causes of Action arising from or related to any act or omission that constitutes gross negligence, fraud, willful misconduct, or criminal conduct, and any and all such Causes of Action are expressly preserved; *provided further, however*, that solely with respect to the dividends paid (either directly or indirectly) to the Shareholder by Toisa Limited on or about May 31, 2016, in an amount totaling $20,000,000 (the "Dividends"), the Debtors, the Informal Committee and the individual lender members thereon, and the Creditors' Committee and the individual members thereon, shall be deemed to have released, and may not assert against the Shareholder or any immediate, mediate or subsequent transferee, any Cause of Action for actual fraudulent conveyances under sections 544 and 548 of the Bankruptcy Code or other applicable law.

> For the avoidance of doubt, without limiting the generality and scope of the foregoing, the term "Causes of Action" as used in this section 10.4(c) of the Plan shall include all potential claims relating to (a) the Shareholder's exercise of his fiduciary duties with regard to the HHI contract and settlement, the Diavaz contract and settlement, the Pelagidis litigation, any other claims arising out of any newbuild contract or dispute, or the defense of the IRS claims; (b) the recoupment of costs relating to personal use of corporate aircraft or other corporate property; (c) the recoupment of the payment of any personal expenses by any Debtor, directly or indirectly, to or for the benefit of the Shareholder; (d) any and all dividends made by

**any Debtor, directly or indirectly, to the Shareholder; and (e) any transfer or reallocation of value made by any Debtor, directly or indirectly, to or for the benefit of the Shareholder; excluding any potential claims arising out of or related to any act or omissions that constitutes gross negligence, fraud, willful misconduct or criminal conduct;** *provided, however*, **that any potential claims arising out of or related to any act or omissions that constitutes gross negligence, fraud, willful misconduct, or criminal conduct are excluded.**

The Shareholder Release is incorporated into this Plan.

10.5    *Injunction*

Except as provided in this Plan or the Confirmation Order, as of the Effective Date, all Persons that have held, currently hold, may hold, or allege that they hold, a Claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, or liability that is released or is the subject of the exculpations under this Article X are permanently enjoined from taking any of the following actions against the Debtors, Post-Effective Toisa and their respective Affiliates, or their property on account of any such released Claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, or liability: (a) commencing or continuing, in any manner or in any place, any action or other proceeding; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (c) creating, perfecting, or enforcing any Lien or encumbrance; (d) asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to any released Person; or (e) commencing or continuing any action, in each such case in any manner, in any place, or against any Person that does not comply with or is inconsistent with the provisions of this Plan or the Confirmation Order.

10.6    *Exculpation and Limitation of Liability*

None of the Released Parties or Exculpated Parties shall have or incur any liability to any Entity, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the Disclosure Statement, the formulation, negotiation, or implementation of this Plan, the solicitation of acceptances of this Plan, the pursuit of Confirmation of this Plan, the Confirmation of this Plan, the consummation of this Plan, or the administration of this Plan or the property to be distributed under this Plan, or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring or liquidation of the Debtors; *provided, however*, that the foregoing provisions of this exculpation shall have no effect on the liability of any Released Party that results from any such act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted gross negligence, intentional fraud, willful misconduct, or criminal conduct. Nothing in this Plan shall affect the ability of the United States to pursue any non-Debtors to the extent allowed by non-bankruptcy law for any liabilities that may be related to any federal tax liabilities owed by the Debtors or the Estates. Additionally, the United States may pursue police and regulatory actions or proceedings with respect to the Released Parties in the manner, and by the administrative or judicial tribunals, in which the United States could have pursued such actions or proceedings as if this bankruptcy had never been commenced.

60

10.7    ***Term of Bankruptcy Injunction or Stays.***    Unless otherwise provided, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

10.8    ***Post-Effective Date Retention of Professionals.***    Upon the Confirmation Date any requirement that professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate and Post-Effective Toisa will employ and pay professionals in the ordinary course of business.

## ARTICLE XI
## RETENTION OF JURISDICTION

11.1    ***Retention of Jurisdiction.***    Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction (unless otherwise indicated) over all matters arising in, arising out of, and/or related to, the Chapter 11 Cases and this Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a)    Resolve any matters related to the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which any Debtor is a party or with respect to which any Debtor may be liable and to hear, determine, and, if necessary, liquidate any Claims arising therefrom;

(b)    Decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters and grant or deny any applications involving the Debtors that may be pending on the Effective Date (which jurisdiction shall be non-exclusive as to any such non-core matters);

(c)    Enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan, and all contract instruments, releases, and other agreements or documents created in connection with this Plan, the Disclosure Statement, or the Confirmation Order;

(d)    Resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of this Plan or any contract, instrument, release, or other agreement or document that is executed or created pursuant to this Plan, or any entity's rights arising from or obligations incurred in connection with this Plan or such documents;

(e)    Modify this Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code or modify the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with this Plan or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, this Plan, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection

with this Plan or the Confirmation Order, in such manner as may be necessary or appropriate to consummate this Plan;

   (f) Hear and determine all applications for compensation and reimbursement of expenses of Professionals under this Plan or under sections 330, 331, 503(b), and 1129(a)(4) of the Bankruptcy Code; *provided, however*, that from and after the Confirmation Date, the payment of reasonable and documented fees and expenses of the Debtors or Post-Effective Toisa, including professional fees, shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

   (g) Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation, implementation, or enforcement of this Plan or the Confirmation Order;

   (h) Adjudicate controversies arising out of the administration of the Estates (including Administrative Claims) or the implementation of this Plan;

   (i) Resolve any cases, controversies, suits, or disputes that may arise in connection with General Unsecured Claims, including without limitation, the Bar Date, related notice, claim objections, allowance, disallowance, estimation, and distribution;

   (j) Hear and determine Retained Actions by or on behalf of the Debtors or Post-Effective Toisa;

   (k) Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked, or vacated, or distributions pursuant to this Plan are enjoined or stayed;

   (l) Determine any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with this Plan, the Disclosure Statement, or the Confirmation Order;

   (m) Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases;

   (n) Hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under the Bankruptcy Code; and

   (o) Enter an order or orders closing the Chapter 11 Cases.

## ARTICLE XII
## MISCELLANEOUS PROVISIONS

   12.1 ***Payment of Statutory Fees.*** All fees payable pursuant to section 1930 of title 28 of the United States Code shall be paid on the earlier of when due or the Effective Date.

12.2    *Amendment or Modification of this Plan.*  Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, the Debtors reserve the right to alter, amend, or modify this Plan at any time prior to or after the Confirmation Date but prior to the substantial consummation of this Plan, in each case with the consent of the Informal Committee and any affected Secured Lender not to be unreasonably withheld.  The Debtors will consult with the Shareholder solely with respect to any alteration, amendment, or modification of the Shareholder Release as set forth in Section 10.4(d) of this Plan.  A Holder of a Claim that has accepted this Plan shall be deemed to have accepted this Plan, as altered, amended, or modified, if the proposed alteration, amendment, or modification does not materially and adversely change the treatment of the Claim of such Holder.

12.3    *Substantial Consummation.*  On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

12.4    *Severability of Plan Provisions.*  If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

12.5    *Successors and Assigns.*  This Plan shall be binding upon and inure to the benefit of the Debtors, and their respective successors and assigns, including, without limitation, Post-Effective Toisa.  The rights, benefits, and obligations of any Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Entity.

12.6    *Revocation, Withdrawal, or Non-Consummation.*  The Debtors reserve the right to revoke or withdraw this Plan at any time prior to the Confirmation Date and to file other plans of reorganization or liquidation, in each case with the consent of the Informal Committee not to be unreasonably withheld.  The Debtors will consult with the Shareholder solely with respect to any revocation or withdrawal of the Shareholder Release as set forth in Section 10.4(d) of this Plan.  If the Debtors revoke or withdraw this Plan, or if Confirmation or consummation of this Plan does not occur, then (a) this Plan shall be null and void in all respects, (b) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount any Claim or Class of Claims), assumption of Executory Contracts or Unexpired Leases effected by this Plan, and any document or agreement executed pursuant to this Plan shall be deemed null and void, and (c) nothing contained in this Plan, and no acts taken in preparation

63

for consummation of this Plan, shall (i) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, the Debtors or any other Person, (ii) prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors, or (iii) constitute an admission of any sort by the Debtors or any other Person.

12.7    ***Dissolution of Creditors' Committee.***  On the Confirmation Date, the Creditors' Committee shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases; *provided*, *however*, that after the Confirmation Date, the Creditors' Committee shall exist and its professionals shall continue to be retained and shall continue to be entitled to reasonable compensation by the Debtors solely with respect to (a) all fee applications filed pursuant to sections 330 and 331 of the Bankruptcy Code and any related hearings; and (b) pending appeals of the Confirmation Order; *provided further*, *however*, that the Bankruptcy Court shall retain jurisdiction with respect to any disputes over the reasonableness of fees.

12.8    ***Governing Law.***  Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule in the Plan Supplement provides otherwise, the rights, duties, and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of law thereof.

12.9    ***Time.***  In computing any period of time prescribed or allowed by this Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

12.10    ***Immediate Binding Effect.***  Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of this Plan and Plan Supplement shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, Post-Effective Toisa, the Holders of Claims and Interests, the Released Parties, the Management Company Released Parties, the Exculpated Parties, and each of their respective successors and assigns.

12.11    ***Entire Agreement.***  On the Effective Date, this Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

12.12    ***Notice.***  All notices, requests, and demands to or upon the Debtors or Post-Effective Toisa to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

TOISA LIMITED
Attn: Jonathan "Joff" Mitchell
Chief Restructuring Officer
C/o AlixPartners
909 Third Avenue
New York, New York 10022
Facsimile: (212) 490-1344

     And

TOGUT, SEGAL & SEGAL LLP
Albert Togut
Frank A. Oswald
Kyle J. Ortiz
Brian F. Moore
One Penn Plaza, Suite 3335
New York, New York 10019
Facsimile: (212) 967-4258

Counsel for Debtors and Debtors in Possession

12.13  *Exhibits.*  All Exhibits to this Plan are incorporated and are a part of this Plan as if set forth in full herein.

12.14  *Filing of Additional Documents.*  On or before substantial consummation of this Plan, the Debtors or Post-Effective Toisa shall file such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

Dated:  March 1, 2019
        New York, New York

                    TOISA LIMITED
                    (for itself and on behalf of each of the other
                    Debtors)

                    By:      /s/ Jonathan Mitchell
                    Name:  Jonathan Mitchell
                    Title:    Chief Restructuring Officer